UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW JERSEY MOTORSPORTS PARK, LLC, *et al.*, | Case No. 11-16752 JHW |
| Debtors | Jointly Administered |

**FINAL ORDER (I) AUTHORIZING USE OF CASH
COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION**

Upon the emergency motion (the "Motion") dated March 7, 2011 of New Jersey

Motorsports Park LLC ("NJMP"), New Jersey Motorsports Park Urban Renewal, L.L.C. ("Urban

Renewal"), NJMP Development Associates, LLC ("Development") and NJMP Operating

Company, LLC ("Operating" and, together with NJMP, Urban Renewal and Development, the

"Debtors"), as debtors and debtors in possession, seeking this Court's authorization, pursuant to

Sections 361, 363(c), 363(e) and 363(m) of Title 11 of the United States Code, 11 U.S.C. § 101,

et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001(b), 4001(d) and 9014 of the

Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and the Local

Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"),

to use Cash Collateral (as defined below) and to provide adequate protection to Merrill Lynch

Mortgage Capital Inc. (the "Lender"), as the sole secured lender under (i) that certain Amended

and Restated Building Loan and Security Agreement dated as of March 5, 2010 (the "Loan

Agreement") between the Debtors, as borrowers, and the Lender and (ii) the other Loan

Documents (as that term is defined below), on account of the Prepetition Obligations and the

Prepetition Liens (as those terms are defined below); and upon the Declaration of Lee Brahin,

Co-Managing Member of the Debtors, in support of the Motion; and due and sufficient notice of

the Motion having been given; and a hearing on interim approval of the Motion (the "Interim

Hearing") having been held before this Court on March 10, 2011; and a hearing on final approval

of the Motion (together with the Interim Hearing, the "Hearings") having been held on April 12,

2011; and objections, if any, to the Motion having been withdrawn, resolved or overruled by this

Court; and upon the entire record made at the Hearings; and after due deliberation; and this Court

having found good and sufficient cause appearing therefor;

BASED ON THE RECORD PRESENTED TO THE COURT BY THE

DEBTORS, IT IS HEREBY FOUND THAT:

A.    On March 7, 2011 (the "Petition Date"), the Debtors commenced their

chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter

11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property and

operating and managing their business, as a debtors in possession pursuant to Bankruptcy Code

§§ 1107 and 1108.

B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion

pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion constitutes a core proceeding as defined

in 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Cases and the Motion is proper before this

Court pursuant to 28 U.S.C. § 1408 and 1409.

C.    By interim order entered March 11, 2011 [ECF No. 25] (the "Interim

Order"), the Court granted the Motion on an interim basis.  The Interim Order incorporated

modifications directed by the United States Trustee for the District of New Jersey (the "U.S.

Trustee").

D.    The Debtors acknowledge and agree that they are party to the Loan

Documents (as defined herein) and that, as of the Petition Date, they were indebted to the Lender

under the Loan Documents in the aggregate principal amount of $30,354,205.14, plus accrued

and unpaid interest, fees, costs and expenses (the "Prepetition Obligations").  The Prepetition

Obligations include, among other things: (1) the Raceway Loan made under the Loan

Agreement in the outstanding principal amount of $28,354,205.14 and (2) the Working Capital

Loan made under the Loan Agreement in the outstanding principal amount of $2,000,000.00.

       E.      The Debtors acknowledge and agree that the Prepetition Obligations are

secured by first priority, valid, properly perfected and enforceable liens and security interests

(the "Prepetition Liens") granted by the Debtors to the Lender under the (1) Loan Agreement,

(2) that certain first priority Mortgage and Security Agreement, dated June 20, 2007 (as

amended, restated, replaced or supplemented or otherwise modified from time to time, (the

"Mortgage") executed and delivered by the Debtors to the Lender, (3) that certain Assignment of

Leases and Rents dated as of June 20, 2007 (the "Assignment of Leases and Rents" and,

collectively with the Loan Agreement, the notes evidencing the Prepetition Obligations, the

Mortgage and all other agreements, certificates or other documents now or hereafter evidencing,

guaranteeing, securing or otherwise executed in connection with the Prepetition Obligations, as

the same may be amended, replaced, supplemented or otherwise modified from time to time, the

"Loan Documents") and (4) the Loan Documents, upon and in substantially all of the assets of

the Debtors, including, but not limited to: (u) the Account Collateral (as that term is defined in

the Loan Agreement); (v) the Rate Cap Collateral (as that term is defined in the Loan

Agreement), if any; (w) the Property (as that term is defined in the Mortgage), (x) the Collateral

(as the term is defined in the Mortgage); (y) any and all monies held by the Lender or on behalf

of the Lender, including without limitation, any sums deposited in the Lockbox Account, the

Collection Account, or the Cash Management Account, the Reserve Funds and the Net Proceeds

(as each of those terms is defined in the Mortgage); and (z) all other collateral, rights, claims or

interests (including the Assignment Rights (defined below)) granted, pledged or assigned to the

Lender under each of the other Loan Documents, in each case whether then owned or thereafter acquired or arising, and all proceeds and products thereof (collectively, the "Prepetition Collateral"). For the avoidance of doubt, all of the cash of the Debtors in existence on the Petition Date constitutes Prepetition Collateral, and all such cash, together with all cash that is acquired by the Debtors after the Petition Date constitutes the Lender's cash collateral (the "Cash Collateral") within the meaning of Bankruptcy Code Section 363(a).

F.      The Debtors further acknowledge and agree that, pursuant to the Mortgage and the Assignment of Rents and Leases, the Debtors (1) absolutely and unconditionally assigned all of the Debtors' rights, title and interests in and to, among other things, all current and future Leases and Rents (as those terms are defined in the Mortgage and the Assignment of Rents and Leases), Bankruptcy Claims and Lease Guaranties (as such terms are defined in the Assignment of Rents and Leases); (2) agreed that such assignment constituted a present, absolute assignment and not an assignment for additional security only; (3) agreed to hold the Rents, or a portion thereof sufficient to discharge all current sums due on or in respect of the Prepetition Obligations for use in the payment of such sums; and (4) granted certain other rights to the Lender (the rights, interests, claims and benefits described in subsections (1) through (4) above, the "Assignment Rights"). The Debtors acknowledge and agree that the Assignment Rights include the right to rents and proceeds within the meaning of Section 552(b) of the Bankruptcy Code.

G.      The Debtors further acknowledge and agree that (1) the Loan Documents are valid, duly executed, and binding in accordance with their terms, are supported by reasonably equivalent value and fair consideration and are not void or voidable under any provision of the Bankruptcy Code, applicable non-bankruptcy law or at equity; (2) the Prepetition Obligations are

valid, binding and enforceable obligations of the Debtors in accordance with the terms set forth in the Loan Documents, are supported by reasonably equivalent value and fair consideration and are not void or voidable under any provision of the Bankruptcy Code, applicable non-bankruptcy law or at equity; (3) the Prepetition Liens and other liens and security interests granted to the Lender with respect to the Prepetition Collateral are valid, properly perfected and enforceable liens, mortgages, assignments and security interests in accordance with the terms of the Loan Documents, are supported by reasonably equivalent value and fair consideration and are not void or voidable under any provision of the Bankruptcy Code, applicable non-bankruptcy law or at equity; and (4) the Debtors do not have any claims or causes of action against the Lender under any legal or equitable theory, including, but not limited to, any avoidance actions under chapter 5 of the Bankruptcy Code.

H.    Without prejudice to the rights under Paragraph 17 hereof of any other party in interest, including the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"), the Debtors irrevocably waive any right to any defense, claim, cause of action, counterclaim or offset or contest with respect to (a) the validity, enforceability, or amount of, the Prepetition Obligations or the Loan Documents, or (b) the validity, perfection, priority or enforceability of the Prepetition Liens.

I.    The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their business without the use of the Cash Collateral. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees and otherwise to finance their operations is essential to their continued viability.  In the absence of the use of the Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors'

estates would occur.  The preservation, maintenance and enhancement of the going concern

value of the Debtors and their businesses is of the utmost significance and importance to a

successful reorganization of the Debtors and to the success of the Chapter 11 Cases.

J.      Pursuant to Bankruptcy Code Section 363, notice of the Hearings, which

have been held pursuant to Bankruptcy Rule 4001 and Bankruptcy Code Section 102(1), and the

relief requested in the Motion, has been given to (1) the U.S. Trustee, (2) counsel for the Lender,

(3) the entities listed on the Debtors' Lists of Creditors Holding the 20 Largest Unsecured

Claims; (4) the Committee; and (5) all other parties on which service is required pursuant to the

Local Rules.  No trustee or examiner has been appointed in the Chapter 11 Cases.

K.      The Lender has an economic interest in the Prepetition Collateral

(including the Cash Collateral) that requires protection under Sections 361 and 363 of the

Bankruptcy Code.  The Lender is entitled, pursuant to Sections 361 and 363(e) of the Bankruptcy

Code, to adequate protection of such interest equal in amount to the degree of diminution in

value of the Lender's interest in the Prepetition Collateral, including, without limitation, any

such diminution resulting from (1) the use, sale or lease by the Debtors, or other decline in value,

of Cash Collateral and any other Prepetition Collateral and (2) the imposition of the automatic

stay pursuant to Section 362 of the Bankruptcy Code (any such diminution, a "Collateral

Diminution" or the "Adequate Protection Obligations").  The treatment requested by the Debtors

for the Lender and provided by this Order will minimize disputes and litigation over collateral

values, the use of the Cash Collateral and the proceeds thereof.

L.      The terms of this Order and the use by the Debtors of Cash Collateral as

set forth herein have been negotiated in good faith and at arm's length among the Debtors, the

Lender, the U.S. Trustee and the Committee within the meaning of Section 363(m) of the

Bankruptcy Code.

M.      The terms of this Order and the use by the Debtors of Cash Collateral as

set forth herein are fair and reasonable and reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value

and fair consideration.

N.      The use of the Cash Collateral is necessary to avoid immediate and

irreparable harm to the estates of the Debtors.  This Court concludes that entry of this Order is in

the best interests of the Debtors' estates and their creditors as its implementation will, among

other things, allow for the continued operations necessary to sustain the Debtors' existing

businesses and enhance the Debtors' prospects for successful reorganization.

Based upon the foregoing findings and conclusions, upon the Motion and other

pleadings filed in these Chapter 11 Cases and upon the record made before this Court at the

Hearings, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Motion Granted. The Motion is granted in its entirety on a final basis,

subject to the terms and conditions set forth in this Order.  All objections to the relief sought

herein or to the entry of this Order, if any, that have not been withdrawn or resolved are

overruled on their merits.

2.      Use of Cash Collateral.  Subject to the terms of this Order, the Debtors

are authorized to use Cash Collateral through the Termination Date (as that term is defined

below) to pay those costs and expenses to which the Lender has consented in accordance with

the Budget (as that term is defined below); provided that all expenses set forth in the Budget for

M&A Consulting Fees, Creditors' Committee Fees, Debtor Fees and Counsel and Lender Fees

and Counsel will be funded, at the time and in the amounts provided for in the Budget, to a

segregated account (the "Fee Reserve Account") and shall be reserved in the Fee Reserve

Account by the Debtors for further distribution to (i) the Debtors' counsel and M&A

consultants and the professionals of the Committee upon further order of the Court and (ii) the

Lender and its professionals in accordance with the procedures set forth in Paragraph 4(c)

hereof.

      3.    Collection of Cash Collateral. The Debtors have modified their pre-

Petition Date cash management and accounts receivable collection system to the extent

authorized by and subject to the terms of the Order Authorizing Continued Use of Existing

Bank Accounts, Business Forms, and Cash Management Systems entered on March 11, 2011

[ECF No. 33] (the "Bank Accounts Order"). For the avoidance of doubt, and notwithstanding

any modifications to the Debtors' cash management system, the Bank Accounts (as defined in

the Bank Accounts Order, but which shall also include the Fee Reserve Account) shall

constitute the Lender's collateral and the Lender shall have continuing first priority and validly

perfected liens in such Bank Accounts.

      4.    Adequate Protection. The Lender is entitled to adequate protection for

any Collateral Diminution. As adequate protection to the Lender for any Collateral Diminution

and of its interest in the Prepetition Collateral, including the Cash Collateral, the Lender is

hereby granted the following, effective as of the Petition Date, without the necessity of

execution by the Debtors of mortgages, security agreements, pledge agreements, financing

statements or any other document.

a.    Adequate Protection Liens. The Lender shall be and is hereby granted valid and perfected security interests in and liens upon (the "Adequate Protection Liens") all of the Debtors' right, title and interest in, to and under all of the prepetition and postpetition assets and property of the Debtors, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, and all proceeds, products, rents and profits thereof, including, without limitation, goods, accounts receivable, accounts, machinery, equipment, furniture, trade fixtures, vehicles, general intangibles, letter of credit rights, cash (including all cash maintained in any deposit or account by the Debtors), deposit accounts, cash in advance deposits, instruments, chattel paper, investment property (including all investment property maintained in any securities account by the Debtors), securities accounts, intellectual property, patents, copyrights, trademarks, tradenames, licenses, causes of action (including, for the avoidance of doubt, and among other things, avoidance actions arising under chapter 5 of the Bankruptcy Code and the proceeds thereof), tort claims, tax refund claims, insurance proceeds, contract rights and proceeds thereof, and all categories of collateral that secure the Prepetition Obligations (collectively, the "Postpetition Collateral, collectively with the Prepetition Collateral and the Cash Collateral, the "Collateral"), subject only to (i) any quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a)(6), (ii) any fees payable to the Clerk of the Bankruptcy Court and (iii) the Carve-Out (as defined below).

i.    Nature of the Adequate Protection Liens. The Adequate Protection Liens shall be prior and senior to all liens and encumbrances of all other secured creditors in and to the Postpetition Collateral (including, without

limitation, liens and security interests, if any, granted or arising in favor of

any federal, state, municipal or other governmental unit, commission,

board or court for any liability of the Debtors), subject only to any valid,

properly perfected and unavoidable liens on any of the Postpetition

Collateral in existence as of the Petition Date. The Adequate Protection

Liens granted pursuant to this Order shall constitute valid and duly

perfected security interests and liens, and the Lender shall not be required

to file or serve mortgages, Uniform Commercial Code financing

statements, notices of lien or similar instruments which otherwise may be

required under federal or state law in any jurisdiction, or to take any

action, including taking possession, to validate and perfect such security

interests and liens; and the failure by the Debtors to execute or file any

documentation relating to the Adequate Protection Liens shall in no way

affect the validity, perfection or priority of such Adequate Protection

Liens. If, however, the Lender, in its sole discretion, determines to file

any such mortgages, Uniform Commercial Code financing statements,

notices of lien or similar instruments, or to otherwise confirm perfection of

such Adequate Protection Liens, the Debtors are directed to cooperate

with and to assist the Lender in doing so, and the stay imposed by

Bankruptcy Code Section 362(a) is hereby modified to allow the filing and

recording in any jurisdiction of a certified copy of this Order or any such

mortgages, Uniform Commercial Code financing statements, notices of

lien or similar instruments and all such documents shall be deemed to have been filed or recorded as of the Petition Date.

ii.     Enforceability of the Adequate Protection Liens. The Adequate Protection Liens shall be enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee, examiner or other estate representative appointed in these Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").

b.     Section 507(b) Claims: The Lender shall be and hereby is granted claims (the "Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b) and 726, which shall at all times be senior to the rights of the Debtors and of any successor trustee (whether under chapter 11 or chapter 7 of the Bankruptcy Code), or any creditor, in these Chapter 11 Cases or any Successor Cases and to any expenses of administration under Bankruptcy Code Sections 105, 503(b), 507(b) or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Bankruptcy Code Section 1112, but only to the extent of any Collateral Diminution, subject only to (i) any quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), (ii) any fees payable to the Clerk of the Bankruptcy Court and (iii) the Carve-Out; to the extent that the other adequate protection provided for hereby proves to be insufficient.

c.    <u>Fees and Expenses</u>. The Debtors are authorized and directed to pay all

reasonable and documented fees, expenses and other obligations owing to the Lender

under the Loan Documents and incurred after the Petition Date, including, without

limitation, the fees, expenses and disbursements of counsel and financial and other

advisors and consultants for the Lender (all such fees, expenses and disbursements, "<u>Fees

and Expenses</u>") in accordance with the Budget. The Lender will provide invoices for the

Fees and Expenses no later than ten days before such invoices are scheduled to be paid in

accordance with the Budget to the Debtors, the U.S. Trustee and the Committee and such

invoices shall be paid promptly and irrevocably by the Debtors at the times and in the

amounts not greater than those contemplated in the Budget if none of the foregoing

parties objects in writing to the payment of any invoice within ten days of its receipt

thereof (the "<u>Fee Challenge Period</u>"). In the event any of the parties identified in the

immediately preceding sentence objects to the payment of any invoice provided to such

party during the Fee Challenge Period, all Fees and Expenses to which no objection has

been raised shall be paid promptly and irrevocably by the Debtors at the times and in the

amounts not greater than those contemplated in the Budget, and the objecting party and

the Lender shall negotiate in good faith in an effort to resolve consensually the objection

to the remaining Fees and Expenses. To the extent an objection cannot be resolved

consensually within ten days from the date on which such objection is first raised with

the Lender, or such long period as may be agreed upon in writing between the objecting

party and the Lender (the "<u>Fee Dispute Period</u>"), the objecting party shall promptly seek

relief from the Court to determine whether the Fees and Expenses subject to an objection

should be paid, and the Court shall determine any such dispute using a reasonableness

standard. Failure to seek such relief from the Court by the objecting party within three (3) days from the expiration of the Fee Dispute Period shall result in the waiver of such party's objection to the payment of the disputed Fees and Expenses. All parties in interest reserve all rights to recharacterize such payments made as payments in repayment of principal.

d.    Deed Custodian. Upon or within reasonable time after entry of this Order, the Debtors shall deposit (i) an absolute assignment, executed by Debtors, of all non-real property assets of Debtors (the "Assignment"), (ii) deeds in lieu of foreclosure executed by Debtors covering all of Debtors' real property (the "Deed") and (iii) other supporting documentation requested by the Lender in its sole discretion (collectively with the Assignment and the Deed, the "Foreclosure Documents"), in each case in favor of the Lender and in form and substance satisfactory to the Lender, in its exclusive discretion, with Loeb & Loeb LLP or such other entity as may be selected by the Lender, in each case in its capacity as custodian for the Lender with respect to the Foreclosure Documents (the "Deed Custodian"). At the request of the Deed Custodian, the Debtors and the Lender (and any other party requested by the Deed Custodian) shall enter into one or more agreements in form and substance satisfactory to the Deed Custodian and the Lender, in their discretion, to effectuate the transactions and remedies contemplated under this Order, without the need for any further order of this Court or any other court. The Foreclosure Documents shall be released to the Debtors or destroyed on the date that the Debtors' Plan becomes effective.

e.    Financial Reporting. The Debtors have delivered to the Lender a 24-week budget, commencing on the Petition Date, of projected cash receipts and disbursements

13

(together with any similar budget (which budget shall be in form and substance satisfactory to the Lender in its sole discretion) covering any subsequent period, the "Budget"), a copy of which is annexed hereto as Exhibit A.  In addition to the Budget, the Debtors shall furnish to the Lender on Thursday of each week, or if Thursday is not a business day, then on the next succeeding business day, (i) a report, substantially in the form as Exhibit B to be supplied (the "Testing Report"), setting forth, from the Petition Date through the Budget week ending the Sunday prior to the issuance of such report, (A) a comparison of the Debtors' actual (1) revenues, (2) wages, (3) aggregate operating expenses, (4) property taxes, (5) professional fees and (6) certain other line item expenses enumerated on such report (collectively, the items in 2 – 6, "Tested Expenses") against the Tested Expenses and revenues projected for such period in the Budget, by line item, on a cumulative and trailing weekly basis, and (B) the actual ending cash balance for each week covered by such Testing Report against the ending cash balance projected for each such week in the Budget; and (ii) a report, substantially in the form as Exhibit C, to be supplied, setting forth, for each budget line item, a comparison of the Debtors' actual disbursements and cash receipts, from the Petition Date through the Budget week ending two Sundays prior to the issuance of such report, against the disbursements and cash receipts projected for such period set forth in the budget, on a cumulative and weekly basis (the "Line Item Variance Report" and, together with the Testing Report, the "Variance Reports").  The first Testing Report shall be delivered by the Debtors to the Lender on the Thursday of the second Budget week and shall set forth the required comparison from the Petition Date through the last day of the first Budget week.  The first Line Item Variance Report shall be delivered by the Debtors to the Lender on the

Thursday of the third Budget week and shall set forth the required comparison from the

Petition Date through the last day of the first Budget week. Thereafter, the Variance

Reports shall be delivered on the Thursday of each week as set forth above. The

Variance Reports shall be in form and substance satisfactory to the Lender in its sole

discretion and shall contain any other metrics reasonably requested by the Lender.

Finally, the Debtors shall further promptly provide to the Lender all financial and other

reporting and other analyses required to be delivered to the Lender under the Loan

Documents, as well as such other financial statements, information and reports that the

Lender may reasonably request.

      f.    <u>Forecast Variance</u>. Until the occurrence of the Termination Date, the

Debtors shall not permit or suffer to exist a variance from the Budget which would have

an adverse financial effect (in the sole discretion of the Lender) on the Debtors. In

addition, and not in limitation of the foregoing, the Debtors shall not permit or suffer to

exist, (i) during the trailing two week period identified in the second Testing Report

delivered to the Lender by the Debtors, total actual revenue that is less than fifty-five

percent (55%) of the projected amounts set forth in the Budget for such period, by line

item and cumulatively, (ii) during the trailing three week period identified in the third

Testing Report delivered to the Lender by the Debtors, total actual revenue that is less

than sixty-five (65%) of the projected amounts set forth in the Budget for such period, by

line item and cumulative, (iii) during the trailing four week period identified in the fourth

Testing Report delivered to the Lender by the Debtors, total actual revenue that is less

than seventy-five (75%) of the projected amounts set forth in the Budget for such period,

by line item and cumulatively, (iv) at any time thereafter prior to the Termination Date,

total actual revenue that is less than eighty-five percent (85%) of the projected amounts
set forth in the Budget, by line item or cumulatively, tested weekly for the five week
trailing period identified in each Testing Report, (v) beginning with the first Testing
Report, at any time prior to the Termination Date, total actual cash disbursements that are
greater than one hundred fifteen percent (115%) of the projected Tested Expenses, by line
item or cumulatively, tested weekly for the five week trailing period (or such shorter
period, as may be applicable) identified in each Testing Report; provided that the Debtors
shall not be permitted to vary at all from the amounts set forth in the Budget for "MRS
Payback" or "Ovations" and (vi) at any time prior to the Termination Date, an actual
ending cash balance for any Budget week that is less than 50% of the ending cash balance
projected for such week in the Budget, as provided in each Testing Report. Any violation
of the foregoing shall hereinafter be referred to as a "Variance Default".

      g.    Monitoring and Inspection of Collateral; Right of Access. All rights of
access afforded or required to be provided by the Debtors to the Lender under the Loan
Documents shall apply hereunder and be deemed incorporated in this Order. Without
limiting such rights, the Debtors shall permit the Lender (through its officers, senior
employees, or agents, including but not limited to the Lender's attorneys or financial or
other consultants or advisors) to inspect the Collateral during business hours upon
reasonable advance notice. In addition, the Debtors shall allow the Lender to periodically
inspect and audit the books, records and account statements of the Debtors in order to
confirm the Debtors' compliance with this Order. The Debtors shall cooperate and
consult with the Lender and its agents and representatives in connection with the
foregoing access and inspection rights and will otherwise provide to the Lender all such

information as the Lender may reasonably request.  Moreover, the Lender, in its

discretion, shall be permitted to retain expert consultants and financial and other advisors

at the expense of the Debtors (with the Fees and Expenses of such consultants and

advisors to be paid pursuant to Section 4(c) of this Order) to assist the Lender in

connection with the exercise of the foregoing rights and otherwise to advise and represent

the interests of the Lender in the Chapter 11 Cases or any Successor Case.

h.    Limitation on Charging Expenses Against Collateral.  Except to the extent

of the Carve-Out, no expenses of administration of these Chapter 11 Cases or any future

proceedings that may result therefrom, including liquidation in bankruptcy or any

Successor Proceeding, shall be charged against or recovered from the Collateral pursuant

to Section 506(c) of the Bankruptcy Code or any similar principle of law, without the

prior written consent of the Lender, which consent may be withheld in the Lender's sole

and exclusive discretion.  No such consent shall be implied from any action, inaction or

acquiescence by the Lender.

i.    Right to Credit Bid.  The Lender shall have the absolute right to credit bid

up to the full amount of the Prepetition Obligations in connection with any sale, auction

or other disposition of the Collateral, whether under Section 363 of the Bankruptcy Code

or in the context of a chapter 11 plan.  Such right to credit bid will extend to any

Successor Cases.

5.    No Offsets or Recoupment.  No Collateral, including the Cash Collateral

or any accounts receivable of the Debtors, or Prepetition Obligations, shall be subject to any

right of offset or recoupment by any account debtor of the Debtors arising prior to the Petition

Date and no such right of offset or recoupment shall be asserted against the Collateral,

including the Cash Collateral, any accounts receivable of the Debtors, or the Prepetition

Obligations, by the Debtors, any account debtor or any other person or entity.

    6.  <u>Reservation of Rights with Respect to Adequate Protection</u>.  Under the

circumstances, and given the consent of the Lender to the use of Cash Collateral as provided

herein, the Court finds that the adequate protection provided herein is reasonable and sufficient

to protect the interests of the Lender.  Notwithstanding any other provision hereof, the grant of

adequate protection to the Lender pursuant to this Order is without prejudice to the right of the

Lender to seek modification of the grant of adequate protection provided hereby so as to

provide different or additional adequate protection, and without prejudice to the right of the

Debtors or any other party in interest to contest any such modification.

    7.  <u>Events of Default</u>.  The occurrence of any of the following (unless

waived in writing by the Lender) shall constitute an "<u>Event of Default</u>" under this Order:

    a.  This Order shall at any time cease to be in full force and effect, or shall

have been vacated, reversed or stayed, or modified or amended without the Lender's

advanced written consent;

    b.  The Debtors shall fail to make any payment required to be made by them

pursuant to the terms of this Order when due, which failure is not cured within two

business days of the Debtors' failure to make such payment;

    c.  The Debtors shall breach any of the other covenants or agreements

contained in this Order applicable to them and such breach shall continue unremedied for

more than three (3) business days following notice of such breach;

    d.  A Variance Default shall occur;

e.      The institution of any judicial proceeding by the Debtors seeking to challenge the validity of any portion of the Prepetition Obligations, the Loan Documents or the applicability or enforceability of the same, or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in relation to this Order or the Loan Documents, including the Prepetition Liens, or any payment pursuant thereto;

f.      Any lien or security interest created or purported to be created under the Loan Documents or this Order shall cease to be, or shall be asserted by Debtors not to be, a valid and perfected lien on or security interest in any of the Collateral, as applicable, with the priority required by the Loan Documents or this Order;

g.      The sale, transfer or other disposition of any portion of the Debtors' assets outside the ordinary course of business without the prior written consent of the Lender in its sole discretion;

h.      The Debtors shall fail to file a plan of reorganization (the "Plan"), having terms consistent with the plan term sheet annexed hereto as Exhibit D (the "Plan Term Sheet"), and a disclosure statement relating to the Plan (the "Disclosure Statement"), in each case in form and substance satisfactory to the Lender, within 45 days from the Petition Date;

i.      The Debtors shall fail to file a motion seeking to approve procedures for the solicitation of offers for plan sponsorship that are higher and better than those set forth in the Plan Term Sheet, within 45 days from the Petition Date;

j.      The Order approving the Disclosure Statement shall not have been entered on or before the 90th calendar day after the Petition Date; provided, however, if the Debtors have filed a Disclosure Statement in accordance with the terms hereof and any

failure to obtain approval of such Disclosure Statement by the Court is not attributable to the actions of the Debtors, Lender will extend such 90-day period for an additional five (5) calendar days;

k.    Failure of the Plan to be confirmed by an order satisfactory in form and substance to the Lender, by not later than 135 calendar days after the Petition Date, so long as the delay in confirming the Plan is not solely attributable to any action of the Lender that is expressly prohibited under this Order;

l.    Failure of the Effective Date (as defined in the Plan) of the Plan to occur on or before 160 calendar days after the Petition Date;

m.    The revocation or modification of the Plan in a manner not approved by the Lender in its sole discretion, or the vacatur for any reason of the order confirming the Plan;

n.    NEI Motorsports, LLC shall fail, within 75 calendar days from the Petition Date, to provide evidence satisfactory to the Lender, in the Lender's sole discretion, of its ability to pay on the Effective Date the consideration necessary to consummate the Plan on the terms contemplated in the Plan Term Sheet;

o.    The Debtors shall fail to disclose, whether by omission, misrepresentation or otherwise, to the Lender, its attorneys, agents or advisors any fact (i) that is materially adverse to the Debtors, their operations, their financial condition, or the nature, extent or location of the Prepetition Collateral or the Postpetition Collateral or (ii) regarding the disposition or use of any of the Postpetition Collateral, including the Cash Collateral, in a way that is adverse to the Lender;

p.    The Debtors shall permit or suffer to exist any superpriority claim (other

than the Carve-Out) or shall grant or suffer to exist any other lien or security interest

(including any other adequate protection lien), that in either case is senior or equal to the

claims and liens (including the Superpriority Claims and the Adequate Protection Liens)

of the Lender;

q.    The Debtors shall make any payment (whether by way of adequate

protection or otherwise) of principal or interest or otherwise on account of any prepetition

indebtedness or payables (including without limitation, reclamation claims, if any) other

than payments to (i) Millville Rescue Squad ("MRS"), upon such payment being

authorized by the Court by one or more "first day" orders or other orders of the Court

(including this Order), (ii) wages and related benefits, (iii) payments to the Lender on

account of the Prepetition Obligations, or (iv) payments approved by Order of this Court,

with the consent of the Lender, which consent shall not unreasonably be withheld.  For

the avoidance of doubt, the Debtors are authorized to use approximately Two Hundred

Thousand Dollars ($200,000.00) from the current Interest Reserve and escrows to be

released to the Debtors for the Debtors' use of Cash Collateral (in the amount of

approximately $336,000.00 as of the Petition Date) and to enable the Debtors to pay

MRS the amounts authorized by the Court in any "first day" order, and to pay other

obligations in accordance with the budget;

r.    The Court shall enter an order granting relief from the automatic stay to

any lessor, holder or holders of any lien or security interest or any other party to permit

foreclosure (or the granting of a deed in lieu of foreclosure or the like) on or repossession

of any item or items of Collateral, or to exercise any other right or remedy, without

Lender consent, and such order shall not be stayed or subject to timely appeal; provided

that the entry of an order granting relief from the automatic stay to a party seeking only to

collect insurance proceeds shall not constitute an Event of Default;

s.      The Debtors shall file any motion or other request for relief seeking (i) to

dismiss any of the Chapter 11 Cases, (ii) to convert any of the Chapter 11 Cases to a case

under chapter 7 of the Bankruptcy Code, or (iii) to appoint a trustee or an examiner with

expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter

11 Cases;

t.      The Bankruptcy Court shall enter an order (i) dismissing any of the

Chapter 11 Cases without Lender consent, (ii) converting any of the Chapter 11 Cases to

a case under chapter 7 of the Bankruptcy Code without Lender consent, (iii) appointing a

trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy

Code in any of the Chapter 11 Cases without Lender consent, or (iv) making a finding of

fraud, dishonesty or misconduct by any officer or director of any of the Debtors,

regarding or relating to the Debtors;

u.      The issuance by any governmental authority, including the Bankruptcy

Court or any other regulatory authority or court of competent jurisdiction, of any ruling,

determination or order making illegal or otherwise restricting, preventing or enjoining the

consummation of a portion of the transactions provided for under the Plan or this Order,

including an order denying confirmation of the Plan or vacating this Order, and such

ruling, determination or order has not been vacated or reversed within five (5) business

days of issuance;

v.      The Debtors' agreement with MRS, dated as of April 17, 2008 (as

amended), whereby the parties contemplated that MRS is to provide emergency services

support to the Debtors in exchange for the fees contemplated therein, shall not have been

assumed under Section 365 of the Bankruptcy Code by an Order of the Bankruptcy Court

on or before July 1, 2011;

w.      The granting by the Bankruptcy Court of relief that is inconsistent in any

respect with the terms set forth in this Order; or

x.      (i) The filing by the Debtors of any motion or other request for relief

seeking an extension of any of the deadlines set forth in this Section 7, or any alteration

of the remedies upon the occurrence of an Event of Default under this Order, without the

express written consent of the Lender in its sole discretion, (ii) the filing by the Debtors

of any pleading supporting any motion from any other party to obtain such extension or

alteration, or (iii) the failure of the Debtors timely to oppose any motion from any other

party to obtain such extension.

8.      Remedies.

a.      Following five (5) days' written notice to the Debtors, the United States

Trustee and the Committee (the "Remedies Notice Period") (email delivery is sufficient),

and subject to Paragraph 8(c) of this Order, Lender shall be permitted in its discretion to

exercise some, any or all of the following rights and remedies upon the occurrence of and

continuation of an Event of Default:

i.      The Adequate Protection Obligations shall be immediately due and

payable and the Lender, in its sole discretion, may terminate the Debtors'

authorization to use Cash Collateral (the date on which such termination

becomes effective, the "<u>Termination Date</u>") by delivering (e-mail delivery

is sufficient) a written notice of termination to the Debtors' counsel, the

U.S. Trustee and counsel to the Committee (e-mail delivery is sufficient),

which notice shall be effective immediately upon the receipt thereof by the

Debtors, without the need for any further order of this Court or any other

court; <u>provided</u> that the Termination Date may be extended from time to

time by a written agreement between the Lender and the Debtors without

need for further approval of this Court, subject only to the provision of

written notice thereof to counsel to the Committee and the filing of such

notice with this Court;

ii.      the Lender shall have full, automatic and self-effectuating relief

from the automatic stay in the Chapter 11 Cases or in any Successor Case

for all purposes, including, without limitation, to exercise any right or

remedy available to it under this Order, the Loan Documents, at law or in

equity, without further order of this Court or any other court including,

without limitation, its right to setoff any amounts in any accounts

maintained pursuant to the Debtors' cash management system; and

iii.     only in the case of an Event of Default under Sections 7(i), (l) and

(m) - (o), at the request of the Lender, the Deed Custodian shall release the

Foreclosure Documents to the Lender in satisfaction of $20,000,000 of the

Prepetition Obligations (with the balance of the Prepetition Obligations to

be treated as an allowed general unsecured claim) without the need for any

further order of this Court or any other court. Upon their release by the

Deed Custodian, the Foreclosure Documents shall immediately become

effective without any further order of this or any other Court, and without

the need for any action by any person or entity, and the Lender shall be

permitted to file or record the Deed, the Assignment or any of the other

Foreclosure Documents with any governmental recording office or similar

person or entity. For the avoidance of doubt, the Foreclosure Documents

shall convey all of the Collateral to the Lender free and clear of all liens,

security interests, claims and encumbrances of any kind.

b.      The foregoing remedies may be enforced in this Court or any other forum

of appropriate jurisdiction, and all such remedies may be exercised by the Lender

consecutively or concurrently.

c.      Notwithstanding anything to the contrary in this paragraph 8, the Debtors,

the U.S. Trustee and the Committee shall be permitted during the Remedies Notice

Period to seek, on an expedited and emergency basis, a determination from the Court that

no Event of Default has occurred or is continuing (a "Default Determination"); and

provided further that, in the event the Court is unable to hear and decide a Default

Determination before the expiration of the Remedies Notice Period, other than as a result

to any degree of the fault or lack of diligence on the part of the party requesting a Default

Determination, the Remedies Notice Period shall be extended until the entry of an order

of the Court ruling on such Default Determination. Unless the Court enters an order

authorizing the Debtors to continue their use of Cash Collateral at such hearing, the

Termination Date shall occur and the Lender may exercise all of its rights and remedies

in accordance with this Paragraph 8.

9.      Restrictions on Use of Cash Collateral; Carve-Out. Notwithstanding any

provision of this Order and the Superpriority Claims granted to the Lender, this Order shall be

subject and subordinate to a carve-out (the "Carve-Out") for (a) following the Termination

Date, the payment of allowed fees and disbursements incurred by the professionals retained,

pursuant to Sections 327 or 1103(a) of the Bankruptcy Code, in the Chapter 11 Cases in an

aggregate amount not to exceed $75,000, provided that no portion of the Collateral may be used

by the Debtors, the Committee, any of their professionals or any other person or entity, at any

time before or after the Termination Date, (i) in connection with any contested matter, dispute,

or adversary proceeding seeking to challenge, invalidate, avoid, or frustrate the Loan

Documents, the Prepetition Obligations, the Prepetition Liens, the Adequate Protection Liens or

the Collateral, or to amend, modify or overturn this Order, (ii) to commence or prosecute any

action, claim, counterclaim or other similar assertion of rights against the Lender or (iii) to

conduct any analysis or other tasks in furtherance of any of the foregoing, provided that the

Committee and/or the Debtors or their professionals shall be permitted to spend up to

$10,000.00 of Cash Collateral in connection with any such analysis or other tasks; (b) fees for

the U.S. Trustee which may be required to be paid during the pendency of the Debtors' Chapter

11 Cases; and (c) reasonable expenses of members of the Committee and/or of a trustee under

section 726(b) of the Bankruptcy Code. Nothing herein shall be a waiver of the right of the

Lender to object to any fee application of any professional retained in the Chapter 11 Cases.

10.     Waiver of Rights by Debtors. Without the prior written consent of the

Lender, the Debtors shall not seek (a) any order dismissing the Chapter 11 Cases or converting

the Chapter 11 Cases to one under Chapter 7 of the Bankruptcy Code or (b) any order which

authorizes under any section of the Bankruptcy Code, including, without limitation, Bankruptcy

Code Section 105 or 364, (i) the granting of any lien or security interest in any property of the

Debtors in favor of any party other than the Lender or (ii) the obtaining of credit or the

incurring of indebtedness that is entitled to superpriority administrative expense status equal or

superior to that granted to the Lender pursuant to this Order. The Debtors further waive any

right to seek relief under the Bankruptcy Code, including, without limitation, under Bankruptcy

Code Section 105, to restrict or impair the rights and remedies of the Lender set forth in this

Order.

11.     <u>Debtors' Ongoing Cooperation</u>. The Debtors are authorized and directed

to perform all acts, and to execute, deliver and comply with the terms of the Loan Agreement

and the Loan Documents and such other documents, instruments and agreements as the Lender

may require, or which otherwise may be deemed reasonably necessary by the Lender to

effectuate the terms and conditions of this Order. No approval, agreement or consent requested

of the Lender by the Debtors pursuant to the terms of this Order or otherwise shall be inferred

from any action, inaction or acquiescence of the Lender other than from a writing signed by the

Lender.

12.     <u>Section 363(m) Protection</u>. Since the Lender is permitting the use of

Cash Collateral in good faith, the Lender shall be entitled to the full protections of Bankruptcy

Code Section 363(m) with respect to the Adequate Protection Liens and all other adequate

protection created or authorized by this Order in the event that this Order or any authorization

contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification,

reversal or vacation of this Order shall not affect (a) the validity, perfection, priority,

allowability or enforceability of any security interest, claim, priority, payments or protection

authorized for the benefit of any Lender hereunder that is granted or attaches prior to the effect

date of such stay, modification, reversal or vacation or (b) the validity of any obligation of the

Debtors to the Lender, incurred pursuant to this Order.  Notwithstanding any such stay,

modification, reversal or vacation, the use of Cash Collateral by the Debtors pursuant hereto

prior to the effective date of such stay, modification, reversal or vacation shall be governed in

all respects by the original provisions hereof, and the Lender shall be entitled to all the rights,

privileges and benefits, including, without limitation the Adequate Protection Liens, the

Postpetition Collateral and the Superpriority Claims granted herein.

13.     The Lender Not in Control of Debtors.  By negotiating, executing or

consenting to the use of the Cash Collateral under the terms of this Order, or by taking any

other action related to or permitted under this Order, the Lender (a) shall not be deemed to be or

to have been in control of the operations of the Debtors at any time or for any purpose and shall

not be deemed to be a "controlling person," a "responsible person" or an "owner or operator"

with respect to the operation or management of any Debtor (as such terms, or any similar terms,

are used in the Internal Revenue Code, United States Comprehensive Environmental Response,

Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal

or state statute), (b) shall not owe any fiduciary duty to the Debtors, their creditors or their

estates and (c) shall not constitute or be deemed to constitute a joint venture or partnership with

any Debtor.

14.     No Marshaling.  Neither the Lender nor the Collateral shall be subject to

any equitable or legal doctrine of marshaling nor any other similar doctrine.

15.     Section 552(b).  The Lender shall be entitled to all the rights and benefits

of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under

Section 552(b) of the Bankruptcy Code shall not apply to the Lender with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

      16.    Survival of Provisions of Order. The provisions of this Order and any actions taken pursuant hereto, and all of the rights, remedies, benefits and protections provided to the Lender, and all obligations of the Debtors to provide financial and other information to, and to cooperate with, the Lender, under this Order and the Loan Documents, shall survive the Termination Date and/or the entry of any order which may be entered (a) confirming any plan of reorganization in the Chapter 11 Cases (and the obligations hereunder and the Prepetition Obligations shall not be discharged by the entry of any such order or pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Debtors having hereby waived such a discharge) unless and to the extent that the applicable confirmation order or confirmed plan of reorganization (in each case in form and substance satisfactory to the Lender in its sole discretion) expressly provides otherwise and such confirmation order has become a final order and the effective date has occurred under such confirmed plan of reorganization; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) appointing or electing any Chapter 11 trustee or any examiner; or (d) dismissing the Chapter 11 Cases; and the terms and provisions of this Order as well as the Superpriority Claims, the Adequate Protection Liens and the other protections and rights granted to the Lender pursuant to this Order shall continue in full force and effect notwithstanding the occurrence of the Termination Date or any of the foregoing orders, and such Superpriority Claims and the Adequate Protection Liens shall maintain their priority as provided by this Order until all of the obligations of the Debtors to the Lender under this Order and all of the Prepetition Obligations are indefeasibly paid in full and discharged.

17.  <u>Rights of Parties in Interest</u>.  Upon entry of this Order, the findings,

conclusions, acknowledgements and agreements of the Court and the Debtors contained in this

Order, including but not limited to those contained in paragraphs C, D, E, F, G and K of this

Order (collectively, the "<u>Acknowledgments</u>"), shall be irrevocable and binding upon the

Debtors in all respects.  Upon entry of this Order, the Acknowledgments shall similarly be

irrevocable and binding upon all parties in interest (including but not limited to the Committee,

any chapter 7 or 11 trustee, examiner or other fiduciary appointed in the Chapter 11 Cases or in

any Successor Case); <u>provided</u> that the Committee shall have until ninety (90) days from the

date of the notice appointing the Committee (or such longer period as the Committee may

obtain for cause shown before the expiration of such period) to investigate the facts and bring

any appropriate proceedings as representative of the estate pertaining to the Acknowledgments

or otherwise (such deadline, the "<u>Challenge Deadline</u>").  If no such proceeding is properly

commenced on or before the Challenge Deadline, the Cash Collateral, the Prepetition

Obligations, the Prepetition Liens and the Adequate Protection Liens shall constitute allowed

claims for all purposes in the Chapter 11 Cases, any subsequent Chapter 7 case or any

Successor Case, the Adequate Protection Liens and the Prepetition Liens shall be deemed legal,

valid, binding, properly perfected, not subject to subordination and otherwise unavoidable, the

Cash Collateral, the Prepetition Obligations, the Adequate Protection Liens and the Prepetition

Liens shall not be subject to subordination, avoidance or any other or further challenge by any

party in interest seeking to exercise the rights of the Debtors' estates, including, without

limitation, any successor(s) thereto, and the Acknowledgments shall be binding, not only on the

Debtors, but also on all parties in interest and shall not be subject to any contest of any kind or

nature by the Debtors or any party in interest.  If any such proceeding is properly commenced

by the Committee on or before the Challenge Deadline, the Bankruptcy Court shall determine

the validity of the Acknowledgments, and the validity, enforceability and priority of the Cash

Collateral, the Prepetition Obligations, the Adequate Protection Liens and the Prepetition Liens,

but only as applicable to the plaintiff in such proceeding and only with respect to and to the

extent of the objections raised in such proceeding, and all other matters and objections not

raised in such proceeding shall be deemed forever waived.

18.    _Immediate Effectiveness_. This Order shall constitute findings of fact and

conclusions of law and, notwithstanding any provision of the Bankruptcy Code, the Bankruptcy

Rules or the Local Rules to the contrary, shall take effect and be fully enforceable immediately

upon entry hereof, _nunc_ _pro_ _tunc_ to the Petition Date. The fourteen day stay provisions of

Bankruptcy Rule 6004(h) are waived and shall not apply to this Order.

19.    _Effect of Entry of Order_. Entry of this Order shall be without prejudice

to, and shall not constitute a waiver of, expressly or implicitly, any and all rights, remedies,

claims and causes of action which the Lender may have against the Debtors or third parties,

whether under the Bankruptcy Code or under applicable non-bankruptcy law, including but not

limited to the right of the Lender at any time, (a) to seek a modification of this Order, or a

different cash collateral order, including to request additional or other adequate protection or

the termination of any Debtor's right to use Cash Collateral after notice and a hearing, including

a hearing noticed on an emergency basis, (b) to seek relief from the automatic stay in effect

pursuant to Bankruptcy Code Section 362, or any other relief in the Chapter 11 Cases or any

Successor Cases, and the right of the Debtors to oppose any such relief, (c) to object to or

propose (or take any other action in connection with) any chapter 11 plan proposed in these

Chapter 11 Cases or any Successor Case, (d) to request the conversion or dismissal of any of, or

the appointment of a chapter 11 trustee or examiner with expanded powers in, the Chapter 11

Cases or a Successor Case.  This Order shall not be deemed to be an amendment or

modification to the Loan Documents and nothing in this Order shall require Lender to extend or

otherwise disburse any funds under the Loan Documents.  Furthermore, nothing contained in

this Order shall be treated as an admission by the Lender regarding the truth, accuracy or

completeness of any fact or the applicability or strength of any legal or equitable claim, theory

or defense, and the Lender shall have standing to assert, and shall not be precluded or estopped

from asserting, any challenge to any factual representation set forth herein or from asserting any

legal or equitable claim, theory or defense against the Debtors or their estates.

      20.     <u>Binding Effect</u>.  The provisions of this Order shall be binding upon and

inure to the benefit of the Lender, the Debtors, and their respective successors and assigns,

including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases or any

Successor Case as a legal representative of the Debtors or the Debtors' estates.

      21.     <u>Section 507(b) Reservation</u>.  Nothing herein shall impair or modify the

application of Section 507(b) of the Bankruptcy Code in the event that the adequate protection

provided to the Lender hereunder is insufficient to compensate the Lender for any Collateral

Diminution.

      22.     <u>No Lien Alteration</u>.  The receipt by the Debtors of any Cash Collateral or

other proceeds of Prepetition Collateral or Postpetition Collateral shall not, and shall not be

deemed to, affect, alter, or otherwise modify the validity, priority or perfection of any liens in

and/or claims against such Cash Collateral or other proceeds, and such liens and claims shall

continue to exist in and against such Cash Collateral or other proceeds in the possession of the

Debtors, in each case with the same validity, priority and perfection as existed immediately

prior to such receipt by the Debtors; it being agreed that nothing in this paragraph shall limit the Debtors' use of Cash Collateral otherwise permitted hereunder or affect the liens of the Lender granted hereby or pursuant to the Loan Documents.

23.     Proofs of Claim.  Notwithstanding any other order of this Court, the Lender shall not be required to file in the Chapter 11 Cases proofs of claim for claims arising under the Loan Documents or this Order, and such claims are allowed subject only to paragraph 17 hereof.

24.     Continuation of Liens.  Notwithstanding anything to the contrary set forth herein, the liens the Lender shall continue to constitute valid and duly perfected first priority security interests and liens in and to the Bank Accounts (whether renamed or otherwise) and any new bank accounts that the Debtors may open, including, but not limited to, the Fee Reserve Account (the "New Accounts", together with the Bank Accounts, the "Accounts"), and the Lender shall not be required to file Uniform Commercial Code financing statements, notices of lien or similar instruments, or enter into any agreements, including control agreements, which otherwise may be required under federal or state law in any jurisdiction, or to take any action, including taking possession, to validate and perfect such security interests and liens in the New Accounts or the renamed Bank Accounts; and the failure by the Debtors to execute or file any documentation relating to the New Accounts or the renamed Bank Accounts shall in no way affect the validity, perfection or priority of such Lender's liens in such Accounts.  If, however, the Lender, in its sole discretion, determines to file any documents, Uniform Commercial Code financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Accounts, whether through control agreements or otherwise, the Debtors are directed to cooperate with and to assist the Lender in doing so, and the stay imposed by Bankruptcy Code

Section 362(a) is hereby modified to allow execution of any documents, including control

agreements, and the filing and recording in any jurisdiction of a certified copy of this Order,

Uniform Commercial Code financing statements, notices of lien or similar instruments and all

such documents shall be deemed to have been entered into, filed or recorded as of the Petition

Date.

| | |
|---|---|
| **COHEN, SEGLIAS, PALLAS, GREENHALL & FURMAN, P.C.**<br><br>By: /s/ Steven D. Usdin<br>    Steven D. Usdin, Esquire<br>    Nella M. Bloom, Esquire<br>    30 South 17th Street, 19th Floor<br>    Philadelphia, PA 19103<br>    (215) 564-1700<br>    *Attorney for the Debtors* | **LOEB & LOEB LLP**<br><br>By: /s/ Vadim J. Rubinstein<br>    Vadim J. Rubinstein<br>    Daniel Besikof<br>    345 Park Avenue<br>    New York, NY 10154-1895<br>    (212) 407-4000<br><br>    -and-<br><br>    Lance N. Jurich, Esq.<br>    10100 Santa Monica Blvd.<br>    Los Angeles, CA 90067<br>    (310) 282-2000<br>    *Attorneys for Merrill Lynch*<br>    *Mortgage Capital, Inc.* |
| **PORZIO, BROMBERG & NEWMAN, PC**<br><br>By: /s/ Brett S. Moore<br>    Warren J. Martin Jr.<br>    Brett S. Moore<br>    100 Southgate Parkway<br>    P.O. Box 1997<br>    Morristown, New Jersey 07962<br>    (973) 538-4006<br>    *Proposed Attorney for the Committee* | |

Dated: Camden, New Jersey
      April 12, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

# Exhibit A

24 Week Cash Flow Projection

# Exhibit B

# Exhibit C

# Exhibit D

**NEW JERSEY MOTORSPORTS PARK LLC**

**FIRST AMENDED PLAN TERM SHEET**

**AS OF MARCH 7, 2011**

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL FINANCIAL RESTRUCTURING AND ANY DEFINITIVE AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET THE EXHIBITS TO IT AND OTHERWISE ACCEPTABLE TO THE DEBTORS AND THE LENDER (EACH AS DEFINED BELOW). THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE DEBTORS.

This term sheet (the "Term Sheet") sets forth the principal terms of a proposed financial restructuring (the "Restructuring") for the existing debt and other obligations of New Jersey Motorsports Park LLC ("NJMP" or the "Company") and each subsidiary or affiliate of NJMP which files on or about the date hereof (the "Petition Date") a case under chapter 11 ("Chapter 11 Case(s)") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (Camden Division) (the "Bankruptcy Court") to pursue a pre-negotiated chapter 11 plan of reorganization supported by Lender (as defined below) and containing the terms set forth herein ("Plan").

**Transaction Overview**

| | |
|---|---|
| **Debtors:** | NJMP, New Jersey Motorsports Park Urban Renewal, L.L.C. ("Urban"), NJMP Development Associates, LLC ("Development"), and NJMP Operating Company, LLC ("Operating") (collectively, the "Debtors"). |

**Significant Creditors:**

- Senior Secured Claim of approximately $30,350,000 in unpaid principal, plus accrued interest, fees, costs and expenses (the "Prepetition Lender Obligations"),[1] arising under or in connection with loans (the "Loan") made by Merrill Lynch Mortgage Capital, Inc. (the "Lender") to the Debtors under that certain (i) Amended and Restated Building Loan and Security Agreement dated as of March 5, 2010 (as amended, restated, replaced or supplemented or otherwise modified from time to time, the "Loan Agreement") between the Debtors, as borrowers, and Lender, as sole lender, (ii) that certain first priority Mortgage and Security Agreement, dated June 20, 2007 (as amended, restated, replaced or supplemented or otherwise modified from time to time, the "Mortgage") executed and delivered by the Debtors to the Lender, (iii) that certain Assignment of Leases and Rents dated as of June 20, 2007 (as amended, restated, replaced or supplemented or otherwise modified from time to time, the "Assignment of Leases and Rents," and, collectively with the Loan Agreement, the notes evidencing the Prepetition Lender Obligations, the Mortgage and all other agreements, certificates or other documents previously, now or hereafter evidencing, guaranteeing, securing or otherwise executed in connection with the Prepetition Lender Obligations, as the same may be amended, replaced, supplemented or otherwise modified from time to time, the "Loan Documents").

- Claims of the State of New Jersey in the approximate amount of $185,000.

- Millville Rescue Squad ("MRS") – Critical vendor and creditor under that certain agreement dated as of April 17, 2008, whereby the parties contemplated that MRS was to

---

[1]   *Note*: Due to the fact that the amount of accrued interest and fees changes on a daily basis, exact figures for these items are not provided herein.

provide emergency services support to NJMP in exchange for the fees contemplated therein (as supplemented and amended, the "MRS Agreement").

- NJMP Holding Group, LLC ("Holding") – Lender under that Special Promissory Note dated as of March 11, 2009, in the principal amount of $500,000 (the "Holdings Claim").

- Cumberland Empowerment Zone Corp. ("CEZC") – Lender under that certain Amended and Restated Mortgage Note dated as of February __, 2011, in the principal amount of $425,000 (the "CEZC Claim").

- General Unsecured Non-Priority Claims: all remaining pre-petition claims, including the Lender Deficiency Claim (as defined below).

**Transaction Summary:** Lender has agreed to restructure the Prepetition Lender Obligations in accordance with that certain "Term Sheet for Loan Facilities Pursuant to Reorganization Under Title 11 of the United States Code for Thunderbolt Raceway New Jersey Motorsports Park, Millville, NJ" (the "Facilities Term Sheet") attached hereto as Exhibit 1 upon the effective date of the Plan (the "Plan Effective Date"). Among other conditions to the Plan Effective Date and Lender's support of a Plan containing the material terms set forth in this Term Sheet, NEI Motorsports LLC (the "Plan Funder") has agreed in the funding commitment term sheet attached hereto as Exhibit 2 (the "Funding Term Sheet") to make a payment of not less than $2,000,000 (the "Funding") upon the occurrence of the Plan Effective Date to fund certain obligations, including $500,000 that shall be used to fund distributions to the Debtors' general unsecured creditors (the "Unsecured Minimum Distribution") in the manner discussed below (collectively, the "Proposed Transaction").

In consideration for the Funding, Plan Funder shall receive an 80.1% non diluted Class A member interest in NJMP, as reorganized debtor ("Reorganized NJMP"), 3.69236% of which Plan Funder shall transfer to ML Green LLC and 2.30764% of which Plan Funder shall transfer to NJMP Holding Group, all as more fully set forth in the Funding Term Sheet.

Debtors shall file a motion in the Bankruptcy Cases that will seek approval of bidding procedures pursuant to which other

parties shall be afforded an opportunity to submit higher and
better bids at an auction (the "Auction") to top the terms of
the Proposed Transaction. Among other things, the bidding
procedures will provide that in order to be considered higher
and better, a competing bid must provide for a cash payment
on the Plan Effective Date of not less than $22,750,000,
(a) less any amounts that otherwise would have been used by
the proposed Funding to fund reserves in accordance with the
Funding Term Sheet, (b) plus all amounts contemplated
pursuant to paragraph 2(i) of the Funding Term Sheet (the
"Minimum Overbid"). Not less than $20,500,000 of the
Minimum Overbid shall be used to satisfy the Prepetition
Lender Obligations on the Plan Effective Date; up to
$250,000 of the Minimum Overbid shall be used to pay a
breakup fee to the Plan Funder, and not less than $2,000,000
of the Minimum Overbid shall be used to fund at least those
costs and other obligations contemplated to be satisfied by the
Funding in the Funding Term Sheet, subject to the
immediately preceding sentence (such transaction, an
"Alternative Transaction").

Unless the Alternative Transaction is accepted by the Debtors
and Lender and approved by the Bankruptcy Court as
constituting a higher and better offer after completion of the
Auction, the Plan shall effectuate the Proposed Transaction in
accordance with this Term Sheet, the Facilities Term Sheet
and the Restructuring Term Sheet.

In the event the Proposed Transaction is effectuated by the
Plan, the first $20,500,000 of the Prepetition Lender
Obligations will be exchanged for (a) loans in the total
principal amount of $20,000,000 evidenced by a senior loan
in the principal amount of $10,000,000 (Note A) and a
subordinate loan evidenced by promissory note (Note B),
having the other terms and subject to the conditions specified
in the Facilities Term Sheet (the "Lender Debt Distribution");
and (b) a 19.9% equity interest in Reorganized NJMP, which
interest shall have an imputed value of $500,000 (the "Lender
Equity Distribution," together with the Lender Debt
Distribution, the "Lender Secured Distribution"). The
remaining portion of the Prepetition Lender Obligations in the
approximate amount of $10,000,000 (the "Lender Deficiency
Claim") shall, pursuant to Section 506(a) of the Bankruptcy
Code, be classified as a general unsecured claim. The Lender
Deficiency Claim shall not share in the Unsecured Minimum
Distribution but shall participate ratably with general
unsecured creditors in any distributions beyond the Unsecured

Minimum Distribution.

In the event the Alternative Transaction is effectuated by the Plan, (a) Lender shall be paid $20,500,000 in cash on the Plan Effective Date and will not receive the Lender Debt Distribution, (b) Lender shall forego the Lender Equity Distribution and (c) the Lender Deficiency Claim shall share ratably with general unsecured creditors in the proceeds received on account of the Alternative Transaction that exceed the Unsecured Minimum Distribution.

The Debtors' use of cash collateral pursuant to section 363 of the Bankruptcy Code shall be under the condition that such use shall be consistent with (i) a 24-week rolling cash flow projection, commencing on the petition date, of anticipated cash receipts and disbursements (together with any similar budget (which budget shall be in form and substance satisfactory to the Lender in its sole discretion, covering any subsequent period, the "Budget"), and (ii) with an interim cash collateral order (the "Interim Cash Collateral Order") and a final cash collateral order; together with the Interim Cash Collateral Order, the "Cash Collateral Order") acceptable to Lender. Among other things, the Cash Collateral Order shall provide Lender with customary replacement liens (the "Replacement Liens") on all of the Debtors' assets, other than the funds received by the Debtors in connection with the Funding.

### Classification and Treatment
### of Claims and Interests

| | |
|---|---|
| **Administrative Expenses (Claims Under 507(a) Of the Bankruptcy Code Other Than Priority Tax Claims, Which Include Restructuring Costs and Unpaid Post-Bankruptcy Trade Claims):** | Each holder of an allowed administrative expense claim shall receive payment in full in cash of the unpaid portion of such allowed administrative expense claim (i) on the Plan Effective Date or as soon thereafter as reasonably practicable, (ii) in the ordinary course of business on Reorganized NJMP, (iii) in the case of professional fees, after Bankruptcy Court approval thereof, or (iv) as otherwise agreed by Reorganized NJMP and such holder. |
| **Priority Tax Claims** | On or as soon as practicable after the Plan Effective Date, each holder of an all allowed priority tax claim will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Secured Claim of Lender:** | (a) In the event the Proposed Transaction is consummated, on the Plan Effective Date Lender shall receive the Lender Secured Distribution on account of the secured portion of the Prepetition Lender Obligations. |
| | (b) In the event the Alternative Transaction is consummated, on the Plan Effective Date Lender shall receive on account of the secured portion of the Prepetition Lender Obligations a cash payment in the amount $20,500,000 from proceeds that are to be paid by the prevailing bidder at the Auction (the "Successful Bidder"). The remaining portion of the Prepetition Lender Obligations shall constitute the Lender Deficiency Claim and will be treated with other unsecured claims as set forth below. |
| | • All reasonable expenses, compensation and other such amounts owing to the Lender after the Petition Date under or in respect of the Loan Documents (including, but not limited to, all reasonable fees and expenses of outside professionals) in an amount not to exceed $325,000 shall be paid in a timely fashion under the Cash Collateral Order and, to the extent accrued but unpaid as of the Plan Effective Date, shall be paid in full on such date. |
| **Other Secured Claims:** | To the extent that any other secured claims exist, on or as soon as practicable after the Plan Effective Date, all such |

secured claims of the Debtors allowed as of the Plan Effective Date, shall be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

**General Unsecured Claims:**

(a) In the event the Proposed Transaction is consummated, each holder of an allowed general unsecured claim shall have its claim cancelled and discharged and in exchange therefor shall receive, on or as soon as reasonably practicable after the Plan Effective Date, its ratable portion of the Unsecured Minimum Distribution without reference to the Debtor against whom such unsecured claim is held; provided that the Lender Deficiency Claim shall not share in this distribution.

(b) In the event the Alternative Transaction is consummated, each holder of an allowed general unsecured claim shall have its claim cancelled and discharged and in exchange therefor shall receive, on or as soon as reasonably practicable after the Plan Effective Date:

(i) its ratable portion of the Unsecured Minimum Distribution without reference to the Debtor against whom such unsecured claim is held; provided that the Lender Deficiency Claim shall not share in this distribution and the Replacement Liens shall not attach thereto; and

(ii) after satisfaction of all obligations that otherwise were to have been paid by the Funding as set forth above, its ratable portion of all funds received on account of the Alternative Transaction that exceed the Unsecured Minimum Distribution without reference to the Debtor against whom such unsecured claim is held; provided that the Lender Deficiency Claim shall share in this distribution and the Replacement Liens shall attach thereto.

• In accordance with section 510(a) of the Bankruptcy Code, distributions on account of the CEZC Claim and the Holdings Claim shall be made to Lender, unless Lender agrees in its sole discretion and absolute discretion (a) not to enforce its contractual right to compel Debtors to turn the distribution to such holders over to the Lender or (b) to forego distributions on account of those claims.

**Intercompany Claims:**

All intercompany claims will be paid, adjusted, reinstated or discharged to the extent reasonably determined to be

appropriate by the Company, subject to the consent of (a) the Lender in the event the Proposed Transaction is consummated or (b) the Successful Bidder to the extent the Alternative Transaction is consummated.

**Section 510(b) Claims:** Any holder of a claim against any of the Debtors that is described in section 510(b) of the Bankruptcy Code shall not receive a distribution under the Plan and such section 510(b) claims shall be extinguished.

**Equity Interests:** On the Effective Date, all equity interests in NJMP, including any rights to acquire any equity interests, shall be cancelled and extinguished and the holders thereof shall not receive a distribution on account of such equity interests under the Plan.

### Other Principal Plan Terms

**Executory Contracts and Unexpired Leases:** Executory contracts and unexpired leases shall be assumed or rejected as determined by the Debtors in consultation with Lender or, if the Alternative Transaction is consummated, by the Successful Bidder. Notwithstanding the foregoing, the MRS Agreement shall be assumed by the Debtors in accordance with the Bankruptcy Code on or before the Plan Effective Date.

In the event the Proposed Transaction is consummated, that certain Financial Security Agreement dated as of June 20, 2007, by and among the City of Millville, NJMP and Lender (as amended, the "Tri-Party Agreement"), shall be assumed by the Debtors and the obligations thereunder shall be reinstated. In the event the Alternative Transaction is consummated, the Tri-Party Agreement shall be assumed by the Debtors and the obligations thereunder shall be reinstated, except that the Successful Bidder shall replace Lender under the Tri-Party Agreement and shall undertake Lender's obligations thereunder.

**Charter; Bylaws:** The charter, bylaws, operating agreement and other organizational documents of each of the Debtors shall have been restated in a manner reasonably satisfactory to the Lender and consistent with section 1123(a) (6) of the Bankruptcy Code.

**Cancellation of Notes, Instruments, Certificates and** Except as otherwise provided herein, on the Plan Effective Date, all notes, instruments, certificates, and other documents evidencing debt of, or equity interests in, the Debtors (other

**Other Documents:** than such notes, instruments, certificates or other documents evidencing (a) debts that will be reinstated or that have been assumed or will be assumed under the Plan or (b) equity interests of any Debtor other than NJMP) shall be cancelled, and the related obligations of the Debtors thereunder shall be discharged.

**Vesting of Assets:** On the Plan Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors' estates shall vest in Reorganized NJMP and the other reorganized debtors (the "Reorganized Debtors"), free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan.

**Compromise and Settlement:** The Plan shall contain customary provisions for the compromise and settlement of claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of allowed claims and equity interests and their respective distributions take into account and conform to the relative priority and rights of such claims and interests.

**Releases:** The Plan will contain language substantially to the effect of the following:

"**Released Party**" means each of: (a) the Lender; (b) the Lender's subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals; and (c) the Debtors' and the Reorganized Debtors' subsidiaries, affiliates, officers, directors, principals, shareholders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.

*Releases by the Debtors.* Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the plan supplement filed in connection therewith (the "Plan Supplement"), for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Plan Effective

Date, the Released Parties are deemed released and
discharged by the Debtors, the Reorganized Debtors, and their
estates from any and all claims, obligations, rights, suits,
damages, causes of action, remedies, and liabilities
whatsoever, including any derivative claims, asserted or
assertable on behalf of the Debtors, whether known or
unknown, foreseen or unforeseen, existing or hereinafter
arising, in law, equity, or otherwise, that the Debtors, the
Reorganized Debtors, their estates, or their affiliates would
have been legally entitled to assert in their own right (whether
individually or collectively) or on behalf of the holder of any
claim or interest or other entity, based on or relating to, or in
any manner arising from, in whole or in part, the Debtors, the
Chapter 11 Cases, the Loan Documents, the Debtors'
restructuring, the purchase or sale (or the rescission of such
purchase or sale) of any security of the Debtors or the
Reorganized Debtors, the subject matter of, or the transactions
or events giving rise to, any claim or interest that is treated in
the Plan, the business or contractual arrangements between
any Debtor and any Released Party, the restructuring of
claims and interests before or during the Chapter 11 Cases,
the negotiation, formulation, or preparation of the Plan and
Disclosure Statement, or related agreements, instruments, or
other documents, upon any other act or omission, transaction,
agreement, event, or other occurrence taking place on or
before the date of Plan confirmation, other than claims or
liabilities arising out of or relating to any act or omission of a
Released Party that constitutes willful misconduct (including
fraud) or gross negligence.[2]

**Releases by Holders of Claims and Interests**. As of the Plan
Effective Date, each holder of a claim or an interest that
receives a distribution under the Plan shall be deemed to have
conclusively, absolutely, unconditionally, irrevocably, and
forever, released and discharged the Debtors, the Reorganized
Debtors, and the Released Parties from any and all claims,
interests, obligations, rights, suits, damages, causes of action,
remedies, and liabilities whatsoever, including any derivative
claims, asserted on behalf of a Debtor, whether known or
unknown, foreseen or unforeseen, existing or hereafter
arising, in law, equity or otherwise, that such entity would
have been legally entitled to assert (whether individually or
collectively), based on or relating to, or in any manner arising

---

[2]    Capitalized terms used but not otherwise defined shall have the meanings commonly associated with such
terms in chapter 11 plans of reorganization.

from, in whole or in part, the Debtors, the Debtors'
restructuring, the Debtors' Chapter 11 Cases, the Loan
Documents, the purchase, sale, or rescission of the purchase
or sale (or the rescission of such purchase or sale) of any
security of the Debtors or the Reorganized Debtors, the
subject matter of, or the transactions or events giving rise to,
any claim or interest that is treated in the Plan, the business or
contractual arrangements between any Debtor and any
Released Party, the restructuring of claims and interests
before or during the Chapter 11 Cases, the negotiation,
formulation, or preparation of the Plan, the Disclosure
Statement, the Plan Supplement, or related agreements,
instruments, or other documents, upon any other act or
omission, transaction, agreement, event, or other occurrence
relating to the Debtors taking place on or before the date of
Plan confirmation, other than claims or liabilities arising out
of or relating to any act or omission of a Released Party that
constitutes willful misconduct (including fraud) or gross
negligence. Notwithstanding anything to the contrary in the
foregoing, the release set forth above does not release any
post-Plan Effective Date obligations of any party under the
Plan or any document, instrument, or agreement (including
those set forth in the Plan Supplement) executed to implement
the Plan.

**Exculpation:**          The Plan will contain language substantially to the effect of
the following:

"***Exculpated Party***" means each of: (a) the Debtors, the
Reorganized Debtors and their affiliates, (b) the Lender; and
(c) with respect to each of the foregoing entities in clauses (a)
and (B), such entities' subsidiaries, affiliates, officers,
directors, principals, shareholders employees, agents,
financial advisors, attorneys, accountants, investment bankers,
consultants, representatives, management companies, fund
advisors and other professionals.

***Exculpation.*** Except as otherwise specifically provided in the
Plan or Plan Supplement, no Exculpated Party shall have or
incur, and each Exculpated Party is hereby released and
exculpated from any claim, obligation, cause of action, or
liability for any claim, except for gross negligence or willful
misconduct, but in all respects such entities shall be entitled to
reasonably rely upon the advice of counsel with respect to
their duties and responsibilities pursuant to the Plan.  The
Debtors and the Reorganized Debtors (and each of their

respective affiliates, agents directors, officers, employees, advisors, and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distribution shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.

**Discharge of Debtors:** Except as otherwise provided and effective as of the Plan Effective Date: (i) the rights afforded in the Plan and the treatment of all claims and interests under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the Debtors or any of their assets, property, or estates; (ii) the Plan shall bind all holders of claims and interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (iii) all claims and interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all entities shall be precluded from asserting against the Debtors, the Debtors' estates, the reorganized Debtors, their successors and assigns, and their assets and properties, any other claims or interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**Injunction:** From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest, or remedy discharged, released or to be released pursuant to the Plan or the Confirmation Order.

**Definitive Documents and Due Diligence:** This Term Sheet is indicative, and any final agreement shall be subject to definitive agreements, pleadings, court submissions, offering memoranda and other documents ("Definitive Documents"), which Definitive Documents shall be substantially consistent with the terms of this Term Sheet, and, if the Proposed Transaction is consummated, the

Facilities Term Sheet and the Funding Term Sheet, and otherwise in form and substance acceptable to the Lender in its sole discretion, except as otherwise provided herein. The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein. consistent with the terms of this Term Sheet and, if the Proposed Transaction is consummated, the Facilities Term Sheet and the Funding Term Sheet and otherwise in form and substance acceptable to the Lender in its sole discretion, except as otherwise provided herein.

**Tax Structure:** The Debtors shall consult with the Lender on tax issues and matters of tax structure relating to the Restructuring, and such matters shall be consistent herewith and otherwise reasonably satisfactory to the Lender.

**Retention of Jurisdiction:** The Plan shall provide for a broad retention of jurisdiction by Bankruptcy Court including for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Plan Effective Date services, (c) resolution of motions, adversary proceedings, or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements, (e) entering and implementing such orders as are necessary or appropriate to sell, dispose of, liquidate or abandon any assets or properties of the FCC trust, to the extent applicable and subject to the provisions of the New Term Loan documentation and (f) other purposes.

**Resolution of Disputed Claims:** The Plan shall provide customary terms for the resolution of disputed claims and any reserves therefor.

# Exhibit 1

**MERRILL LYNCH MORTGAGE CAPITAL INC.**
c/o Global Structured Finance and Investments
Bank of America Merrill Lynch, 5th Floor
Mail Code: NY1-503-05-13
335 Madison Avenue
New York, NY 10017

**TERM SHEET FOR LOAN FACILITIES PURSUANT TO REORGANIZATION
UNDER TITLE 11 OF THE UNITED STATES CODE FOR
THUNDERBOLT RACEWAY
NEW JERSEY MOTORSPORTS PARK,
MILLVILLE, NJ**

March 7, 2011

| | |
|---|---|
| **Background:** | Pursuant to an Amended and Restated Building Loan and Security Agreement (as amended or otherwise modified and in effect from time to time, the "**Loan Agreement**"; capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement) dated as of March 5, 2010, between Merrill Lynch Mortgage Capital Inc. ("**Lender**") and New Jersey Motorsports Park LLC, New Jersey Urban Renewal, L.L.C., NJMP Development Associates, LLC, and NJMP Operating Company, LLC (collectively, "**Borrower**"), Lender made the loans described in the Loan Agreement (the "**Existing Loans**") to Borrower which are secured by the Property and the other Collateral (collectively, the "**Collateral**"). |
| | Borrower and Guarantors have requested that Lender support Borrower filing a petition (the "**Petition**") under Chapter 11 of the U.S. Bankruptcy Code ("**Code**") and agree to support a plan of reorganization acceptable to Lender that will include, among other matters, a restructure of the Existing Loans (the "**Restructure**" and/or the "**Restructured Loan Facilities**") in accordance with the terms of that certain Plan Term Sheet for New Jersey Motorsports Park LLC, dated as of March 7, 2011 (the "**Plan Term Sheet**"). Lender has agreed to consider the Restructure on terms and conditions consistent with the Plan Term Sheet and satisfactory to Lender including, but not limited to, (i) the provisions of the Loan Agreement and the other loan documents described therein, as modified by the matters set forth hereinafter and (ii) a description of a proposed investment more specifically set forth in that certain Funding Term Sheet (as such term is defined in the Plan Term Sheet) of NEI Motorsports LLC. |

1

**Revised**
**Loan Facilities:** The current aggregate outstanding amount of the Existing Loans is approximately $30,350,000 (as of March 7, 2011). The Existing Loans will be revised into a senior loan ("**Senior Loan**") evidenced by a promissory note ("**Note A**") and a subordinate loan ("**Subordinate Loan**") evidenced by promissory note ("**Note B**"). The Senior Loan and the Subordinate Loan are sometimes collectively referred to as the "**Loans**." The remaining portion of the current Existing Loans will be converted into an equity interest in New Jersey Motorsports Park LLC, as reorganized and recapitalized in accordance with the Restructure ("**NJMP**"), and an unsecured deficiency claim, as described hereinafter.

**Collateral:** The Senior Loan and the Subordinate Loan will be secured by the Property and Collateral currently encumbered by the Existing Loans and the Loan Documents. Borrower hereby represents and warrants to Lender that the Collateral includes substantially all of the assets (real and personal) owned by Borrower. Lender, at Lender's sole option, may (i) provide construction financing for the Trackside Villas on terms and conditions mutually acceptable to Lender and Borrower and/or (ii) subject to the satisfaction of the conditions to release Collateral described in the Loan Agreement, release from Lender's Collateral vacant lots (each, a "**Trackside Villa Lot**" and collectively, the "**Trackside Villa Lot**") on which Trackside Villas are intended to be constructed if Borrower requests such release(s) in connection with entering into construction financing agreement(s) with third-party lender(s).

**Note A:** The closing of the Restructure ("**Closing**") will occur as soon as possible following approval by the applicable bankruptcy court (the "**Bankruptcy Court**") of a plan of reorganization acceptable to Lender. Upon the Closing, the principal amount of Note A will be $10,000,000.00. Note A will mature on November 30, 2014 ("**Maturity Date**"). Upon repayment in full of Note A prior to the Maturity Date, the Subordinate Loan shall become the Senior Loan and interest on Note B will immediately be due and payable monthly, on a current basis. Repayment of any loans or equity investments, all or a portion of the proceeds of which were used to repay Note B prior to the Maturity Date, will be junior and subordinate to Note B.

Subject to the provisions of the following paragraph, Note A will bear a floating monthly interest rate (the "**Interest Rate**") per annum equal to the one-month LIBOR plus a spread (the "**Interest Rate Spread**") of 500 basis points; provided, however, that the Interest Rate shall never be less than 5.25% per annum nor greater than 7.25% per annum. The Interest Rate will be adjusted monthly

and interest payments will be calculated on an actual/360 day basis. During the first 12 months of the term of Note A, interest only will be payable monthly. Thereafter, until repayment in full of the Senior Loan, the principal amount of Note A will be amortized and principal and interest payments will be payable monthly based on a 15-year (straight line) amortization schedule. Principal payments pursuant to the Restructured Loan Facilities will accrue during the calendar months of November through March inclusive, and be payable in equal installments during the months of April through October, inclusive. Interest payments will be made on a monthly basis.

**Revolving Portion:**    Borrower shall be permitted to reborrow and repay amounts equal to principal prepayments in excess of previously required principal reduction payments (**"Revolving Portion"**) until the Maturity Date, provided that (i) Note A is outstanding and has not been repaid in full, (ii) no defaults exist under the Loans, and (iii) the maximum amount of principal revolving at any one time under the Revolving Portion of Note A does not exceed $2,000,000. The Interest Rate on the Revolving Portion of Note A will be 7.25% per annum.

**Note B:**    Upon the Closing, the principal amount of Note B will be $10,000,000.00. Note B will mature on the Maturity Date.

Note B will bear a floating monthly Interest Rate per annum equal to the one-month LIBOR plus the Interest Rate Spread; provided, however, that the Interest Rate shall never be less than 5.25% per annum nor greater than 7.25% per annum. The Interest Rate will be adjusted monthly and interest will accrue (but will not be compounded), be capitalized, added to principal, and due and payable in full on the Maturity Date; provided, however, if Note A is repaid in full prior to the Maturity Date, interest on Note B will immediately be due and payable monthly on a current basis.

**Equity Interest:**    Upon the Closing, $500,000 of the Existing Loans will be converted to a 19.9% percentage interest in NJMP, such interest to be held by Lender or one or more of its affiliates (**"ML Investor"**).

**Deficiency Claim**    Upon the Closing, the remaining portion of the Existing Loans in excess of $20,500,000 will be converted to a general unsecured claim (the **"Lender Deficiency Claim"**). The treatment of the Lender Deficiency Claim is set forth in the Plan Term Sheet.

**ML Investor**    ML Investor will have all rights customarily afforded to equity investors, and the operating agreement of NJMP upon completion of the Restructure will contain terms similar to those contained in

the current operating agreement of NJMP, subject to such
modifications as are mutually satisfactory to ML Investor and the
other members, including, without limitation, the following: (i)
distributions will be made first to the members in proportion to
each member's new invested capital (in the form of cash or
cancellation of debt) in NJMP following the Restructure until each
member has received an IRR of 12% on such member's new
invested capital and, thereafter, in proportion to each member's
percentage interest; (ii) no member will be required to make any
additional contributions; however, each member may make
additional contributions if and to the extent it so desires, in which
case such member's additional invested capital will also be entitled
to the priority return referred to in (i) above; (iii) all "Major
Decisions" will require the consent of ML Investor and two new
"Major Decisions" will be added: (a) the delegation of duties of the
managing member to a person other than the property manager or
others specified in the business plan or approved budget and (b)
any transactions between the managing member and an affiliate of
the managing member, regardless of the fairness of the terms; (iv)
no member will be permitted to exercise the buy/sell for a period
of 12 months from the date of the operating agreement; only the
ML Investor, in its discretion, will be permitted to exercise the
buy/sell during the period beginning 12 months and ending 5 years
after the date of the operating agreement; and any member may
exercise the buy/sell 5 years after the date of the operating
agreement; further, the buy/sell purchase price will not be subject
to appraisal and appropriate changes will be made to reflect that
there are more than 2 members; (v) after a period of 5 years from
the date of the operating agreement, ML Investor will have the
right to cause NJMP to sell the Property or require that the other
members sell their equity interests in NJMP to a third party
(together with ML Investor's equity interest), subject to a right of
first refusal in favor of the other members; (vi) any transfer of
interests in NJMP will require the consent of ML Investor and will
be subject to a tag-along right in favor of ML Investor; and (vii)
ML Investor will have the right to transfer all or any portion of its
interest in NJMP without the consent of any other member;
provided, that any sale of the ML Investor interest shall be
pursuant to an arms' length transaction with a bona fide third party
purchaser and such purchaser shall retain Major Decision rights
under the Operating Agreement only in the event that the third
party purchaser is also the owner of the Loan Facilities.

**Cash Management:**     At Closing, Borrower will modify the existing cash management
documentation, as required by Lender (i) to require that all
Property-related revenues will continue to be directed into a sweep
account on a daily basis(so long as the daily sweep does not

constitute a disbursement in the bankruptcy proceeding subjecting Borrower to the payment of quarterly United States Trustee fees as a result of such daily sweep), (ii) to establish additional reserve accounts, (iii) after all required debt service payments and reserves requirements are satisfied (including any new reserve accounts required by Lender in connection with the Restructure), to permit funds to be sent to an account to pay operating expenses of the Property based upon budgets prepared by Borrower and approved by Lender, (iv) to require remaining funds to be applied to reduce the principal balance of Note A, and (v) thereafter, to permit any remaining funds to be released to Borrower provided no default has occurred and is ongoing. The mechanism for the sweep and reserve build up and the release of such funds for working capital or to Borrower shall be further defined and mutually agreed upon in the loan facilities documentation and cash management agreement.

**Reporting Requirements:**

During the term of the Loans, Borrower will provide to Lender such periodic financial statements and reports as Lender shall require including, but not limited to (i) operating and capital expense budgets for the upcoming year on or before January 15 of the then current fiscal year, (ii) audited annual financial statements within 120 days following year-end and certified accurate by an officer of the Borrower to Lender, and (iii) monthly unaudited financial statements (including monthly operating budget) within 20 days of the applicable period, certified as accurate by an officer of Borrower.

**Due Diligence:**

Prior to Closing, Lender will conduct due diligence with respect to the Property, Borrower, Guarantors and the Collateral as required by Lender, all of which must be satisfactory to Lender. Such due diligence will include, but is not limited to:

(i)     Receipt of third party reports including an updated MAI appraisal (in accordance with FIRREA standards) and environmental and engineering reports (all commissioned by or acceptable to Lender in the name of Lender, its successors and assigns);

(ii)    Receipt of acceptable title insurance endorsements insuring the continued priority of Lender's liens in and on the Collateral and an updated survey for the Property; and

(iii)   Satisfactory review of financial information and authorization documentation for Borrower and Guarantors and such other parties as Lender shall require.

**Conditions Precedent:** This Term Sheet is provided for discussion purposes only and does not constitute a commitment to proceed with the Restructure. The terms hereof are not all inclusive. Closing of the Restructure would be subject to, among other things: (i) approval by the Bankruptcy Court of a plan of reorganization of Borrower that is acceptable to Lender and consistent with the Plan Term Sheet, (ii) the Restructure contemplated by this Term Sheet is deemed the highest and best offer after completion of the Auction (as defined in the Plan Term Sheet); (iii) delivery to Lender and Lender's approval of all financial reports for Borrower, Guarantors and the Collateral including, but not limited to, schedules of "legacy liabilities" and all unsecured creditors, (iv) completion and execution of acceptable bankruptcy and Restructure loan documentation as Lender and its counsel shall require, (v) the execution by Lee Brahin and Harvey Siegel of an Environmental Indemnity (as defined in the Loan Agreement), a Litigation Indemnity (as defined in the Loan Agreement) and a Carveout Guarantee (as defined in the Loan Agreement) in substantially the same forms as those previously executed by Messrs. Brahin and Siegel in connection with the Loan Agreement, (vi) no material adverse change in the fair market value of the Property since the date of the most recent appraisal of the Property, or the financial condition of Borrower or Guarantors since the date hereof, (vii) the absence of any material disruption or material adverse change in current financial, banking or capital market conditions, in the sole reasonable judgment of Lender other than is customary with respect to seasonal operations, and (viii) final approval by Lender's credit committee.

**Confidentiality:** Except to the extent required by law, and except as necessary to facilitate a reorganization under the Code, Borrower and Guarantors agree not to disclose, and to cause their respective officers, directors, employees and agents not to disclose, this Term Sheet, any of the terms, conditions, or other facts relating hereto, including the status thereof, or the fact that discussions or negotiations are taking place concerning the Restructure, to any person other than its or their investors, partners, attorneys and other advisors who need to know such information for the purpose of causing the consummation of the proposed Restructure, provided that any such parties will be informed of the confidential nature of such information and directed to keep such information in the strictest confidence. The terms set forth herein are proprietary to Lender and are made available solely for the purpose of discussing the Restructure. Oral or written disclosure of this Term Sheet to any competitor of Lender shall be detrimental to Lender and shall be an explicit violation of this paragraph.

**Governing Law
Venue:**

This Term Sheet will be governed and construed under the laws of
the State of New York without regard to any conflicts of laws
principles.

# Exhibit 2

**MERRILL LYNCH MORTGAGE CAPITAL INC.**
c/o Global Structured Finance and Investments
Bank of America Merrill Lynch, 5th Floor
Mail Code: NY1-S03-05-13
335 Madison Avenue
New York, NY  10017

### TERM SHEET FOR LOAN FACILITIES PURSUANT TO REORGANIZATION UNDER TITLE 11 OF THE UNITED STATES CODE FOR THUNDERBOLT RACEWAY NEW JERSEY MOTORSPORTS PARK, MILLVILLE, NJ

March 7, 2011

**Background:**

Pursuant to an Amended and Restated Building Loan and Security Agreement (as amended or otherwise modified and in effect from time to time, the **"Loan Agreement"**; capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement) dated as of March 5, 2010, between Merrill Lynch Mortgage Capital Inc. (**"Lender"**) and New Jersey Motorsports Park LLC, New Jersey Urban Renewal, L.L.C., NJMP Development Associates, LLC, and NJMP Operating Company, LLC (collectively, **"Borrower"**), Lender made the loans described in the Loan Agreement (the **"Existing Loans"**) to Borrower which are secured by the Property and the other Collateral (collectively, the **"Collateral"**).

Borrower and Guarantors have requested that Lender support Borrower filing a petition (the **"Petition"**) under Chapter 11 of the U.S. Bankruptcy Code (**"Code"**) and agree to support a plan of reorganization acceptable to Lender that will include, among other matters, a restructure of the Existing Loans (the **"Restructure"** and/or the **"Restructured Loan Facilities"**) in accordance with the terms of that certain Plan Term Sheet for New Jersey Motorsports Park LLC, dated as of March 7, 2011 (the **"Plan Term Sheet"**). Lender has agreed to consider the Restructure on terms and conditions consistent with the Plan Term Sheet and satisfactory to Lender including, but not limited to, (i) the provisions of the Loan Agreement and the other loan documents described therein, as modified by the matters set forth hereinafter and (ii) a description of a proposed investment more specifically set forth in that certain Funding Term Sheet (as such term is defined in the Plan Term Sheet) of NEI Motorsports LLC.

1

**Revised
Loan Facilities:**   The current aggregate outstanding amount of the Existing Loans is approximately $30,350,000 (as of March 7, 2011). The Existing Loans will be revised into a senior loan ("**Senior Loan**") evidenced by a promissory note ("**Note A**") and a subordinate loan ("**Subordinate Loan**") evidenced by promissory note ("**Note B**"). The Senior Loan and the Subordinate Loan are sometimes collectively referred to as the "**Loans.**" The remaining portion of the current Existing Loans will be converted into an equity interest in New Jersey Motorsports Park LLC, as reorganized and recapitalized in accordance with the Restructure ("**NJMP**"), and an unsecured deficiency claim, as described hereinafter.

**Collateral:**   The Senior Loan and the Subordinate Loan will be secured by the Property and Collateral currently encumbered by the Existing Loans and the Loan Documents. Borrower hereby represents and warrants to Lender that the Collateral includes substantially all of the assets (real and personal) owned by Borrower. Lender, at Lender's sole option, may (i) provide construction financing for the Trackside Villas on terms and conditions mutually acceptable to Lender and Borrower and/or (ii) subject to the satisfaction of the conditions to release Collateral described in the Loan Agreement, release from Lender's Collateral vacant lots (each, a "**Trackside Villa Lot**" and collectively, the "**Trackside Villa Lot**") on which Trackside Villas are intended to be constructed if Borrower requests such release(s) in connection with entering into construction financing agreement(s) with third-party lender(s).

**Note A:**   The closing of the Restructure ("**Closing**") will occur as soon as possible following approval by the applicable bankruptcy court (the "**Bankruptcy Court**") of a plan of reorganization acceptable to Lender. Upon the Closing, the principal amount of Note A will be $10,000,000.00. Note A will mature on November 30, 2014 ("**Maturity Date**"). Upon repayment in full of Note A prior to the Maturity Date, the Subordinate Loan shall become the Senior Loan and interest on Note B will immediately be due and payable monthly, on a current basis. Repayment of any loans or equity investments, all or a portion of the proceeds of which were used to repay Note B prior to the Maturity Date, will be junior and subordinate to Note B.

Subject to the provisions of the following paragraph, Note A will bear a floating monthly interest rate (the "**Interest Rate**") per annum equal to the one-month LIBOR plus a spread (the "**Interest Rate Spread**") of 500 basis points; provided, however, that the Interest Rate shall never be less than 5.25% per annum nor greater than 7.25% per annum. The Interest Rate will be adjusted monthly

and interest payments will be calculated on an actual/360 day basis. During the first 12 months of the term of Note A, interest only will be payable monthly. Thereafter, until repayment in full of the Senior Loan, the principal amount of Note A will be amortized and principal and interest payments will be payable monthly based on a 15-year (straight line) amortization schedule. Principal payments pursuant to the Restructured Loan Facilities will accrue during the calendar months of November through March inclusive, and be payable in equal installments during the months of April through October, inclusive. Interest payments will be made on a monthly basis.

**Revolving Portion:**    Borrower shall be permitted to reborrow and repay amounts equal to principal prepayments in excess of previously required principal reduction payments ("**Revolving Portion**") until the Maturity Date, provided that (i) Note A is outstanding and has not been repaid in full, (ii) no defaults exist under the Loans, and (iii) the maximum amount of principal revolving at any one time under the Revolving Portion of Note A does not exceed $2,000,000. The Interest Rate on the Revolving Portion of Note A will be 7.25% per annum.

**Note B:**    Upon the Closing, the principal amount of Note B will be $10,000,000.00. Note B will mature on the Maturity Date.

Note B will bear a floating monthly Interest Rate per annum equal to the one-month LIBOR plus the Interest Rate Spread; provided, however, that the Interest Rate shall never be less than 5.25% per annum nor greater than 7.25% per annum. The Interest Rate will be adjusted monthly and interest will accrue (but will not be compounded), be capitalized, added to principal, and due and payable in full on the Maturity Date; provided, however, if Note A is repaid in full prior to the Maturity Date, interest on Note B will immediately be due and payable monthly on a current basis.

**Equity Interest:**    Upon the Closing, $500,000 of the Existing Loans will be converted to a 19.9% percentage interest in NJMP, such interest to be held by Lender or one or more of its affiliates ("**ML Investor**").

**Deficiency Claim**    Upon the Closing, the remaining portion of the Existing Loans in excess of $20,500,000 will be converted to a general unsecured claim (the "**Lender Deficiency Claim**"). The treatment of the Lender Deficiency Claim is set forth in the Plan Term Sheet.

**ML Investor**    ML Investor will have all rights customarily afforded to equity investors, and the operating agreement of NJMP upon completion of the Restructure will contain terms similar to those contained in

the current operating agreement of NJMP, subject to such modifications as are mutually satisfactory to ML Investor and the other members, including, without limitation, the following: (i) distributions will be made first to the members in proportion to each member's new invested capital (in the form of cash or cancellation of debt) in NJMP following the Restructure until each member has received an IRR of 12% on such member's new invested capital and, thereafter, in proportion to each member's percentage interest; (ii) no member will be required to make any additional contributions; however, each member may make additional contributions if and to the extent it so desires, in which case such member's additional invested capital will also be entitled to the priority return referred to in (i) above; (iii) all "Major Decisions" will require the consent of ML Investor and two new "Major Decisions" will be added: (a) the delegation of duties of the managing member to a person other than the property manager or others specified in the business plan or approved budget and (b) any transactions between the managing member and an affiliate of the managing member, regardless of the fairness of the terms; (iv) no member will be permitted to exercise the buy/sell for a period of 12 months from the date of the operating agreement; only the ML Investor, in its discretion, will be permitted to exercise the buy/sell during the period beginning 12 months and ending 5 years after the date of the operating agreement; and any member may exercise the buy/sell 5 years after the date of the operating agreement; further, the buy/sell purchase price will not be subject to appraisal and appropriate changes will be made to reflect that there are more than 2 members; (v) after a period of 5 years from the date of the operating agreement, ML Investor will have the right to cause NJMP to sell the Property or require that the other members sell their equity interests in NJMP to a third party (together with ML Investor's equity interest), subject to a right of first refusal in favor of the other members; (vi) any transfer of interests in NJMP will require the consent of ML Investor and will be subject to a tag-along right in favor of ML Investor; and (vii) ML Investor will have the right to transfer all or any portion of its interest in NJMP without the consent of any other member; provided, that any sale of the ML Investor interest shall be pursuant to an arms' length transaction with a bona fide third party purchaser and such purchaser shall retain Major Decision rights under the Operating Agreement only in the event that the third party purchaser is also the owner of the Loan Facilities.

**Cash Management:**   At Closing, Borrower will modify the existing cash management documentation, as required by Lender (i) to require that all Property-related revenues will continue to be directed into a sweep account on a daily basis(so long as the daily sweep does not

constitute a disbursement in the bankruptcy proceeding subjecting Borrower to the payment of quarterly United States Trustee fees as a result of such daily sweep), (ii) to establish additional reserve accounts, (iii) after all required debt service payments and reserves requirements are satisfied (including any new reserve accounts required by Lender in connection with the Restructure), to permit funds to be sent to an account to pay operating expenses of the Property based upon budgets prepared by Borrower and approved by Lender, (iv) to require remaining funds to be applied to reduce the principal balance of Note A, and (v) thereafter, to permit any remaining funds to be released to Borrower provided no default has occurred and is ongoing. The mechanism for the sweep and reserve build up and the release of such funds for working capital or to Borrower shall be further defined and mutually agreed upon in the loan facilities documentation and cash management agreement.

**Reporting Requirements:**   During the term of the Loans, Borrower will provide to Lender such periodic financial statements and reports as Lender shall require including, but not limited to (i) operating and capital expense budgets for the upcoming year on or before January 15 of the then current fiscal year, (ii) audited annual financial statements within 120 days following year-end and certified accurate by an officer of the Borrower to Lender, and (iii) monthly unaudited financial statements (including monthly operating budget) within 20 days of the applicable period, certified as accurate by an officer of Borrower.

**Due Diligence:**   Prior to Closing, Lender will conduct due diligence with respect to the Property, Borrower, Guarantors and the Collateral as required by Lender, all of which must be satisfactory to Lender. Such due diligence will include, but is not limited to:

(i)   Receipt of third party reports including an updated MAI appraisal (in accordance with FIRREA standards) and environmental and engineering reports (all commissioned by or acceptable to Lender in the name of Lender, its successors and assigns);

(ii)   Receipt of acceptable title insurance endorsements insuring the continued priority of Lender's liens in and on the Collateral and an updated survey for the Property; and

(iii)   Satisfactory review of financial information and authorization documentation for Borrower and Guarantors and such other parties as Lender shall require.

**Conditions Precedent:** This Term Sheet is provided for discussion purposes only and does not constitute a commitment to proceed with the Restructure. The terms hereof are not all inclusive. Closing of the Restructure would be subject to, among other things: (i) approval by the Bankruptcy Court of a plan of reorganization of Borrower that is acceptable to Lender and consistent with the Plan Term Sheet, (ii) the Restructure contemplated by this Term Sheet is deemed the highest and best offer after completion of the Auction (as defined in the Plan Term Sheet); (iii) delivery to Lender and Lender's approval of all financial reports for Borrower, Guarantors and the Collateral including, but not limited to, schedules of "legacy liabilities" and all unsecured creditors, (iv) completion and execution of acceptable bankruptcy and Restructure loan documentation as Lender and its counsel shall require, (v) the execution by Lee Brahin and Harvey Siegel of an Environmental Indemnity (as defined in the Loan Agreement), a Litigation Indemnity (as defined in the Loan Agreement) and a Carveout Guarantee (as defined in the Loan Agreement) in substantially the same forms as those previously executed by Messrs. Brahin and Siegel in connection with the Loan Agreement, (vi) no material adverse change in the fair market value of the Property since the date of the most recent appraisal of the Property, or the financial condition of Borrower or Guarantors since the date hereof, (vii) the absence of any material disruption or material adverse change in current financial, banking or capital market conditions, in the sole reasonable judgment of Lender other than is customary with respect to seasonal operations, and (viii) final approval by Lender's credit committee.

**Confidentiality:** Except to the extent required by law, and except as necessary to facilitate a reorganization under the Code, Borrower and Guarantors agree not to disclose, and to cause their respective officers, directors, employees and agents not to disclose, this Term Sheet, any of the terms, conditions, or other facts relating hereto, including the status thereof, or the fact that discussions or negotiations are taking place concerning the Restructure, to any person other than its or their investors, partners, attorneys and other advisors who need to know such information for the purpose of causing the consummation of the proposed Restructure, provided that any such parties will be informed of the confidential nature of such information and directed to keep such information in the strictest confidence. The terms set forth herein are proprietary to Lender and are made available solely for the purpose of discussing the Restructure. Oral or written disclosure of this Term Sheet to any competitor of Lender shall be detrimental to Lender and shall be an explicit violation of this paragraph.

**Governing Law  
Venue:**

This Term Sheet will be governed and construed under the laws of the State of New York without regard to any conflicts of laws principles.

# Exhibit 2

NEI Motorsports, LLC

As of March 7, 2011

New Jersey Motorsports Park LLC

Re:  First Amended $2,000,000.00 Funding Commitment Term Sheet

     We are pleased to inform you of the commitment of NEI Motorsports, LLC ("NEI") to provide an equity infusion into reorganized New Jersey Motorsports Park LLC ("NJMP") in the amount of at least Two Million ($2,000,000.00) Dollars (the "Funding").  The provisions described in this commitment are not intended to be an exhaustive list of the terms, provisions and conditions to be contained in the Operating Agreement for NJMP, as reorganized debtor (the "NJMP Operating Agreement").  Such NJMP Operating Agreement shall be consistent with (a) the current operating agreement of New Jersey Motorsports Park LLC and (b) that certain Term Sheet for Loan Facilities Pursuant to Reorganization Under Title 11 of the United States Code for Thunderbolt Raceway New Jersey Motorsports Park, Millville, NJ (the "Facilities Term Sheet"), and shall contain such other terms, provisions, conditions, certifications, representations, and warranties as we, in our reasonable discretion, may require, and which shall not be inconsistent with (a) and (b) of this sentence.  In consideration for the Funding, we shall receive an 80.1% non diluted Class A member interest in NJMP, 3.69236% of which we shall transfer to ML Green LLC and 2.30764% of which we shall transfer to NJMP Holding Group.  The remaining 19.9% Class A member interest shall be vested in Merrill Lynch Mortgage Capital Inc. (the "Lender") in accordance with the Facilities Term Sheet.  The Funding is subject to the following terms and conditions, and shall also be subject to higher and better offers:

     1.   Amount/Timing of Funding:  The Funding shall be no less than Two Million ($2,000,000.00) Dollars US in immediately available funds.  We shall close on the Funding and pay the Funding amount no later than five (5) business days following the date that the Order confirming that certain Plan of Reorganization (the "Plan") filed in the bankruptcy cases of NJMP and its affiliates (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of New Jersey (the "Court") becomes a final order of the Court, provided such order becomes a final order no later than December 26, 2011.  The Funding shall be deposited into the attorney trust account of our attorney not less than 10 days before the first scheduled hearing date for Plan confirmation, with certification of same to the Court upon receipt, and will subsequently be disbursed in accordance with the terms herein.  Notwithstanding the foregoing, our commitment to make the Funding shall expire on December 26, 2011 (the "Outside Date").

     2.   Purpose of Funding:  The Funding shall be used to pay all costs of the restructure pursuant to the Plan and the Plan Term Sheet related thereto, including, but not limited to:

     (i)   $404,778 shall be allocated to the fees and expenses (including filing fees and costs) of attorneys, professionals, and consultants (a) retained by the debtors and the official committee of unsecured creditors appointed in the Debtors' cases, in each case as approved by

NY894234.2

202970-10311

the Court after appropriate application and subject to the budget approved by the Court in connection with the debtors' final cash collateral order, and (b) retained by Lender. In the event $404,778 shall not be sufficient to satisfy such obligations on the date the Plan goes effective (the "Effective Date") and the full $2,000,000 Funding has otherwise been used in accordance herewith, NEI shall pay such outstanding obligations that exceed $404,778 (the "Excess"). Notwithstanding the foregoing, NJMP shall pay the first $200,000 of such Excess from cash on hand as of the Effective Date that was not paid with the Funding and NEI shall pay the balance of the Excess;

      (ii)    $50,000 shall be allocated to priority tax claims;

      (iii)   $209,222 shall be allocated to the payment to Ovations upon Plan confirmation;

      (iv)   $500,000 shall be allocated to the payment of the claims of general unsecured creditors of all of the Debtors (other than Ovations), which amount shall be paid ratably to all such creditors;

      (v)    $336,000 shall be allocated to fund reserves for, among other things, debt payment, insurance, taxes and such other reserves as Lender and NJMP mutually shall deem necessary;

      (vi)   $500,000 shall be allocated to meet operating and other liquidity obligations of the reorganized debtors; and

      (vii)  to pay such other costs and expenses as Lender and NEI mutually shall deem necessary to continue the ongoing business operations of reorganized debtors.

    3. <u>Equity Interest of NEI:</u> In consideration for the Funding, NEI shall receive an 80.1% Class A member interest in NJMP in accordance with the terms hereof. NEI shall, pursuant to the NJMP Operating Agreement, be the managing member of NJMP.

    If you agree to the terms and conditions of this commitment, please acknowledge your acceptance by executing the enclosed copy of this letter and returning same to me. This commitment shall not be binding, and shall become null and void, unless the attached counterpart is signed by New Jersey Motorsports Park LLC to evidence acceptance of the outline of the terms and conditions referenced herein and is returned to me by April 12, 2011.

Very Truly Yours,

NEI Motorsports, LLC

By: _____
   Lee Brahin, Manager

NY894234.2

202970-10311

Accepted on this ____ day of _____, 2011

New Jersey Motorsports Park LLC

    By: NJMP Holding Group, LLC, Managing Member

        By: NJMP Associates, LLC, Managing Member

            By: _____
              Lee Brahin, co-Manager