# Exhibit A

**MERRILL LYNCH MORTGAGE CAPITAL INC.**
c/o Global Structured Finance and Investments
Bank of America Merrill Lynch, 5th Floor
Mail Code: NY1-503-05-13
335 Madison Avenue
New York, NY 10017

**TERM SHEET FOR LOAN FACILITIES PURSUANT TO REORGANIZATION
UNDER TITLE 11 OF THE UNITED STATES CODE FOR
THUNDERBOLT RACEWAY
NEW JERSEY MOTORSPORTS PARK,
MILLVILLE, NJ**

March 7, 2011

**Background:**

Pursuant to an Amended and Restated Building Loan and Security Agreement (as amended or otherwise modified and in effect from time to time, the "**Loan Agreement**"; capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement) dated as of March 5, 2010, between Merrill Lynch Mortgage Capital Inc. ("**Lender**") and New Jersey Motorsports Park LLC, New Jersey Urban Renewal, L.L.C., NJMP Development Associates, LLC, and NJMP Operating Company, LLC (collectively, "**Borrower**"), Lender made the loans described in the Loan Agreement (the "**Existing Loans**") to Borrower which are secured by the Property and the other Collateral (collectively, the "**Collateral**").

Borrower and Guarantors have requested that Lender support Borrower filing a petition (the "**Petition**") under Chapter 11 of the U.S. Bankruptcy Code ("**Code**") and agree to support a plan of reorganization acceptable to Lender that will include, among other matters, a restructure of the Existing Loans (the "**Restructure**" and/or the "**Restructured Loan Facilities**") in accordance with the terms of that certain Plan Term Sheet for New Jersey Motorsports Park LLC, dated as of March 7, 2011 (the "**Plan Term Sheet**"). Lender has agreed to consider the Restructure on terms and conditions consistent with the Plan Term Sheet and satisfactory to Lender including, but not limited to, (i) the provisions of the Loan Agreement and the other loan documents described therein, as modified by the matters set forth hereinafter and (ii) a description of a proposed investment more specifically set forth in that certain Funding Term Sheet (as such term is defined in the Plan Term Sheet) of NEI Motorsports LLC.

1

| | |
|---|---|
| **Revised<br>Loan Facilities:** | The current aggregate outstanding amount of the Existing Loans is approximately $30,350,000 (as of March 7, 2011). The Existing Loans will be revised into a senior loan ("**Senior Loan**") evidenced by a promissory note ("**Note A**") and a subordinate loan ("**Subordinate Loan**") evidenced by promissory note ("**Note B**"). The Senior Loan and the Subordinate Loan are sometimes collectively referred to as the "**Loans**." The remaining portion of the current Existing Loans will be converted into an equity interest in New Jersey Motorsports Park LLC, as reorganized and recapitalized in accordance with the Restructure ("**NJMP**"), and an unsecured deficiency claim, as described hereinafter. |
| **Collateral:** | The Senior Loan and the Subordinate Loan will be secured by the Property and Collateral currently encumbered by the Existing Loans and the Loan Documents. Borrower hereby represents and warrants to Lender that the Collateral includes substantially all of the assets (real and personal) owned by Borrower. Lender, at Lender's sole option, may (i) provide construction financing for the Trackside Villas on terms and conditions mutually acceptable to Lender and Borrower and/or (ii) subject to the satisfaction of the conditions to release Collateral described in the Loan Agreement, release from Lender's Collateral vacant lots (each, a "**Trackside Villa Lot**" and collectively, the "**Trackside Villa Lot**") on which Trackside Villas are intended to be constructed if Borrower requests such release(s) in connection with entering into construction financing agreement(s) with third-party lender(s). |
| **Note A:** | The closing of the Restructure ("**Closing**") will occur as soon as possible following approval by the applicable bankruptcy court (the "**Bankruptcy Court**") of a plan of reorganization acceptable to Lender. Upon the Closing, the principal amount of Note A will be $10,000,000.00. Note A will mature on November 30, 2014 ("**Maturity Date**"). Upon repayment in full of Note A prior to the Maturity Date, the Subordinate Loan shall become the Senior Loan and interest on Note B will immediately be due and payable monthly, on a current basis. Repayment of any loans or equity investments, all or a portion of the proceeds of which were used to repay Note B prior to the Maturity Date, will be junior and subordinate to Note B. |
| | Subject to the provisions of the following paragraph, Note A will bear a floating monthly interest rate (the "**Interest Rate**") per annum equal to the one-month LIBOR plus a spread (the "**Interest Rate Spread**") of 500 basis points; provided, however, that the Interest Rate shall never be less than 5.25% per annum nor greater than 7.25% per annum. The Interest Rate will be adjusted monthly |

and interest payments will be calculated on an actual/360 day basis. During the first 12 months of the term of Note A, interest only will be payable monthly. Thereafter, until repayment in full of the Senior Loan, the principal amount of Note A will be amortized and principal and interest payments will be payable monthly based on a 15-year (straight line) amortization schedule. Principal payments pursuant to the Restructured Loan Facilities will accrue during the calendar months of November through March inclusive, and be payable in equal installments during the months of April through October, inclusive. Interest payments will be made on a monthly basis.

**Revolving Portion:** Borrower shall be permitted to reborrow and repay amounts equal to principal prepayments in excess of previously required principal reduction payments (**"Revolving Portion"**) until the Maturity Date, provided that (i) Note A is outstanding and has not been repaid in full, (ii) no defaults exist under the Loans, and (iii) the maximum amount of principal revolving at any one time under the Revolving Portion of Note A does not exceed $2,000,000. The Interest Rate on the Revolving Portion of Note A will be 7.25% per annum.

**Note B:** Upon the Closing, the principal amount of Note B will be $10,000,000.00. Note B will mature on the Maturity Date.

Note B will bear a floating monthly Interest Rate per annum equal to the one-month LIBOR plus the Interest Rate Spread; provided, however, that the Interest Rate shall never be less than 5.25% per annum nor greater than 7.25% per annum. The Interest Rate will be adjusted monthly and interest will accrue (but will not be compounded), be capitalized, added to principal, and due and payable in full on the Maturity Date; provided, however, if Note A is repaid in full prior to the Maturity Date, interest on Note B will immediately be due and payable monthly on a current basis.

**Equity Interest:** Upon the Closing, $500,000 of the Existing Loans will be converted to a 19.9% percentage interest in NJMP, such interest to be held by Lender or one or more of its affiliates (**"ML Investor"**).

**Deficiency Claim:** Upon the Closing, the remaining portion of the Existing Loans in excess of $20,500,000 will be converted to a general unsecured claim (the **"Lender Deficiency Claim"**). The treatment of the Lender Deficiency Claim is set forth in the Plan Term Sheet.

**ML Investor** ML Investor will have all rights customarily afforded to equity investors, and the operating agreement of NJMP upon completion of the Restructure will contain terms similar to those contained in

the current operating agreement of NJMP, subject to such modifications as are mutually satisfactory to ML Investor and the other members, including, without limitation, the following: (i) distributions will be made first to the members in proportion to each member's new invested capital (in the form of cash or cancellation of debt) in NJMP following the Restructure until each member has received an IRR of 12% on such member's new invested capital and, thereafter, in proportion to each member's percentage interest; (ii) no member will be required to make any additional contributions; however, each member may make additional contributions if and to the extent it so desires, in which case such member's additional invested capital will also be entitled to the priority return referred to in (i) above; (iii) all "Major Decisions" will require the consent of ML Investor and two new "Major Decisions" will be added: (a) the delegation of duties of the managing member to a person other than the property manager or others specified in the business plan or approved budget and (b) any transactions between the managing member and an affiliate of the managing member, regardless of the fairness of the terms; (iv) no member will be permitted to exercise the buy/sell for a period of 12 months from the date of the operating agreement; only the ML Investor, in its discretion, will be permitted to exercise the buy/sell during the period beginning 12 months and ending 5 years after the date of the operating agreement; and any member may exercise the buy/sell 5 years after the date of the operating agreement; further, the buy/sell purchase price will not be subject to appraisal and appropriate changes will be made to reflect that there are more than 2 members; (v) after a period of 5 years from the date of the operating agreement, ML Investor will have the right to cause NJMP to sell the Property or require that the other members sell their equity interests in NJMP to a third party (together with ML Investor's equity interest), subject to a right of first refusal in favor of the other members; (vi) any transfer of interests in NJMP will require the consent of ML Investor and will be subject to a tag-along right in favor of ML Investor; and (vii) ML Investor will have the right to transfer all or any portion of its interest in NJMP without the consent of any other member; provided, that any sale of the ML Investor interest shall be pursuant to an arms' length transaction with a bona fide third party purchaser and such purchaser shall retain Major Decision rights under the Operating Agreement only in the event that the third party purchaser is also the owner of the Loan Facilities.

**Cash Management:**     At Closing, Borrower will modify the existing cash management documentation, as required by Lender (i) to require that all Property-related revenues will continue to be directed into a sweep account on a daily basis(so long as the daily sweep does not

constitute a disbursement in the bankruptcy proceeding subjecting Borrower to the payment of quarterly United States Trustee fees as a result of such daily sweep), (ii) to establish additional reserve accounts, (iii) after all required debt service payments and reserves requirements are satisfied (including any new reserve accounts required by Lender in connection with the Restructure), to permit funds to be sent to an account to pay operating expenses of the Property based upon budgets prepared by Borrower and approved by Lender, (iv) to require remaining funds to be applied to reduce the principal balance of Note A, and (v) thereafter, to permit any remaining funds to be released to Borrower provided no default has occurred and is ongoing. The mechanism for the sweep and reserve build up and the release of such funds for working capital or to Borrower shall be further defined and mutually agreed upon in the loan facilities documentation and cash management agreement.

**Reporting Requirements:**

During the term of the Loans, Borrower will provide to Lender such periodic financial statements and reports as Lender shall require including, but not limited to (i) operating and capital expense budgets for the upcoming year on or before January 15 of the then current fiscal year, (ii) audited annual financial statements within 120 days following year-end and certified accurate by an officer of the Borrower to Lender, and (iii) monthly unaudited financial statements (including monthly operating budget) within 20 days of the applicable period, certified as accurate by an officer of Borrower.

**Due Diligence:**

Prior to Closing, Lender will conduct due diligence with respect to the Property, Borrower, Guarantors and the Collateral as required by Lender, all of which must be satisfactory to Lender. Such due diligence will include, but is not limited to:

(i)     Receipt of third party reports including an updated MAI appraisal (in accordance with FIRREA standards) and environmental and engineering reports (all commissioned by or acceptable to Lender in the name of Lender, its successors and assigns);

(ii)    Receipt of acceptable title insurance endorsements insuring the continued priority of Lender's liens in and on the Collateral and an updated survey for the Property; and

(iii)   Satisfactory review of financial information and authorization documentation for Borrower and Guarantors and such other parties as Lender shall require.

**Conditions Precedent:** This Term Sheet is provided for discussion purposes only and does not constitute a commitment to proceed with the Restructure. The terms hereof are not all inclusive. Closing of the Restructure would be subject to, among other things: (i) approval by the Bankruptcy Court of a plan of reorganization of Borrower that is acceptable to Lender and consistent with the Plan Term Sheet, (ii) the Restructure contemplated by this Term Sheet is deemed the highest and best offer after completion of the Auction (as defined in the Plan Term Sheet); (iii) delivery to Lender and Lender's approval of all financial reports for Borrower, Guarantors and the Collateral including, but not limited to, schedules of "legacy liabilities" and all unsecured creditors, (iv) completion and execution of acceptable bankruptcy and Restructure loan documentation as Lender and its counsel shall require, (v) the execution by Lee Brahin and Harvey Siegel of an Environmental Indemnity (as defined in the Loan Agreement), a Litigation Indemnity (as defined in the Loan Agreement) and a Carveout Guarantee (as defined in the Loan Agreement) in substantially the same forms as those previously executed by Messrs. Brahin and Siegel in connection with the Loan Agreement, (vi) no material adverse change in the fair market value of the Property since the date of the most recent appraisal of the Property, or the financial condition of Borrower or Guarantors since the date hereof, (vii) the absence of any material disruption or material adverse change in current financial, banking or capital market conditions, in the sole reasonable judgment of Lender other than is customary with respect to seasonal operations, and (viii) final approval by Lender's credit committee.

**Confidentiality:** Except to the extent required by law, and except as necessary to facilitate a reorganization under the Code, Borrower and Guarantors agree not to disclose, and to cause their respective officers, directors, employees and agents not to disclose, this Term Sheet, any of the terms, conditions, or other facts relating hereto, including the status thereof, or the fact that discussions or negotiations are taking place concerning the Restructure, to any person other than its or their investors, partners, attorneys and other advisors who need to know such information for the purpose of causing the consummation of the proposed Restructure, provided that any such parties will be informed of the confidential nature of such information and directed to keep such information in the strictest confidence. The terms set forth herein are proprietary to Lender and are made available solely for the purpose of discussing the Restructure. Oral or written disclosure of this Term Sheet to any competitor of Lender shall be detrimental to Lender and shall be an explicit violation of this paragraph.

**Governing Law
Venue:**

This Term Sheet will be governed and construed under the laws of the State of New York without regard to any conflicts of laws principles.

# Exhibit B

## NEW JERSEY MOTORSPORTS PARK LLC

## FIRST AMENDED PLAN TERM SHEET

### AS OF MARCH 7, 2011

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL FINANCIAL RESTRUCTURING AND ANY DEFINITIVE AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET THE EXHIBITS TO IT AND OTHERWISE ACCEPTABLE TO THE DEBTORS AND THE LENDER (EACH AS DEFINED BELOW). THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE DEBTORS.

This term sheet (the "Term Sheet") sets forth the principal terms of a proposed financial restructuring (the "Restructuring") for the existing debt and other obligations of New Jersey Motorsports Park LLC ("NJMP" or the "Company") and each subsidiary or affiliate of NJMP which files on or about the date hereof (the "Petition Date") a case under chapter 11 ("Chapter 11 Case(s)") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (Camden Division) (the "Bankruptcy Court") to pursue a pre-negotiated chapter 11 plan of reorganization supported by Lender (as defined below) and containing the terms set forth herein ("Plan").

## Transaction Overview

**Debtors:**    NJMP, New Jersey Motorsports Park Urban Renewal, L.L.C. ("Urban"), NJMP Development Associates, LLC ("Development"), and NJMP Operating Company, LLC ("Operating") (collectively, the "Debtors").

**Significant Creditors:**
- Senior Secured Claim of approximately $30,350,000 in unpaid principal, plus accrued interest, fees, costs and expenses (the "Prepetition Lender Obligations"),[1] arising under or in connection with loans (the "Loan") made by Merrill Lynch Mortgage Capital, Inc. (the "Lender") to the Debtors under that certain (i) Amended and Restated Building Loan and Security Agreement dated as of March 5, 2010 (as amended, restated, replaced or supplemented or otherwise modified from time to time, the "Loan Agreement") between the Debtors, as borrowers, and Lender, as sole lender, (ii) that certain first priority Mortgage and Security Agreement, dated June 20, 2007 (as amended, restated, replaced or supplemented or otherwise modified from time to time, the "Mortgage") executed and delivered by the Debtors to the Lender, (iii) that certain Assignment of Leases and Rents dated as of June 20, 2007 (as amended, restated, replaced or supplemented or otherwise modified from time to time, the "Assignment of Leases and Rents," and, collectively with the Loan Agreement, the notes evidencing the Prepetition Lender Obligations, the Mortgage and all other agreements, certificates or other documents previously, now or hereafter evidencing, guaranteeing, securing or otherwise executed in connection with the Prepetition Lender Obligations, as the same may be amended, replaced, supplemented or otherwise modified from time to time, the "Loan Documents").

- Claims of the State of New Jersey in the approximate amount of $185,000.

- Millville Rescue Squad ("MRS") – Critical vendor and creditor under that certain agreement dated as of April 17, 2008, whereby the parties contemplated that MRS was to

---

[1]    *Note:* Due to the fact that the amount of accrued interest and fees changes on a daily basis, exact figures for these items are not provided herein.

provide emergency services support to NJMP in exchange for the fees contemplated therein (as supplemented and amended, the "MRS Agreement").

- NJMP Holding Group, LLC ("Holding") – Lender under that Special Promissory Note dated as of March 11, 2009, in the principal amount of $500,000 (the "Holdings Claim").

- Cumberland Empowerment Zone Corp. ("CEZC") – Lender under that certain Amended and Restated Mortgage Note dated as of February __, 2011, in the principal amount of $425,000 (the "CEZC Claim").

- General Unsecured Non-Priority Claims: all remaining pre-petition claims, including the Lender Deficiency Claim (as defined below).

**Transaction Summary:**   Lender has agreed to restructure the Prepetition Lender Obligations in accordance with that certain "Term Sheet for Loan Facilities Pursuant to Reorganization Under Title 11 of the United States Code for Thunderbolt Raceway New Jersey Motorsports Park, Millville, NJ" (the "Facilities Term Sheet") attached hereto as Exhibit 1 upon the effective date of the Plan (the "Plan Effective Date"). Among other conditions to the Plan Effective Date and Lender's support of a Plan containing the material terms set forth in this Term Sheet, NEI Motorsports LLC (the "Plan Funder") has agreed in the funding commitment term sheet attached hereto as Exhibit 2 (the "Funding Term Sheet") to make a payment of not less than $2,000,000 (the "Funding") upon the occurrence of the Plan Effective Date to fund certain obligations, including $500,000 that shall be used to fund distributions to the Debtors' general unsecured creditors (the "Unsecured Minimum Distribution") in the manner discussed below (collectively, the "Proposed Transaction").

In consideration for the Funding, Plan Funder shall receive an 80.1% non diluted Class A member interest in NJMP, as reorganized debtor ("Reorganized NJMP"), 3.69236% of which Plan Funder shall transfer to ML Green LLC and 2.30764% of which Plan Funder shall transfer to NJMP Holding Group, all as more fully set forth in the Funding Term Sheet.

Debtors shall file a motion in the Bankruptcy Cases that will seek approval of bidding procedures pursuant to which other

parties shall be afforded an opportunity to submit higher and better bids at an auction (the "Auction") to top the terms of the Proposed Transaction. Among other things, the bidding procedures will provide that in order to be considered higher and better, a competing bid must provide for a cash payment on the Plan Effective Date of not less than $22,750,000, (a) less any amounts that otherwise would have been used by the proposed Funding to fund reserves in accordance with the Funding Term Sheet, (b) plus all amounts contemplated pursuant to paragraph 2(i) of the Funding Term Sheet (the "Minimum Overbid"). Not less than $20,500,000 of the Minimum Overbid shall be used to satisfy the Prepetition Lender Obligations on the Plan Effective Date; up to $250,000 of the Minimum Overbid shall be used to pay a breakup fee to the Plan Funder, and not less than $2,000,000 of the Minimum Overbid shall be used to fund at least those costs and other obligations contemplated to be satisfied by the Funding in the Funding Term Sheet, subject to the immediately preceding sentence (such transaction, an "Alternative Transaction").

Unless the Alternative Transaction is accepted by the Debtors and Lender and approved by the Bankruptcy Court as constituting a higher and better offer after completion of the Auction, the Plan shall effectuate the Proposed Transaction in accordance with this Term Sheet, the Facilities Term Sheet and the Restructuring Term Sheet.

In the event the Proposed Transaction is effectuated by the Plan, the first $20,500,000 of the Prepetition Lender Obligations will be exchanged for (a) loans in the total principal amount of $20,000,000 evidenced by a senior loan in the principal amount of $10,000,000 (Note A) and a subordinate loan evidenced by promissory note (Note B), having the other terms and subject to the conditions specified in the Facilities Term Sheet (the "Lender Debt Distribution"); and (b) a 19.9% equity interest in Reorganized NJMP, which interest shall have an imputed value of $500,000 (the "Lender Equity Distribution," together with the Lender Debt Distribution, the "Lender Secured Distribution"). The remaining portion of the Prepetition Lender Obligations in the approximate amount of $10,000,000 (the "Lender Deficiency Claim") shall, pursuant to Section 506(a) of the Bankruptcy Code, be classified as a general unsecured claim. The Lender Deficiency Claim shall not share in the Unsecured Minimum Distribution but shall participate ratably with general unsecured creditors in any distributions beyond the Unsecured

Minimum Distribution.

In the event the Alternative Transaction is effectuated by the Plan, (a) Lender shall be paid $20,500,000 in cash on the Plan Effective Date and will not receive the Lender Debt Distribution, (b) Lender shall forego the Lender Equity Distribution and (c) the Lender Deficiency Claim shall share ratably with general unsecured creditors in the proceeds received on account of the Alternative Transaction that exceed the Unsecured Minimum Distribution.

The Debtors' use of cash collateral pursuant to section 363 of the Bankruptcy Code shall be under the condition that such use shall be consistent with (i) a 24-week rolling cash flow projection, commencing on the petition date, of anticipated cash receipts and disbursements (together with any similar budget (which budget shall be in form and substance satisfactory to the Lender in its sole discretion, covering any subsequent period, the "Budget"), and (ii) with an interim cash collateral order (the "Interim Cash Collateral Order") and a final cash collateral order; together with the Interim Cash Collateral Order, the "Cash Collateral Order") acceptable to Lender. Among other things, the Cash Collateral Order shall provide Lender with customary replacement liens (the "Replacement Liens") on all of the Debtors' assets, other than the funds received by the Debtors in connection with the Funding.

## Classification and Treatment
## of Claims and Interests

**Administrative Expenses (Claims Under 507(a) Of the Bankruptcy Code Other Than Priority Tax Claims, Which Include Restructuring Costs and Unpaid Post-Bankruptcy Trade Claims):**

Each holder of an allowed administrative expense claim shall receive payment in full in cash of the unpaid portion of such allowed administrative expense claim (i) on the Plan Effective Date or as soon thereafter as reasonably practicable, (ii) in the ordinary course of business on Reorganized NJMP, (iii) in the case of professional fees, after Bankruptcy Court approval thereof, or (iv) as otherwise agreed by Reorganized NJMP and such holder.

**Priority Tax Claims**

On or as soon as practicable after the Plan Effective Date, each holder of an all allowed priority tax claim will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

**Secured Claim of Lender:**

(a) In the event the Proposed Transaction is consummated, on the Plan Effective Date Lender shall receive the Lender Secured Distribution on account of the secured portion of the Prepetition Lender Obligations.

(b) In the event the Alternative Transaction is consummated, on the Plan Effective Date Lender shall receive on account of the secured portion of the Prepetition Lender Obligations a cash payment in the amount $20,500,000 from proceeds that are to be paid by the prevailing bidder at the Auction (the "Successful Bidder"). The remaining portion of the Prepetition Lender Obligations shall constitute the Lender Deficiency Claim and will be treated with other unsecured claims as set forth below.

● All reasonable expenses, compensation and other such amounts owing to the Lender after the Petition Date under or in respect of the Loan Documents (including, but not limited to, all reasonable fees and expenses of outside professionals) in an amount not to exceed $325,000 shall be paid in a timely fashion under the Cash Collateral Order and, to the extent accrued but unpaid as of the Plan Effective Date, shall be paid in full on such date.

**Other Secured Claims:**

To the extent that any other secured claims exist, on or as soon as practicable after the Plan Effective Date, all such

secured claims of the Debtors allowed as of the Plan Effective Date, shall be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

**General Unsecured Claims:**

(a) In the event the Proposed Transaction is consummated, each holder of an allowed general unsecured claim shall have its claim cancelled and discharged and in exchange therefor shall receive, on or as soon as reasonably practicable after the Plan Effective Date, its ratable portion of the Unsecured Minimum Distribution without reference to the Debtor against whom such unsecured claim is held; provided that the Lender Deficiency Claim shall not share in this distribution.

(b) In the event the Alternative Transaction is consummated, each holder of an allowed general unsecured claim shall have its claim cancelled and discharged and in exchange therefor shall receive, on or as soon as reasonably practicable after the Plan Effective Date:

(i) its ratable portion of the Unsecured Minimum Distribution without reference to the Debtor against whom such unsecured claim is held; provided that the Lender Deficiency Claim shall not share in this distribution and the Replacement Liens shall not attach thereto; and

(ii) after satisfaction of all obligations that otherwise were to have been paid by the Funding as set forth above, its ratable portion of all funds received on account of the Alternative Transaction that exceed the Unsecured Minimum Distribution without reference to the Debtor against whom such unsecured claim is held; provided that the Lender Deficiency Claim shall share in this distribution and the Replacement Liens shall attach thereto.

• In accordance with section 510(a) of the Bankruptcy Code, distributions on account of the CEZC Claim and the Holdings Claim shall be made to Lender, unless Lender agrees in its sole discretion and absolute discretion (a) not to enforce its contractual right to compel Debtors to turn the distribution to such holders over to the Lender or (b) to forego distributions on account of those claims.

**Intercompany Claims:**

All intercompany claims will be paid, adjusted, reinstated or discharged to the extent reasonably determined to be

appropriate by the Company, subject to the consent of (a) the Lender in the event the Proposed Transaction is consummated or (b) the Successful Bidder to the extent the Alternative Transaction is consummated.

| | |
|---|---|
| **Section 510(b) Claims:** | Any holder of a claim against any of the Debtors that is described in section 510(b) of the Bankruptcy Code shall not receive a distribution under the Plan and such section 510(b) claims shall be extinguished. |
| **Equity Interests:** | On the Effective Date, all equity interests in NJMP, including any rights to acquire any equity interests, shall be cancelled and extinguished and the holders thereof shall not receive a distribution on account of such equity interests under the Plan. |

## Other Principal Plan Terms

| | |
|---|---|
| **Executory Contracts and Unexpired Leases:** | Executory contracts and unexpired leases shall be assumed or rejected as determined by the Debtors in consultation with Lender or, if the Alternative Transaction is consummated, by the Successful Bidder.  Notwithstanding the foregoing, the MRS Agreement shall be assumed by the Debtors in accordance with the Bankruptcy Code on or before the Plan Effective Date.

In the event the Proposed Transaction is consummated, that certain Financial Security Agreement dated as of June 20, 2007, by and among the City of Millville, NJMP and Lender (as amended, the "Tri-Party Agreement"), shall be assumed by the Debtors and the obligations thereunder shall be reinstated.  In the event the Alternative Transaction is consummated, the Tri-Party Agreement shall be assumed by the Debtors and the obligations thereunder shall be reinstated, except that the Successful Bidder shall replace Lender under the Tri-Party Agreement and shall undertake Lender's obligations thereunder. |
| **Charter; Bylaws:** | The charter, bylaws, operating agreement and other organizational documents of each of the Debtors shall have been restated in a manner reasonably satisfactory to the Lender and consistent with section 1123(a) (6) of the Bankruptcy Code. |
| **Cancellation of Notes, Instruments, Certificates and** | Except as otherwise provided herein, on the Plan Effective Date, all notes, instruments, certificates, and other documents evidencing debt of, or equity interests in, the Debtors (other |

**Other Documents:**    than such notes, instruments, certificates or other documents evidencing (a) debts that will be reinstated or that have been assumed or will be assumed under the Plan or (b) equity interests of any Debtor other than NJMP) shall be cancelled, and the related obligations of the Debtors thereunder shall be discharged.

**Vesting of Assets:**    On the Plan Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors' estates shall vest in Reorganized NJMP and the other reorganized debtors (the "Reorganized Debtors"), free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan.

**Compromise and Settlement:**    The Plan shall contain customary provisions for the compromise and settlement of claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of allowed claims and equity interests and their respective distributions take into account and conform to the relative priority and rights of such claims and interests.

**Releases:**    The Plan will contain language substantially to the effect of the following:

"**Released Party**" means each of: (a) the Lender; (b) the Lender's subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals; and (c) the Debtors' and the Reorganized Debtors' subsidiaries, affiliates, officers, directors, principals, shareholders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals.

*Releases by the Debtors*. Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the plan supplement filed in connection therewith (the "Plan Supplement"), for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Plan Effective

9

Date, the Released Parties are deemed released and
discharged by the Debtors, the Reorganized Debtors, and their
estates from any and all claims, obligations, rights, suits,
damages, causes of action, remedies, and liabilities
whatsoever, including any derivative claims, asserted or
assertable on behalf of the Debtors, whether known or
unknown, foreseen or unforeseen, existing or hereinafter
arising, in law, equity, or otherwise, that the Debtors, the
Reorganized Debtors, their estates, or their affiliates would
have been legally entitled to assert in their own right (whether
individually or collectively) or on behalf of the holder of any
claim or interest or other entity, based on or relating to, or in
any manner arising from, in whole or in part, the Debtors, the
Chapter 11 Cases, the Loan Documents, the Debtors'
restructuring, the purchase or sale (or the rescission of such
purchase or sale) of any security of the Debtors or the
Reorganized Debtors, the subject matter of, or the transactions
or events giving rise to, any claim or interest that is treated in
the Plan, the business or contractual arrangements between
any Debtor and any Released Party, the restructuring of
claims and interests before or during the Chapter 11 Cases,
the negotiation, formulation, or preparation of the Plan and
Disclosure Statement, or related agreements, instruments, or
other documents, upon any other act or omission, transaction,
agreement, event, or other occurrence taking place on or
before the date of Plan confirmation, other than claims or
liabilities arising out of or relating to any act or omission of a
Released Party that constitutes willful misconduct (including
fraud) or gross negligence.[2]

**Releases by Holders of Claims and Interests**. As of the Plan
Effective Date, each holder of a claim or an interest that
receives a distribution under the Plan shall be deemed to have
conclusively, absolutely, unconditionally, irrevocably, and
forever, released and discharged the Debtors, the Reorganized
Debtors, and the Released Parties from any and all claims,
interests, obligations, rights, suits, damages, causes of action,
remedies, and liabilities whatsoever, including any derivative
claims, asserted on behalf of a Debtor, whether known or
unknown, foreseen or unforeseen, existing or hereafter
arising, in law, equity or otherwise, that such entity would
have been legally entitled to assert (whether individually or
collectively), based on or relating to, or in any manner arising

---

[2]    Capitalized terms used but not otherwise defined shall have the meanings commonly associated with such
terms in chapter 11 plans of reorganization.

from, in whole or in part, the Debtors, the Debtors'
restructuring, the Debtors' Chapter 11 Cases, the Loan
Documents, the purchase, sale, or rescission of the purchase
or sale (or the rescission of such purchase or sale) of any
security of the Debtors or the Reorganized Debtors, the
subject matter of, or the transactions or events giving rise to,
any claim or interest that is treated in the Plan, the business or
contractual arrangements between any Debtor and any
Released Party, the restructuring of claims and interests
before or during the Chapter 11 Cases, the negotiation,
formulation, or preparation of the Plan, the Disclosure
Statement, the Plan Supplement, or related agreements,
instruments, or other documents, upon any other act or
omission, transaction, agreement, event, or other occurrence
relating to the Debtors taking place on or before the date of
Plan confirmation, other than claims or liabilities arising out
of or relating to any act or omission of a Released Party that
constitutes willful misconduct (including fraud) or gross
negligence. Notwithstanding anything to the contrary in the
foregoing, the release set forth above does not release any
post-Plan Effective Date obligations of any party under the
Plan or any document, instrument, or agreement (including
those set forth in the Plan Supplement) executed to implement
the Plan.

**Exculpation:**    The Plan will contain language substantially to the effect of
the following:

*"Exculpated Party"* means each of: (a) the Debtors, the
Reorganized Debtors and their affiliates, (b) the Lender; and
(c) with respect to each of the foregoing entities in clauses (a)
and (B), such entities' subsidiaries, affiliates, officers,
directors, principals, shareholders employees, agents,
financial advisors, attorneys, accountants, investment bankers,
consultants, representatives, management companies, fund
advisors and other professionals.

*Exculpation.* Except as otherwise specifically provided in the
Plan or Plan Supplement, no Exculpated Party shall have or
incur, and each Exculpated Party is hereby released and
exculpated from any claim, obligation, cause of action, or
liability for any claim, except for gross negligence or willful
misconduct, but in all respects such entities shall be entitled to
reasonably rely upon the advice of counsel with respect to
their duties and responsibilities pursuant to the Plan.  The
Debtors and the Reorganized Debtors (and each of their

respective affiliates, agents directors, officers, employees, advisors, and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distribution shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.

**Discharge of Debtors:** Except as otherwise provided and effective as of the Plan Effective Date: (i) the rights afforded in the Plan and the treatment of all claims and interests under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the Debtors or any of their assets, property, or estates; (ii) the Plan shall bind all holders of claims and interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (iii) all claims and interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all entities shall be precluded from asserting against the Debtors, the Debtors' estates, the reorganized Debtors, their successors and assigns, and their assets and properties, any other claims or interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**Injunction:** From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest, or remedy discharged, released or to be released pursuant to the Plan or the Confirmation Order.

**Definitive Documents and Due Diligence:** This Term Sheet is indicative, and any final agreement shall be subject to definitive agreements, pleadings, court submissions, offering memoranda and other documents ("Definitive Documents"), which Definitive Documents shall be substantially consistent with the terms of this Term Sheet, and, if the Proposed Transaction is consummated, the

Facilities Term Sheet and the Funding Term Sheet, and otherwise in form and substance acceptable to the Lender in its sole discretion, except as otherwise provided herein. The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein. consistent with the terms of this Term Sheet and, if the Proposed Transaction is consummated, the Facilities Term Sheet and the Funding Term Sheet and otherwise in form and substance acceptable to the Lender in its sole discretion, except as otherwise provided herein.

**Tax Structure:**          The Debtors shall consult with the Lender on tax issues and matters of tax structure relating to the Restructuring, and such matters shall be consistent herewith and otherwise reasonably satisfactory to the Lender.

**Retention of Jurisdiction:**          The Plan shall provide for a broad retention of jurisdiction by Bankruptcy Court including for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Plan Effective Date services, (c) resolution of motions, adversary proceedings, or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements, (e) entering and implementing such orders as are necessary or appropriate to sell, dispose of, liquidate or abandon any assets or properties of the FCC trust, to the extent applicable and subject to the provisions of the New Term Loan documentation and (f) other purposes.

**Resolution of Disputed Claims:**          The Plan shall provide customary terms for the resolution of disputed claims and any reserves therefor.

# Exhibit C

NEI Motorsports, LLC

As of March 7, 2011

New Jersey Motorsports Park LLC

Re: First Amended $2,000,000.00 Funding Commitment Term Sheet

     We are pleased to inform you of the commitment of NEI Motorsports, LLC ("NEI") to provide an equity infusion into reorganized New Jersey Motorsports Park LLC ("NJMP") in the amount of at least Two Million ($2,000,000.00) Dollars (the "Funding"). The provisions described in this commitment are not intended to be an exhaustive list of the terms, provisions and conditions to be contained in the Operating Agreement for NJMP, as reorganized debtor (the "NJMP Operating Agreement"). Such NJMP Operating Agreement shall be consistent with (a) the current operating agreement of New Jersey Motorsports Park LLC and (b) that certain Term Sheet for Loan Facilities Pursuant to Reorganization Under Title 11 of the United States Code for Thunderbolt Raceway New Jersey Motorsports Park, Millville, NJ (the "Facilities Term Sheet"), and shall contain such other terms, provisions, conditions, certifications, representations, and warranties as we, in our reasonable discretion, may require, and which shall not be inconsistent with (a) and (b) of this sentence. In consideration for the Funding, we shall receive an 80.1% non diluted Class A member interest in NJMP, 3.69236% of which we shall transfer to ML Green LLC and 2.30764% of which we shall transfer to NJMP Holding Group. The remaining 19.9% Class A member interest shall be vested in Merrill Lynch Mortgage Capital Inc. (the "Lender") in accordance with the Facilities Term Sheet. The Funding is subject to the following terms and conditions, and shall also be subject to higher and better offers:

    1.  <u>Amount/Timing of Funding</u>: The Funding shall be no less than Two Million ($2,000,000.00) Dollars US in immediately available funds. We shall close on the Funding and pay the Funding amount no later than five (5) business days following the date that the Order confirming that certain Plan of Reorganization (the "Plan") filed in the bankruptcy cases of NJMP and its affiliates (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of New Jersey (the "Court") becomes a final order of the Court, provided such order becomes a final order no later than December 26, 2011. The Funding shall be deposited into the attorney trust account of our attorney not less than 10 days before the first scheduled hearing date for Plan confirmation, with certification of same to the Court upon receipt, and will subsequently be disbursed in accordance with the terms herein. Notwithstanding the foregoing, our commitment to make the Funding shall expire on December 26, 2011 (the "Outside Date").

    2.  <u>Purpose of Funding</u>: The Funding shall be used to pay all costs of the restructure pursuant to the Plan and the Plan Term Sheet related thereto, including, but not limited to:

    (i)  $404,778 shall be allocated to the fees and expenses (including filing fees and costs) of attorneys, professionals, and consultants (a) retained by the debtors and the official committee of unsecured creditors appointed in the Debtors' cases, in each case as approved by

the Court after appropriate application and subject to the budget approved by the Court in connection with the debtors' final cash collateral order, and (b) retained by Lender. In the event $404,778 shall not be sufficient to satisfy such obligations on the date the Plan goes effective (the "Effective Date") and the full $2,000,000 Funding has otherwise been used in accordance herewith, NEI shall pay such outstanding obligations that exceed $404,778 (the "Excess"). Notwithstanding the foregoing, NJMP shall pay the first $200,000 of such Excess from cash on hand as of the Effective Date that was not paid with the Funding and NEI shall pay the balance of the Excess;

      (ii)    $50,000 shall be allocated to priority tax claims;

      (iii)    $209,222 shall be allocated to the payment to Ovations upon Plan confirmation;

      (iv)    $500,000 shall be allocated to the payment of the claims of general unsecured creditors of all of the Debtors (other than Ovations), which amount shall be paid ratably to all such creditors;

      (v)    $336,000 shall be allocated to fund reserves for, among other things, debt payment, insurance, taxes and such other reserves as Lender and NJMP mutually shall deem necessary;

      (vi)    $500,000 shall be allocated to meet operating and other liquidity obligations of the reorganized debtors; and

      (vii)    to pay such other costs and expenses as Lender and NEI mutually shall deem necessary to continue the ongoing business operations of reorganized debtors.

    3. Equity Interest of NEI: In consideration for the Funding, NEI shall receive an 80.1% Class A member interest in NJMP in accordance with the terms hereof. NEI shall, pursuant to the NJMP Operating Agreement, be the managing member of NJMP.

    If you agree to the terms and conditions of this commitment, please acknowledge your acceptance by executing the enclosed copy of this letter and returning same to me. This commitment shall not be binding, and shall become null and void, unless the attached counterpart is signed by New Jersey Motorsports Park LLC to evidence acceptance of the outline of the terms and conditions referenced herein and is returned to me by April 12, 2011.

Very Truly Yours,

NEI Motorsports, LLC

By: _____
    Lee Brahin, Manager

NY894234.2

202970-10311

Accepted on this _____ day of _____, 2011

New Jersey Motorsports Park LLC

    By: NJMP Holding Group, LLC, Managing Member

        By: NJMP Associates, LLC, Managing Member

           By: _____
              Lee Brahin, co-Manager

# Exhibit D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| NEW JERSEY MOTORSPORTS PARK, LLC, *et al.*, | Case No. 11-16752 JHW |
| Debtors | Jointly Administered |

### SALE AND AUCTION PROCEDURES, NOTICE PROCEDURES AND BREAK-UP FEE PROVISIONS IN CONNECTION WITH PROPOSED DISPOSITION OF REORGANIZED INTERESTS

On March 7, 2011, New Jersey Motorsports Park, LLC ("NJMP"), New Jersey Motorsports Park Operating Company, LLC ("Operating"), New Jersey Motorsports Park Urban Renewal, LLC ("Urban Renewal"), and New Jersey Motorsports Park Development Associates, LLC ("Development" and, collectively, the "Debtors") each filed voluntary petitions for relief pursuant to Title 11, Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey, Camden Vicinage (the "Bankruptcy Court").

On April 2_, 2011, the Debtors filed that certain Debtors' Motion for Approval of Sale and Auction Procedures, Notice Procedures and Break-up Fee Provisions (the "Bidding Procedures") in Connection with Proposed Disposition of Reorganized Interests (docket no. __) (the "Motion").[1]

The Bidding Procedures set forth herein define the process by which the Debtors are permitted to conduct an auction for the right to become a sponsor of the Plan (a "Plan Sponsor") and, in turn, the owner of 100% of the non-diluted Class A membership interests (the "Reorganized Interests") in Reorganized NJMP.

1.    **Stalking Horse Proposed Transaction.**

Pursuant to the Term Sheets, and as set forth in the Debtors' Plan, NEI Motorsports LLC ("NEI") and Merrill Lynch Mortgage Capital, Inc. (the "Lender") have agreed to become the stalking horse Plan Sponsors and to enter into the Proposed Transaction.

The terms of the Proposed Transaction are summarized below; however Interested parties should review the Plan and the Term Sheets for the specific terms and conditions thereof. A review of these documents is essential to an understanding of the transactions contemplated in connection with these Bidding Procedures (including the Proposed Transaction), which will be effectuated pursuant to the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

*Summary of Proposed Transaction Terms.*

- NEI will make a payment of not less than $2,000,000 (the "Funding") upon the occurrence of the effective date under the Plan (the "Plan Effective Date"), which will be used to fund certain obligations, including $500,000 that shall be used to fund distributions to the Debtors' general unsecured creditors (the "Unsecured Minimum Distribution").

- In consideration for the Funding, NEI shall receive 80.1% of the Reorganized Interests, 3.69236% of which NEI shall transfer to ML Green and 2.30764% of which NEI shall transfer to Holdings, all as more fully set forth in the Funding Term Sheet. As set forth in the Plan Term Sheet and the Plan, in the event the Proposed Transaction is ultimately determined to be the highest and best offer, the Lender will agree to exchange $20,500,000 of the Prepetition Obligations (the "Restructured Secured Debt Amount") for (a) secured loans in the total principal amount of $20,000,000 evidenced by a senior loan in the principal amount of $10,000,000 (Note A) and a subordinated loan in the principal amount of $10,000,000 evidenced by promissory note (Note B), having the other terms and subject to the conditions specified in the Facilities Term Sheet; and (b) 19.9% of the Reorganized Interests.

- If the Proposed Transaction is consummated, the Lender's deficiency claim (*i.e.*, the Prepetition Obligations of $30,354,205.14 less the $20,500,000 Restructured Secured Debt Amount) (the "Deficiency Claim") will be treated as a general unsecured claim, but will not share in the Unsecured Minimum Distribution. However, the Deficiency Claim will share with general unsecured creditors in any distributions other than the Unsecured Minimum Distribution.

- The Proposed Transaction is subject to higher and better offers, which these Bidding Procedures are designed to encourage.

**2.    Bidding Procedures**

    *A.    Due Diligence.*

    i.    Upon execution of a confidentiality agreement supplied by the Debtors, in the form annexed hereto as Exhibit A (the "Confidentiality Agreement"), any party desiring to submit a bid (a "Potential Bidder") to become the Plan Sponsor and owner of the Reorganized Interests (such Potential Bidder's proposal, an "Alternative Transaction") upon the Plan Effective Date shall be granted access to relevant business and financial information of the Debtors to allow the Potential Bidder to evaluate the Debtors' business and assets for the sole purpose of submitting a bid; provided that the Debtors shall have no obligation to provide information to any party that, in the Debtors' business judgment, after consultation with the General Unsecured Creditors Committee appointed in the Debtors' bankruptcy cases (the "Committee") and the Lender, lacks the ability to consummate the Plan and provide necessary funding for the Alternative Transaction on the Plan Effective Date.

    ii.    Subject to the immediately preceding paragraph, any Potential Bidder that has signed a Confidentiality Agreement shall be permitted to examine the Debtors' assets, including any financial information relevant to its proposed transaction.    Such examination shall be

conducted and completed at least three business days prior to the Auction. Such examination may include an on-site physical inspection of the Debtors' facilities during normal business hours with 24 hours' advance written notice to counsel for the Debtors, which notice shall be via electronic mail, facsimile, overnight mail and/or hand delivery. Such due diligence shall be conducted at mutually convenient dates and times and shall be conducted in a manner that is not disruptive to the Debtors' business operations.

      *B.*    *Qualifying Bids.*

      i.    All Potential Bidders shall submit to the Debtors bids in the form of written agreements containing, at minimum, the terms below, accompanied by a signed Confidentiality Agreement (to the extent not previously provided). All bids shall be served on the Debtors at New Jersey Motorsports Park, LLC, Attn: Lee F. Brahin, 47 Warbird Drive, Millville, NJ 08332, with a copy to the undersigned counsel, Cohen Seglias Pallas Greenhall & Furman, P.C., Attn: Steven D. Usdin, Esquire, 30 South 17th Street, 19th Floor, Philadelphia, Pennsylvania 19103, so as to be received by the Debtors no later than _____ __.m. Eastern Prevailing Time on _____, 2011 (the "Bid Deadline").

      ii.    In order to constitute a "Qualifying Bid," such bid must conform to the following requirements:

      (a)    provide for a cash payment on the Plan Effective Date of not less than $22,750,000, (a) less any amounts that otherwise would have been used from the proposed Funding to fund reserves in accordance with the Funding Term Sheet, (b) plus all amounts contemplated pursuant to paragraph 2(i) of the Funding Term Sheet (the "Minimum Overbid");[2]

      (b)    set forth a list of executory contracts and unexpired leases that the Potential Bidder proposes the Debtors to assume, along with an undertaking by the Potential Bidder to pay any costs of cure in accordance with Section 365 of the Bankruptcy Code;[3]

      (c)    not provide for any payment to the Potential Bidder of a break-up fee, expense reimbursement or similar type of fee or payment;

      (d)    be accompanied by a deposit in the amount of $227,500, payable in immediately available funds (the "Deposit"), to be held by the Debtors' counsel to secure

---

[2]    In accordance with the Plan, not less than $20,500,000 of the Minimum Overbid shall be used to satisfy the Restructured Secured Debt Amount on the Plan Effective Date and not less than $2,000,000 of the Minimum Overbid shall be used to fund at least those costs and other obligations contemplated to be satisfied by the Funding in the Funding Term Sheet, subject to the immediately preceding sentence. In addition, and subject to approval of the Bankruptcy Court, up to $250,000 of the Minimum Overbid shall be used to pay the Break-up Fee (as defined below).

[3]    The assumption or rejection of any such executory contracts or unexpired leases will be effectuated pursuant to the procedures for assumption and rejection of executory contracts and unexpired leases set forth in the Plan.

the Qualifying Bid, which Deposit, subject to the provisions of these Bidding Procedures, shall be refunded to the Potential Bidder without interest if the Potential Bidder's Qualifying Bid is not accepted by the Debtors as the highest and best offer;

(e)    contain financial and other information sufficient (i) to enable the Debtors, in their business judgment, after consultation with the Committee and the Lender, to evaluate and confirm the Potential Bidder's financial ability to consummate the transaction, including evidence reasonably satisfactory to the Debtors that the Potential Bidder has financial resources available and sufficient to become the Plan Sponsor and pay the Minimum Overbid,[4] (ii) to provide adequate assurance of future performance under Section 365 of the Bankruptcy Code, and (iii) to demonstrate that the Plan will be feasible if the Potential Bidder's bid is determined to be the highest and best bid;

(f)    not contain any additional due diligence, financing or other contingencies of any kind;

(g)    provide that the Qualifying Bid is irrevocable;

(h)    fully disclose the identity of each entity that will be acquiring a portion of the Reorganized Interests under, or otherwise participating in connection with, such bid;

(i)    provide that the Potential Bidder consents to the jurisdiction of the Bankruptcy Court;

(j)    provide for a closing of the Alternative Transaction no later than the Plan Effective Date; and

(k)    provide that the Potential Bidder shall undertake the obligations of Lender and Lee F. Brahin, under the Financial Security Agreement dated June 20, 2007 by and among the City, NJMP, and Merrill Lynch, and all amendments thereto. The Debtors reserve the right to identify any such other agreements that may survive the Plan Effective Date. .

iii.    The Debtors shall review each bid and determine, after consultation with the Lender and the Committee, whether such bid constitutes a Qualifying Bid. The Debtors shall promptly notify each party submitting a bid whether such bid constitutes a Qualifying Bid.

iv.    In determining whether any bid constitutes a Qualifying Bid, any Potential Bidder shall be required, within twenty-four hours after the Debtors' request, to submit such additional financial statements and other documents relating to its business activities and its ability to consummate the transactions contemplated under its bid, as the Debtors, after consultation with the Committee and the Lender, deem necessary to analyze the bid.

---

[4]    If a Potential Bidder is an entity formed for the purpose of this transaction, such Potential Bidder must also provide similar financial information of the equity holder(s) of the Potential Bidder who will guarantee or fund the Potential Bidder's obligations.

v.      Copies of each Qualifying Bid shall be made available to all Potential Bidders who submit a Qualifying Bid (each such bidder, a "Qualifying Bidder") within two business days from the Bid Deadline.

vi.     NEI and the Lender shall be deemed Qualifying Bidders, and the joint bid submitted by them pursuant to the Proposed Transaction shall constitute a Qualifying Bid and the baseline bid for purposes of the Auction, which will have to be topped by Qualifying Bidders.

C.      _Auction._

i.      The Auction shall commence at _____ ___.m. Eastern Prevailing Time on _____, 2011, at Cohen, Seglias, Pallas, Greenhall & Furman, P.C., 30 South 17th Street, 19th Floor, Philadelphia, PA 19103.

ii.     Only NEI, the Lender and any other Qualifying Bidders shall be permitted to participate in the Auction.  NEI and the Lender shall be permitted to counter-bid against any other Qualifying Bidder on terms and conditions which are different from those set forth in the Term Sheets or the Plan.  For the avoidance of doubt, the Lender shall be permitted to credit bid up to the full amount of the Prepetition Obligations in connection with any bid by it under Section 363(k) of the Bankruptcy Code.

iii.    Qualifying Bids made prior to or at the Auction may not be withdrawn after they are made, and all Qualifying Bids will remain open as irrevocable backup bids until the Proposed Transaction or an Alternative Transaction has been consummated with the successful bidder.

iv.     The following procedures shall govern the Auction:

(a)     each Qualifying Bidder (including NEI and the Lender) shall appear in person or through an authorized representative (which representative shall appear in person);

(b)     only Qualifying Bidders (including NEI and the Lender) shall be entitled to submit bids;

(c)     bidding at the Auction shall commence at the amount of the highest Qualifying Bid received by the Debtors;

(d)     each successive bid after the commencement of bidding at the Auction shall be at least $250,000 higher than the last outstanding highest bid;

(e)     the Debtors reserve their rights, in their business judgment, after consultation with the Committee and the Lender, to determine at any time whether a bid constitutes a higher and better offer than other bids received, and the Debtors shall be entitled to consider any factors, including but not limited to the consideration proposed under such bid, the financial or other wherewithal of the Qualifying Bidder to consummate the transactions contemplated under such bid and the overall benefit to the Debtors' estates;

(f)    the Debtors reserve their right to reject any proposed higher or better bid which, in their business judgment, after consultation with the Committee and the Lender, is deemed inadequate or insufficient, or which bid is contrary to the best interests of the estates;

(g)    any Qualifying Bidder (including NEI and Lender) may make any modifications to its Qualifying Bids at the Auction; provided that the Debtors reserve their right, in their business judgment, after consultation with the Committee and the Lender, to determine whether such modifications impact whether such bid represents the highest and best offer;

(h)    the Debtors shall conduct the Auction until the Debtors determine, in their business judgment, after consultation with the Committee and the Lender, that they have received the highest and best offer available;

(i)    each Qualifying Bidder shall comply with such other terms and procedures as may be imposed by the Bankruptcy Court at or prior to the Auction;

(j)    the Debtors may, in their business judgment, after consultation with the Committee and the Lender, at any time prior to the Sale Hearing (as defined below), continue the Auction from time to time, adjourn the Auction and reopen the Auction, upon notice to NEI, the Lender, the Committee and any Qualifying Bidders, without notice to the Bankruptcy Court or any other persons or parties, and the Debtors may establish, by announcement at the Auction, any such modified or additional bidding procedures as the Debtors may deem appropriate based on the circumstances; provided, however, that such modifications and changes shall not materially alter the Bidding Procedures set forth herein; and

(k)    the Debtors shall submit any disputes that may arise in connection with the Auction to, and for resolution by, the Bankruptcy Court.

D.    _Identification of Prevailing Bidder; Court Approval at Sale Hearing._

i.    At the conclusion of the Auction, the Debtors shall announce the identity of the party submitting the highest and best offer (the "Prevailing Bid"). Such Prevailing Bid shall be subject to approval by the Bankruptcy Court at the Sale Hearing to approve the winning transaction (the "Sale Hearing").

ii.    The Sale Hearing shall be held before the Honorable Judith H. Wizmur, Chief Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Camden Vicinage, Mitchell H. Cohen U.S. Courthouse, Courtroom 4B, 400 Cooper Street, Camden, New Jersey 08101 on _____, 2011 at _____ _.m. prevailing Eastern time, or at such time thereafter as counsel may be heard, or at such other time as the Bankruptcy Court may establish.

iii.    The Debtors' presentation to the Bankruptcy Court of any Qualified Bid and/or Prevailing Bid will not constitute the acceptance of any bid. The Debtors will be deemed to have accepted a successful bid only when such bid has been approved by the Bankruptcy Court by

final order.

E.    *Failure to Consummate Transaction.*

i.     If, for any reason, the party submitting the Prevailing Bid fails to consummate its transaction, the Debtors shall designate the next highest and best offer as the Prevailing Bid (the "Secondary Prevailing Bid"), and the Debtors shall be authorized to consummate the closing of the transaction with the party submitting the Secondary Prevailing Bid without further order of the Court.

ii.     If, for any reason, the party submitting the Secondary Prevailing Bid fails to consummate the transaction, the Debtors shall designate the next highest and best offer as the Prevailing Bid (the "Tertiary Prevailing Bid"), and the Debtors shall be authorized to consummate the transaction with the party submitting the Tertiary Prevailing Bid without further order of the Court.

iii.     If, for any reason, the party submitting the Prevailing Bid that is approved by the Bankruptcy Court, or any Secondary Prevailing Bid or Tertiary Prevailing Bid, fails or refuses to consummate a transaction on the terms set forth in its bid, or otherwise breaches the terms of any such bid, the Debtors shall be entitled to retain the Deposit provided by each such Qualifying Bidder, without limiting any other rights that the Debtors may have against such Qualifying Bidder.

F.    *Return of Deposit.*

Except as provided above in connection with the failure of a party submitting the Prevailing Bid, the Secondary Prevailing Bid or the Tertiary Prevailing Bid to consummate the transactions contemplated under such bids, each Deposit shall be returned to the Qualifying Bidder who supplied the Deposit, without interest, within thirty (30) days after the completion of the Sale Hearing.

G.    *Jurisdiction of the Bankruptcy Court.*

The Bankruptcy Court shall have jurisdiction to hear any matters that may arise from or relate to these Bidding Procedures, the Auction and/or the transactions in connection therewith. If a party other than NEI and the Lender submits the Prevailing Bid, NEI and the Lender shall have standing to object thereto.

H.    *Break-up Fee.*

The Debtors have agreed to pay a break-up fee to NEI in the amount of $250,000 (the "Break-Up Fee") in the event that the Debtors accept a higher and better offer on account of an Alternative Transaction (other than a higher and better offer by NEI and the Lender), or (ii) the Bankruptcy Court enters an order approving any other bid as the highest and best offer (other than the bid of NEI and the Lender).

#1272046-v1 50919-0001

# Exhibit E

## CONFIDENTIALITY AGREEMENT

AGREEMENT made this _____ day of _____, 2011 by and between New Jersey Motorsports Park, LLC ("NJMP"), New Jersey Motorsports Park Operating Company, LLC ("Operating"), New Jersey Motorsports Park Urban Renewal, LLC ("Urban"), and New Jersey Motorsports Park Development Associates, LLC ("Development"), NJMP Holding Group, LLC ("Holdings"), and ML Green, LLC ("ML Green") (collectively the "Sellers") and _____ (hereinafter referred to as "Recipient").

### WITNESSETH:

WHEREAS, on March 7, 2011, NJMP, Operating, Development, and Urban (the "Debtors") filed Petitions for Chapter 11 protection in the United States Bankruptcy Court for the District of New Jersey, Camden Vicinage, which are jointly administered under Case No. 11-16752 JHW; and

WHEREAS, pursuant to the Petitions, the Debtors filed a Motion for Approval of Sale and Auction Procedures, Notice Procedures, and Cost Reimbursement/Break-Up Fee Provisions in Connection With Proposed Auction of Interests (the "Bidding Procedures Motion") to an unrelated third party (the "Proposed Purchaser"); and

WHEREAS, NJMP's members are ML Green and Holdings, and NJMP is the sole member of Operating, Development, and Urban; and

WHEREAS, the Debtors have obtained entry of an order, pursuant to section 363 of the Bankruptcy Code, approving sale and auction procedures, notice procedures and break-up fee provisions in connection with the proposed auction, which would afford the successful bidder to become a sponsor of the Debtors' joint plan of reorganization (the "Plan"), and, in turn, the owner of 100% of the equity interests in NJMP as reorganized under the Plan as of the Effective Date (as defined in the Plan) (such transaction, the "Transaction"); and

WHEREAS, pursuant to the Bidding Procedures Motion, as a condition to be given Confidential Information and Material, as defined below, Recipient is required to enter into this Confidentiality Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. In this Agreement, the term "Confidential Information and Material" shall be construed to include, to the extent not previously disclosed, the identity of existing and potential customers, all disclosed information pertaining to the Debtors' assets, liabilities, finances, business, and data, whether in written, electronic, and/or photographic form, which is provided by Sellers to Recipient.

2.    Confidential Information and Material shall not be used or reproduced by Recipient for any purpose other than to evaluate its interest in consummating a potential Transaction (the "Transaction").

3.    Recipient agrees to safeguard all Confidential Information and Material with the same degree of care with which it protects its own most highly confidential information, which degree of care shall in no event be less than that which is reasonable under the circumstances.

4.    Recipient agrees to limit access to the Confidential Information and Material to those of its representatives, advisors, accountants, attorneys, directors, officers, employees and agents (individually and jointly referred to as "Representatives") who have a need to know in order to evaluate the Transaction, and who are under obligations of confidentiality that are at least comparable to those set forth in this Agreement.  Recipient shall fully inform all such persons of the terms of this Agreement and hereby accepts responsibility for their compliance with the provisions contained herein and assumes any liability arising from or out of their non-compliance therewith.

5.    Without Sellers' prior written consent, Recipient will not initiate, accept or engage in any discussions or contacts of any kind with any customer, vendor, employee, or supplier of Sellers or with the staff or employees of Sellers with which Recipient does not already maintain a relationship or contact.

6.    As a condition to the furnishing of Confidential Information and Material about Sellers concerning the Transaction, Recipient agrees to treat Confidential Information and Material concerning Sellers, whether prepared by Sellers or their advisors, directors, officers, employees, agents, accountants and/or attorneys (collectively "Agents"), which has been or will be furnished to Recipient in the future, in accordance with the provisions of this Agreement and to take or abstain from taking certain other actions as set forth below.

7.    In this Agreement, Confidential Information and Material does not include information which (i) is already in Recipient's possession, provided that such information is not known by Recipient to be subject to another confidentiality agreement with, or other obligation of secrecy to, another party, (ii) becomes generally available to the public other than as a result of an unauthorized disclosure by Recipient or its Representatives, or (iii) becomes available to Recipient on a non-confidential basis from a source other than Sellers or their Agents, provided that such source is not known by Recipient to be bound by a confidentiality agreement with, or other obligation of secrecy to, Recipient or its Representatives, Sellers or another party.

8.    Recipient agrees that the Confidential Information and Material will be used solely for the purpose of evaluating the Transaction and will not be used for any other purposes whatsoever, and that such information will be kept confidential by Recipient and its Representatives; provided, however, that (i) any such information may be disclosed to Recipient's Representatives who need to know such information for the purpose of evaluating the Transaction between Recipient and Sellers (it being understood that such Representatives shall be informed by Recipient of the confidential nature of such information and shall be

2

directed by Recipient to treat such information confidentially), and (ii) any disclosure of such information may be made to which Sellers consent in writing.

9.  Recipient may disclose Confidential Information to the extent required by applicable law, rule, subpoena, regulation, regulatory authority or other applicable judicial or governmental order or process, provided, however, that unless otherwise prohibited by law, Recipient will provide the Sellers with prompt notice of such request or requirement so that Sellers may at their election seek a protective order or other appropriate remedy and Recipient and its Representatives will cooperate with the Sellers' efforts to obtain the same; provided further, however, if, absent the entry of such a protective order or other remedy, Recipient or a Representative is compelled by applicable law, rule, subpoena, regulation, regulatory authority or other applicable judicial or governmental order or process to disclose Confidential Information, Recipient or such Representative will use its best efforts to obtain assurance that confidential treatment will be accorded to that portion of the confidential Information that is being disclosed.

10.  Sellers will endeavor to include in any Confidential Information and Material any and all information known to them which they believe to be relevant for the purpose of the Transaction.

11.  Recipient agrees that from the date of the execution of this Agreement and for a period of two (2) years thereafter unless the Sale to Recipient is consummated and closed, Recipient will not solicit, induce or encourage any of Sellers' employees or employees of the Successful Bidder (as that term is defined in the Bidding Procedures Motion) to leave Sellers' employment or the employment of the Successful Bidder; provided, however, that Recipient shall not be prohibited from employing any such person who contacts the Recipient on his or her own initiative or in response to a published general solicitation.

12.  In the event that the Transaction between Sellers and Recipient is not consummated, Recipient will and will cause its Representatives to deliver promptly to Sellers and/or the Successful Bidder all documents (and all copies, extracts, or summaries thereof) furnished to Recipient or its Representatives by or on behalf of Sellers pursuant hereto.  All other Confidential Information and Material not returned to Sellers and/or the Successful Bidder, including all Confidential Information and Material prepared by Recipient or its Representatives shall be destroyed and no copy thereof shall be retained and, upon request of Sellers and/or the Successful Bidder, Recipient shall certify in writing to Sellers and the Successful Bidder that such action has been taken.  Notwithstanding the return or destruction of the Confidential Information and Material, Recipient and its Representatives will continue to be bound by their obligations of confidentiality pursuant to this Agreement.

13.  Recipient agrees to indemnify and hold Sellers and the Successful Bidder harmless from any damages, loss, costs, or liability arising out of or resulting from any unauthorized use or disclosure by the Recipient or its Representatives of the Confidential Information and Material. The Recipient understands and acknowledges that the Confidential Information and Material provided by Sellers constitutes the unique, valuable and special property of Sellers, and that unauthorized disclosure thereof by the Recipient or its Representatives or the breach by the

3

Recipient or its Representatives of the provisions of this Agreement, may cause irreparable injury to Sellers and the Successful Bidder. Accordingly, the Recipient understands, acknowledges and agrees that the remedy at law (i.e. monetary damages) for any breach by it or its covenants contained herein may be inadequate, and in recognition thereof, also agrees that Sellers and/or the Successful Bidder shall, in addition thereto, be entitled to injunctive relief without bond, upon the finding by a court of competent jurisdiction of a breach of any provision of this Agreement, which relief shall be in addition to and not in derogation of any other remedies which may be available to Sellers and the Successful Bidder as a result of such breach.

14. If it appears that Recipient or its Representatives have disclosed or used or threatened to disclose or use Confidential Information and Material in violation of this Agreement, Sellers and/or the Successful Bidder will be entitled to an injunction to restrain Recipient and its Representatives from disclosing or using, in whole or in part, the Confidential Information and Material. This shall not preclude Sellers or the Successful Bidder from pursuing other remedies, including a claim for losses and damages.

15. No failure or delay in exercising any right under this Agreement will constitute a waiver, nor will any single or partial exercise of any right preclude any other or further exercise of any other right. In case any provision of this Agreement shall be found to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

16. During the period while the Sellers remain under Chapter 11 protection pursuant to the Petitions, this Agreement shall be governed by and construed in accordance with Chapter 11 of Title 11 of the U.S. Code and the rules of the United States Bankruptcy Court for the District of New Jersey and the laws of the State of New Jersey, without giving effect to the conflict of laws principles thereof. Thereafter this Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without giving effect to the conflict of laws principles thereof.

17. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or other electronic transmission shall be effective as delivery of a manually executed counterpart thereof and shall be deemed an original signature for all purposes.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by its duly authorized officers as of the day and year first written above.

[Signatures on the following page]

4

**SELLERS:**

NEW JERSEY MOTORSPORTS PARK, LLC; NEW
JERSEY MOTORSPORTS PARK OPERATING
COMPANY, LLC; NEW JERSEY MOTORSPORTS
PARK DEVELOPMENT ASSOCIATES, LLC; and
NEW JERSEY MOTORSPORTS PARK URBAN
RENEWAL, LLC

Attest:

_____          By: _____
                                        Lee F. Brahin

Dated:                              Dated:

Attest:                             NJMP HOLDING GROUP, LLC

                                    By: _____
_____               Lee F. Brahin

                                    Dated:
Dated:

Attest:                             ML GREEN, LLC

_____          By: _____

Dated:                              Dated:

Attest:                             **RECIPIENT:**

_____          By: _____

Dated:                              Dated:

#1272061-v1 50919-0001