COHEN, SEGLIAS, PALLAS,
GREENHALL & FURMAN, PC
Steven D. Usdin, Esquire
Nella M. Bloom, Esquire (NB3891)
30 South 17th Street, 19th Floor
Philadelphia, PA 19103
Tel: (215) 564-1700
Fax: (215) 564-3066
Email:  susdin@cohenseglias.com
        nbloom@cohenseglias.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NEW JERSEY MOTORSPORTS PARK, LLC, *et al.*,<br><br>Debtors | Chapter 11<br><br>Case No. 11-16752 JHW<br><br>Jointly Administered |

## AMENDED JOINT DISCLOSURE STATEMENT OF THE DEBTORS RELATING TO AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

PLEASE READ THIS AMENDED JOINT DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") CAREFULLY.  THIS JOINT DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' AMENDED PLAN (THE "PLAN").   THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE.  THE PROPONENTS URGE THE VOTER TO ACCEPT THE PLAN.

New Jersey Motorsports Park, LLC
New Jersey Motorsports Park Operating Company, LLC
New Jersey Motorsports Park Development Associates, LLC
New Jersey Motorsports Park Urban Renewal, LLC

DATED:  May 24, 2011

1

The section headings used herein are for convenience of reference only and shall not form any part of this amended joint disclosure statement (the "Joint Disclosure Statement") or affect its interpretation. The sections of this Joint Disclosure Statement, set forth according to their headings and page numbers, are as follows:

| | | | |
|---|---|---|---|
| I. | **Introduction** | | 4 |
| | A. | What is Chapter 11? | 5 |
| | B. | What is a Plan of Reorganization? | 5 |
| | C. | What is a Disclosure Statement? | 5 |
| | D. | The Purpose of the Disclosure Statement | 6 |
| | E. | Notice to Holders of Claims | 7 |
| | | | |
| II. | **Acceptance of the Plan** | | 8 |
| | A. | Voting Procedures | 8 |
| | B. | Confirmation Hearing and Deadline for Objections to Confirmation | 10 |
| | | | |
| III. | **Plan of Reorganization – General Overview** | | 10 |
| | | | |
| IV. | **Significant Information Concerning The Debtors** | | 12 |
| | A. | General Information | 12 |
| | | 1. The Purchase of the Property | 12 |
| | | 2. The PILOT Agreement | 12 |
| | | 3. Development | 13 |
| | | 4. The Merrill Lynch Loan | 13 |
| | | 5. Cumberland Empowerment Zone Loan | 14 |
| | | 6. Millville Rescue Squad | 14 |
| | | 7. Ovations Food Services, LP | 14 |
| | | 8. Trackracket, Inc. Litigation | 15 |
| | | 9. City of Millville | 15 |
| | | | |
| | B. | Administration Of The Chapter 11 Cases | 15 |
| | | 1. Debtors' Retention of Professionals | 15 |
| | | 2. First Day Motions | 16 |
| | | 3. Motions to Maintain the Debtors' Business Activities | 17 |
| | | 4. Bar Date | 18 |
| | | 5. Cash Collateral Order | 18 |
| | | 6. Motion for Relief from Stay | 19 |
| | | | |
| | C. | Financial Information | 19 |
| | | | |
| V. | **The Plan** | | 20 |
| | A. | Treatment and Classification of Claims | |
| | | 1. Administrative Claims | 20 |
| | | 2. Professional Compensation and Reimbursement Claims | 20 |
| | | 3. Priority Tax Claims | 21 |
| | | 4. Class 1 - Secured Claim of Merrill Lynch | 21 |
| | | 5. Class 1(a) – Other Secured Claims | 22 |
| | | 6. Class 2 - Other Priority Claims | 23 |
| | | 7. Class 3 - General Unsecured Claims | 23 |
| | | 8. Class 4 - Interests | 24 |

|       | 9.  | Class 5 – City of Millville | 24 |
|       |     |                             |    |
| B. | Sale and Auction Provisions |  | 24 |
| C. | Revised Loan Facilities |  | 26 |
| D. | Surviving Litigation |  | 26 |
| E. | Summary Of Other Provisions |  | 27 |
|  | 1. | Rejection of Executory Contracts and Unexpired Leases | 27 |
|  | 2. | Cancellation of Securities, Instruments, and Any Other Agreements Evidencing Claims and Interests | 27 |
|  | 3. | Provisions for Treatment of Disputed Claims | 28 |
|  | 4. | Method of Distribution Under the Plan | 28 |
|  | 5. | Plan Administrator | 29 |
|  | 6. | Retention of Jurisdiction by the Bankruptcy Court | 29 |
|  | 7. | Modification of Plan | 31 |
|  | 8. | Releases by Creditors | 31 |
|  | 9. | Releases of Lender Released Parties by the Debtors and the Estates | 32 |
|  | 10. | Injunction | 32 |
|  | 11. | Exculpation Provision | 32 |
|  | 12. | Substantive Consolidation | 33 |
|  | 13. | Continued Corporate Existence and Vesting of Assets | 33 |
|  | 14. | Management of Reorganized Debtors | 34 |
|  | 15. | Tax Consequences of the Plan | 34 |

**VI.  Confirmation of the Plan**  34
  A.  Acceptance  34
  B.  Best Interest Test  35
  C.  Cramdown  36
  D.  Feasibility  37

**VII.  Alternatives to Confirmation and Consummation Of Plan**  37
  A.  Liquidation Under Chapter 7  37
  B.  Alternative Plan of Reorganization  37

**VIII.  Effect of Confirmation of the Plan**  38

**IX.  Risk Factors**  38

**X.  Conclusion**  38

## I.    INTRODUCTION

New Jersey Motorsports Park, LLC ("NJMP"), New Jersey Motorsports Park Operating Company, LLC ("Operating"), New Jersey Motorsports Park Urban Renewal, LLC ("Urban"), and New Jersey Motorsports Park Development Associates, LLC ("Development") (collectively the "Debtors") submit this Amended Joint Disclosure Statement pursuant to section 1125 of the Bankruptcy Code (the "Disclosure Statement") to holders of Claims against the Debtor in connection with (i) the solicitation of acceptances of the Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan")[1] submitted by the Debtors; and (ii) the hearing to consider confirmation of the Plan to be scheduled on _____ prevailing Eastern time.

On March 7, 2011, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, Vicinage of Camden (the "Bankruptcy Court"). The Debtor's bankruptcy cases have been assigned to the Honorable Judith H. Wizmur.

On April 21, 2011, the Debtors filed the Plan, which provides for the reorganization of the Debtors' assets and the treatment of outstanding Claims against the Debtors. Pursuant to section 1125 of the Bankruptcy Code, the Debtors prepared and filed this Joint Disclosure Statement for Bankruptcy Court approval before circulation to holders of Claims in connection with the solicitation of acceptances of the Plan. A copy of the Plan is enclosed in this information packet.

The Plan contains six (6) Classes of Claims. Upon a review of the Schedules and Statements of Financial Affairs filed by the Debtors as a whole, the Classes of Claims and estimated Claim amounts are as follows:

| Class | Type of Claim | Estimated Amount | Estimated Recovery |
|---|---|---|---|
| 1 | Secured Claim of Merrill Lynch | $30,543,205.13 | Less than 100% |
| 1(a) | Other Secured Claims | Unknown | 100% |
| 2 | Other Priority Claims | $96,257.00 | 100% |
| 3 | General Unsecured Claims | $4,308,000.00 | Less than 100% |
| 4 | Equity Security Holders | | 0% |
| 5 | City of Millville | $396,667.87 | 100% |

The Debtors also have recognized three (3) types of claimants that are not in a Class. These are (a) Administrative Expense Claims; (b) Professional Compensation and

---

[1]    Capitalized terms not defined in this Joint Disclosure Statement shall have the meanings ascribed to them in the Plan.

Reimbursement Claims; and (c) Priority Tax Claims.   The Debtors anticipate that the Administrative Claims will be paid in the ordinary course of business, the Professional Compensation and Reimbursement Claims will total approximately $250,000.00, and the Priority Tax Claims will total approximately $197,000.00 for all Debtors combined.

The Debtors' source of payment for all Allowed Claims, as well as all Claims not in a Class, is derived from the Bankruptcy Court-approved motion for use of the cash collateral (the "Cash Collateral Motion") of the Debtors' primary lender, Merrill Lynch Mortgage Capital, Inc. ("Merrill Lynch"), and an infusion of $2,000,000.00 in new equity from NEI[2] or another Successful Bidder in accordance with the Bidding Procedures Order.   Pursuant to the Plan, Merrill Lynch's Secured Claim in an amount in excess of $30 million shall either be (a) exchanged for a new loan in the amount of $20,000,000.00 (the "Loan") and a distribution of 19.9% of the Reorganized Equity Interests, or (b) $20,500,000.00 of such Secured Claim will be paid on the Effective Date.   The income derived from the Debtors' ordinary course operation provided the Debtors with sufficient funds to operate their business.

A.    What is Chapter 11?

Chapter 11 of the Bankruptcy Code is the principal vehicle for reorganizing business entities under the federal bankruptcy laws.   Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors.   The filing of a petition for reorganization under chapter 11 generally provides, under section 362 of the Bankruptcy Code, for an automatic stay of attempts to collect Claims or enforce Liens that arose prior to the commencement of a debtor's chapter 11 case which otherwise interfere with the debtor's property or business.   The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

B.    What is a Plan of Reorganization?

The principal purpose of a chapter 11 case is to facilitate the formulation of a plan of reorganization which provides for the restructuring of a debtor's liabilities and the treatment of claims.  A plan of reorganization may also provide for the liquidation of a debtor's assets.  Here, the Plan proposed by the Debtor provides for the reorganization of its assets and distributions to holders of Claims in accordance with the priority scheme set forth in the Bankruptcy Code.

C.    What is a Disclosure Statement?

After a plan of reorganization has been proposed, the holders of claims against a debtor that are impaired by the terms of the plan and that are entitled to distributions under the plan are entitled to vote on whether to accept or reject the plan. The Bankruptcy Code requires disclosure of "adequate information" to all such voting creditors by way of a Court-approved disclosure statement before the plan proponent may solicit votes on the plan.  The Bankruptcy Code provides that a disclosure statement containing adequate information must contain "information

---

[2]        The proposed ownership of NEI is attached hereto as "Exhibit D."

of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and condition of the debtor's books and records, that would enable a hypothetical reasonable creditor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a).

The Debtors present this Joint Disclosure Statement to the voting holders of Allowed Claims against the Debtors in order to provide each voting holder of an Allowed Claim with sufficient information to make an informed decision as to whether to accept or reject the Plan. The Debtors are also making this Joint Disclosure Statement available to, among others, the known holders of Administrative Expense Claims and Priority Tax Claims in order to provide such holders with additional information to evaluate the Plan.

D.    The Purpose of the Disclosure Statement

The purpose of this Disclosure Statement is to provide the holders of Claims with important, necessary and material information about the Debtors and the Plan to enable them to make an informed judgment on the merits of accepting or rejecting the Plan. This information includes, among other matters, general background information, an overview of the Chapter 11 Case and an explanation of how the Plan will function. Accompanying this Disclosure Statement are copies of:

- the Plan;

- a notice fixing the time for the transmission of Ballots accepting or rejecting the Plan, the date and time of the hearing to consider confirmation of the Plan and related matters, and the time for filing objections to the Plan;

- a Ballot for accepting or rejecting the Plan submitted for the holders of Claims that are entitled to vote to accept or reject the Plan;

- a pre-addressed envelope;

- a letter of transmittal from counsel to the Debtors; and

- a letter of transmittal from counsel to the Committee.

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

- WHO CAN VOTE ON OR OBJECT TO THE PLAN;

- THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what you will receive for your claim if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN LIQUIDATION;

- THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;

- WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN;

- THE EFFECT OF CONFIRMATION; and

- THE FEASIBILITY OF THE PLAN.

E.     Notice to Holders of Claims

The information contained in this Joint Disclosure Statement is based upon financial and other information supplied by the Debtors and their advisors, and except where specifically noted, has not been subject to an audit or independent review or prepared in accordance with generally accepted accounting principles.  Certain of the information is by its nature forward-looking and contains estimates and assumptions that may be materially different from actual, future results.  The statements contained in this Joint Disclosure Statement are made as of the date hereof unless another time is specified herein, and the delivery of this Joint Disclosure Statement shall not create an implication that there has been no change in the information contained herein since the date hereof.

This Joint Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtors, the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by the holders of Claims.  If any inconsistency exists between the Plan and the Joint Disclosure Statement, the terms of the Plan control.  This Joint Disclosure Statement is an attempt by the Debtors to set forth in reasonable detail information sufficient to enable holders of Claims to make an informed judgment about the Plan. All holders of Claims with questions about this Joint Disclosure Statement and any other materials included with this Joint Disclosure Statement are invited to address written inquiries to the Debtors, in care of counsel for the Debtors.  However, no information or representation concerning the Debtors other than as set forth in this Joint Disclosure Statement is authorized by the Debtors, nor should it be relied upon in reaching a decision whether to vote in favor of the Plan.

**IMPORTANT: THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.   NO PERSON INCLUDING, WITHOUT LIMITATION, ANY CREDITOR, SHOULD CONSTRUE THE CONTENTS OF THIS JOINT DISCLOSURE STATEMENT AS LEGAL, TAX OR INVESTMENT ADVICE, AND THE DEBTORS DISCLAIM RESPONSIBILITY FOR ANY SUCH ADVICE. CONSEQUENTLY, EACH PERSON IS STRONGLY URGED TO CONSULT HIS OR HER OWN LEGAL COUNSEL, ACCOUNTANTS OR OTHER PROFESSIONAL ADVISORS AS TO ANY LEGAL, TAX, INVESTMENT AND/OR RELATED MATTERS OR CONSEQUENCES ARISING FROM OR ANCILLARY TO THE PLAN OR ANY OF ITS PROVISIONS OR ANY ACTIONS TO BE TAKEN IN**

**FURTHERANCE THEREOF, INCLUDING, WITHOUT LIMITATION, WHETHER TO VOTE IN FAVOR OF THE PLAN.**

**SUMMARIES OF ANY PROVISIONS OF AGREEMENTS REFERRED TO IN THIS JOINT DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT AND TO ALL OF THE PROVISIONS OF THE APPLICABLE AGREEMENT.**

**THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, CREDITORS, AND ALL PARTIES IN INTEREST.**

Nothing contained in this Joint Disclosure Statement shall constitute an admission of any fact or liability by any Debtor, or be admissible in any proceeding involving the Debtors or any other party.

## II.   ACCEPTANCE OF THE PLAN

A.   <u>Voting Procedures</u>

By Order dated _____, the Bankruptcy Court approved this Joint Disclosure Statement as containing adequate information for holders of Claims in accordance with section 1125(b) of the Bankruptcy Code. However, the Bankruptcy Court has not passed upon the fairness or the merits of the Plan, and approval of this Joint Disclosure Statement should not be construed as either a guaranty of the accuracy or completeness of the information contained herein or an endorsement of the Plan by the Bankruptcy Court.

The Plan divides the holders of Claims and Equity Interests into six (6) Classes. Classes 1, 3, and 4 are impaired by the Plan and are entitled to vote.

In determining acceptance of the Plan, votes of the holders of Claims will only be counted if submitted by holders of Claims (a) which have been duly scheduled by the Debtors as undisputed, non-contingent and liquidated, (b) who have filed a proof of Claim with the Clerk of the Bankruptcy Court, which has not been disallowed or the subject of an unresolved objection prior to the Voting Deadline (as defined below), or (c) allowed or estimated (in each case including for voting purposes only) by Court order or by agreement of the parties. If you are in any way uncertain if your Claim has been correctly scheduled, you should refer to the Debtors' Schedules which are on file with the Bankruptcy Court.

**The Bankruptcy Court has fixed _____ at 5:00 p.m., prevailing Eastern Time, as the date by which holders of Claims as of the Voting Record Date who are entitled to vote may vote to accept or reject the Plan (the "Voting Deadline"). In order for your vote on the Plan to count, your Ballot must be properly completed and received at the following address by the Voting Deadline:**

Cohen Seglias Pallas Greenhall & Furman, PC
30 South 17th Street, 19th Floor
Philadelphia, PA  19103
Attention: Steven D. Usdin, Esquire
Telephone : 215-564-1700

Pursuant to Bankruptcy Rule 3018(a), notwithstanding objection to a Claim, the Bankruptcy Court after notice and a hearing may temporarily allow the Claim in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

**Ballots may not be transmitted orally, by facsimile or by electronic mail.** In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the relevant requirements for voting on the Plan have been satisfied.  Any Ballot which is not executed by the holder of an Allowed Claim or which does not indicate an acceptance or rejection of the Plan shall be considered null and void and will not be counted.  The Debtors reserve the right to reject any Ballot not in proper form, the acceptance of which would, in the opinion of the Debtors and their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities as to a particular Ballot, and/or the submission thereof.

If a Ballot is signed by an officer of a corporation or other person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.

If you have any questions about the procedure for voting, if you did not receive a Ballot and believe you are entitled to vote to accept or reject the Plan, or if you received a damaged Ballot or lost your Ballot, please call or write to the following:

Cohen Seglias Pallas Greenhall & Furman, PC
30 South 17th Street, 19th Floor
Philadelphia, PA  19103
Attention: Steven D. Usdin, Esquire
Telephone: 215-564-1700

The vote of each holder of a Claim is important.  In order for the Plan to be deemed accepted by any Class of creditors without resort to the "cramdown" provisions of the Bankruptcy Code, the Plan must receive the assent of creditors who hold at least two-thirds (2/3) in dollar amount of the Claims in such Class that vote on that Plan, and who comprise more than one-half (1/2) by number of the holders of Claims in such Class that vote on that Plan.  If the Plan is not approved by all Impaired Classes of Claims, the Debtors will be forced to seek confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.  For the Plan to be confirmed under such provisions, *inter alia*, at least one Impaired Class, determined without including any acceptances of the Plan by any "insider" (as defined in Section 101(31) of the Bankruptcy Code), must have accepted the Plan.  If the requisite

9

acceptances are received, that Plan is subsequently confirmed by the Bankruptcy Court, and the Effective Date occurs, all holders of Claims will be bound by the Plan and the transactions contemplated thereby, regardless of how any individual Claim or Class voted on the Plan.

B.    Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing for _____ prevailing Eastern Time before the Honorable Judith H. Wizmur, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Vicinage of Camden, Mitchell H. Cohen U.S. Courthouse, 400 Cooper Street, Courtroom 4B, Camden, New Jersey 08608.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.    The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are RECEIVED on or before _____ at 5:00 p.m. prevailing Eastern Time by:

> Cohen Seglias Pallas Greenhall & Furman, PC
> 30 South 17th Street, 19th Floor
> Philadelphia, PA  19103
> Attention: Steven D. Usdin, Esquire
> Telephone : 215-564-1700

Unless an objection is timely filed and served it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

## III.   PLAN OF REORGANIZATION - GENERAL OVERVIEW

The following tables summarize the classification and treatment of Claims under the Plan based upon a review by the Debtors of Claims identified in the Schedules and a general estimate of the amount by which Allowed Claims may ultimately exceed the amounts identified in the Schedules.  For certain Classes of Claims, the actual amounts of Allowed Claims could exceed or could be less than the amounts estimated by the Debtors in calculating the estimated recoveries set forth in the table below.  Accordingly, no representation can be or is being made with respect to whether the estimated percentage recoveries shown below will actually be realized by the holders of Allowed Claims in any particular Class.  In addition, the Debtors have attempted to make certain estimates in respect of Administrative Expense Claims and other Claims which are inherently subject to uncertainty.  No representation or warranty as to their accuracy is being made.  Unless otherwise noted, the estimates are as of the Commencement Date.

| Class | Type of Claim | Treatment | Estimated Recovery |
|-------|---------------|-----------|--------------------|
|  | Administrative Expense Claims | Unimpaired; paid in full in Cash on the later of allowance and the Effective Date or in accordance with the terms and conditions relating to obligations incurred in the | 100% |

| | | | |
|---|---|---|---|
| | | ordinary course of business during the pendency of the Chapter 11 Cases | |
| | Professional Compensation Reimbursement Claims | Unimpaired; paid in full in Cash on the later of (i) the Effective Date or (ii) the date such fees are approved by a Final Order. | 100% |
| | Priority Tax Claims | Unimpaired; and either paid in Cash on the Effective Date or paid over a five-year period from the Commencement Date as provided in section 1129(a)(9)(C) of the Bankruptcy Code, with simple interest at the statutory rate. **Estimated Amount**: $197,067.64 | 100% |
| 1 | Secured Claim of Merrill Lynch | Impaired; Merrill Lynch shall receive on the Effective Date either the Lender Debt Distribution and the Lender Equity Distribution, or a $20,500,000.00 Cash payment. The Lender Deficiency Claim shall be a General Unsecured Claim. **Estimated Amount**: $30,543,205.13 | Less than 100% (entitled to vote) |
| 1(a) | Other Secured Claims | Unimpaired. On or as soon as practicable after the Effective Date, holders of Class 1(a) Allowed Claims, in full and final satisfaction of their Claims secured by valid Liens on the Debtors' property, shall receive treatment as set forth in Section V(A)(5), *infra*. **Estimated Amount**: Unknown | 100% (not entitled to vote) |
| 2 | Other Priority Claims | Unimpaired. Holders of Other Priority Claims have either had such claims satisfied prior to the Effective Date or the Debtors have satisfied such obligations through the provision of services in accordance with a Final Order. **Estimated Amount**: $96,257.00 | 100% (not entitled to vote) |
| 3 | General Unsecured Claims | Impaired; holders of General Unsecured Claims shall receive a Pro Rata Share of the Plan Pool proceeds and other unencumbered funds that may become available for distribution after the Effective Date. **Estimated Amount**: $4,308,000.00. It is anticipated that the amount of Allowed General Unsecured Claims for this Class shall be $1,500,000.00 to $2,000,000.00, which shall provide a distribution of approximately 25% to 33%. | Less than 100% (entitled to vote) |
| 4 | Interests | Impaired; on the Effective Date the Interests shall be Cancelled and the holders of such interests shall receive no property or distribution on account of such Interests. **Estimated Amount**: N/A | 0% (not entitled to vote) |

11

| 5 | City of Millville | Unimpaired; to be paid in full pursuant to a Promissory Note entered into between NJMP, Lee F. Brahin and Harvey Siegel, as guarantors (the "Guarantors") and the City dated as of December 23, 2004. The City shall receive distribution from the Debtors' estates. **Estimated Amount**: $396,666.87 | 100% (not entitled to vote) |
|---|---|---|---|

## IV.    SIGNIFICANT INFORMATION CONCERNING THE DEBTORS

A.    General Information

NJMP is a New Jersey limited liability company that is owned by NJMP Holding Group, LLC, a New Jersey limited liability company ("Holdings") and ML Green, LLC, a Delaware limited liability company ("ML Green"). NJMP is the sole owner and managing member of Operating, Development, and Urban, the other Debtors. Holdings owns approximately 38.5% of NJMP and ML Green owns approximately 61.5% of NJMP. Holdings is owned 86% by NJMP Associates, LLC, a New Jersey limited liability company ("Associates"), and 14% by Thunderbolt Investment Partners, LLC (Thunderbolt), a New Jersey limited liability company.

1.    The Purchase of the Property

On or about June 21, 2004, NJMP and the City entered into a Municipal Development Authority Agreement (the "MDA Agreement") for the purchase over time of approximately 707 acres located in Millville, Cumberland County, New Jersey (the "Real Property"). NJMP intended to purchase the Real Property in order to develop it as part of an Airpark Motorsports Commercial District. The MDA was amended in its final form on October 17, 2006 and adopted on November 6, 2006. As part of the MDA Agreement, NJMP was designated to be the developer of the Real Property. The Real Property was to be developed over three phases into motorsports racetracks, concessions, suites, garages, hotels, restaurants, and other facilities incident to the operation of a motorsports park and general tourist destination. NJMP and/or its designee Urban purchased approximately 500 acres, and NJMP retained the option to purchase approximately 250 acres more through April 1, 2015. As of the Petition Date, NJMP had not yet exercised its option to purchase.

2.    The PILOT Agreement

On or about March 9, 2007, the City and Urban entered into a Payment In Lieu Of Taxes Agreement (the "PILOT Agreement"). The PILOT Agreement provided that the City exempted Urban from certain local real estate taxes otherwise payable for the Real Estate for fifteen (15) years from the date that the development project set forth in the MDA Agreement was substantially completed. In lieu of taxes, the City agreed to accept an estimated $175,000 annual service charge on the improvements on the Real Property, with the final amount of taxes to be established by reference to commercial elements and non-commercial elements of the Urban Property post-development, as well as the New Jersey Long-Term Tax Exemption Law, N.J.S.A.

12

40A:20-1 *et seq.* and the New Jersey Local Redevelopment and Housing Law, <u>N.J.S.A.</u> 40A-12a-1 *et seq.*

Pursuant to the PILOT Agreement, NJMP transferred the Real Property to Urban, and on June 20, 2007, NJMP and Urban entered into a lease agreement for the Real Property. The lease agreement provided, in relevant part, that NJMP would own any improvements made to the Real Property pursuant to the MDA Agreement for the duration of the lease term. As of the Commencement Date, the lease agreement between NJMP and Urban was in place.

      3.      Development

Debtor Development was created in 2008 for the purpose of developing certain portions of the Real Property as condominium units for sale. On or about July 9, 2008, Urban transferred to Development certain portions of the Real Property for development into condominium units. Then, on or about December 21, 2009, the Master Deed for the Villas at Breighton (the "Deed") was signed, thus initiating the development of the the Villa Trackside Townhouses (the "Villas"). Portions of the Real Property originally held by NJMP and subsequently transferred to Urban were transferred to Development to create the Villas, and those portions of the Real Property were then omitted from the PILOT Agreement. As of the Commencement Date, eight (8) Villas had sold, and Development owned twenty-eight (28) partially improved lots and one hundred forty-six (146) unimproved lots on the Real Estate, which lots have been approved for development into Villas.

      4.      The Merrill Lynch Loan

On or about June 20, 2007, the Debtors and Merrill Lynch Mortgage Capital, Inc. ("Merrill Lynch") entered into a Mortgage and Security Agreement, and a Note (collectively, the "Mortgage"), whereby Merrill Lynch agreed to lend the Debtors the sum of $31,000,000.00 for the development of the Real Property (the "Business Enterprise"). In exchange for the loan outlined in the Mortgage, Merrill Lynch received a secured interest in the Business Enterprise. As part of the issuance of the loan to complete the developments on the Real Property, an affiliate of Merrill Lynch took a 51% equity interest in ML Green, the remaining 49% interest being held by Greenfield Thunderbolt, LLC, a Delaware limited liability company.

The Merrill Lynch Mortgage permitted the Debtors to complete certain improvements for the construction of the racetracks, physical plant, concessions, restaurant, and associated development features of the Real Property (the "Business Enterprise") contemplated by the MDA Agreement, and permitted the racetrack to begin operation. Now, the Business Enterprise consists of two motorsports racetracks, concession stands, a restaurant, a hotel, and retail stores. The Business Enterprise operates from March to November. The concessions and restaurant are run by the Debtors. The facility hosts approximately eleven professional racing events annually, leases the tracks to racing enthusiasts and members, and historically generates approximately $9 million in sales per year. The facility is also open to guests who race motorcycles, go-karts, and other motorsports vehicles, and groups who lease the facility to run events.

5.    Cumberland Empowerment Zone Loan

On December 1, 2009, NJMP entered into a loan agreement with the Cumberland Empowerment Zone Corporation (the "CEZ") for a loan in the amount of $425,000.00 (the "CEZ Loan"). The CEZ Loan was extended by CEZ to fund certain improvements to the Real Property, and is subordinate to the Merrill Lynch Mortgage. The CEZ Loan provides that for the first year, NJMP was required to make interest payments only, and that the maturity date was December 1, 2010. Harvey Siegel and Lee F. Brahin have personally guaranteed the CEZ Loan and have made all payments on account of the CEZ Loan.

In accordance with that certain Intercreditor Agreement between Merrill Lynch and CEZ, dated as of November 25, 2009, and pursuant to section 510(a) of the Bankruptcy Code, distributions on account of the CEZ Loan, which constitutes a Class 3 General Unsecured Claim, will be made to Merrill Lynch unless Merrill Lynch agrees in its sole and absolute discretion, on or before the Confirmation Date, (a) not to enforce its contractual right to compel Debtors to turn over to Merrill Lynch the distribution (or any part thereof) to CEZ or (b) to forego a distribution (or any part thereof) on account of the CEZ Claim.

6.    Millville Rescue Squad

The improvements on the real property made pursuant to the MDA Agreement consisted of two motorsports racetracks, a restaurant, a hotel, concessions, and other improvements incident to the operation of a motorsports park. The racetracks are managed and operated in accordance with New Jersey law (including Title 13, Chapter 62 of the Administrative Code, Title 8, Chapters 40 and 41 of the Administrative Code, and certain portions of the New Jersey fire code). These rules together provide in relevant part that a racetrack can only hold racing activities when certain emergency services are present.

Millville Rescue Squad ("MRS") has historically provided the Debtors with the appropriate and necessary life support, fire rescue, and wrecking services in compliance with New Jersey law. MRS's staff has specialized training relating to the needs of the racetrack. The Debtors have not been able to locate another service provider with the requisite qualifications which would provide these services at a lower rate than MRS. In February of 2011, the Debtors renegotiated the agreement with MRS to provide the Debtors with the requisite services. The treatment of the agreement with MRS is discussed below.

7.    Ovations Food Services, LP

On or about June 28, 2007, NJMP contracted with Ovations Food Services, LP ("Ovations") for Ovations to manage and operate the food, beverage, novelties, and merchandise concessions and catering services at the property. As part of that agreement, Ovations made an investment towards food, beverage, merchandise capital improvements, smallwares, concession trailers, and concession equipment, and incurred architectural and design fees, consulting fees, and contractor fees to improve the property. The agreement between NJMP and Ovations was amended from time to time. The treatment of the Agreement with Ovations is discussed below.

The Debtors filed the instant Chapter 11 Cases in order to reorganize the debt with Merrill Lynch, to continue their business operation, and to reorganize the corporate structure of the Debtors.

8.    TrackRacket, Inc. Litigation

On or about December 23, 2009, TrackRacket, Inc., *et al.* instituted a Complaint in the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-1230-09 ("Complaint"). TrackRacket, Inc. ("TrackRacket") brought this action against NJMP under New Jersey state nuisance laws, and as such the claim sounds in tort. As set forth in the Complaint, it is TrackRacket's position that the decibel levels emanating from NJMP are extraordinarily high. The Complaint seeks to enforce the state nuisance laws, which would force NJMP to manage its noise to what TrackRacket alleges are reasonable/livable levels. Regarding monetary damages, TrackRacket submits that the value of their homes have decreased due to the noise emanating from NJMP and have used federal noise guidelines to substantiate the purported drop in value. TrackRacket estimates that the monetary damage of the claims of the households that it represents is in excess of $350,000. This is exclusive of the equitable remedies being sought for the remediation of noise levels.

NJMP has asserted its defenses to the Complaint and has denied any responsibility for the allegations in the Complaint. NJMP states that it is in full compliance with all local, state and federal noise guidelines. Additionally, NJMP states that it is in compliance with the guidelines set forth in a Consent Order of the Superior Court of New Jersey, Law Division, Cumberland County, No. CUM-L-000320-05.

9.    City of Millville

On or about December 23, 2004, the City of Millville entered into a Promissory Note in the amount of $600,000.00 (the "Promissory Note"), which Promissory Note was signed by NJMP and guaranteed by the Guarantors. NJMP and the Guarantors then assigned the Promissory Note to the Guarantors and Holdings. Since the Promissory Note was signed, the Guarantors have paid all amounts in full to the City.

B.    Administration Of The Chapter 11 Cases

The Debtors filed their Petitions for Relief on March 7, 2011 (the "Commencement Date").

1.    Debtors' Retention of Professionals

The Debtors sought and obtained Bankruptcy Court approval to retain Cohen, Seglias, Pallas, Greenhall, & Furman, PC ("CSPG&F") as bankruptcy counsel to assist them in connection with operational matters and the overall reorganization process. An order authorizing the Debtors to retain CSPG&F was entered on March 29, 2011 (docket no. 75 in NJMP).

15

The Debtors also sought and obtained Bankruptcy Court approval to employ Lipsky & Brandt as Special Counsel to assist them in negotiating the restructure of the Merrill Lynch loan, negotiating with Ovations to continue to utilize the equipment, providing general corporate services to the Debtors in their ongoing relationships with the City of Millville and various County agencies, and proceeding with existing litigation to the extent that relief from stay was entered to allow the matters to proceed. An order authorizing the Debtor to employ Lipsky & Brandt was entered on April 4, 2011 (docket no. 85).

The Debtors also sought and obtained leave of the Bankruptcy Court to employ Mercadien, P.C. to provide professional accounting services in order to prepare appropriate state and federal tax returns and to perform an audit of the Debtors' books and records. An order authorizing the Debtor to employ Mercadien, P.C. was entered on April 4, 2011 (docket no. 86). The Bankruptcy Court-approved professionals retained by the Debtors will file applications seeking compensation and reimbursement of expenses.

The Debtors may also seek leave of the Bankruptcy Court to employ such other professionals as they may deem necessary in their business judgment to carry out their duties as debtors-in-possession in their Chapter 11 Cases.

2.    First Day Motions

On March 7, 2011, the Debtors filed certain first day motions. Those first day motions were heard on March 10, 2011, at which time The Honorable Judith H. Wizmur approved the following motions:[3]

A.    Motion for Debtor's Interim Use of Cash Collateral (at docket no. 5; Order granting same at docket no. 25);

B.    Motion for Continued Use of Bank Accounts, Business Forms, and Cash Management Systems (at docket no. 6; Order granting same at docket no. 33);

C.    Motion for Relief to Pay Prepetition Wages, Benefits, and Related Taxes (at docket no. 7; Order granting same at docket no. 30);

D.    Motion for Relief to Pay MRS as a Critical Vendor (at docket no. 8; Order granting same at docket no. 29);

E.    Motion for Continuation of Utility Services (at docket no. 9; Order granting same at docket no. 31);

F.    Motion for Designation as Complex Chapter 11 Case (at docket no. 10; Order granting same at docket no. 28); and

G.    Motion for Joint Administration of the Bankruptcy Cases (at docket no.12; Order granting same at docket no. 27).

---

[3]    The docket numbers referenced herein refer to the main case, docketed at 11-16752 JHW, unless otherwise specified.

As a result of the first day motions, the Debtors had the authority to operate their facilities and use their available cash.

3.    Motions to Maintain the Debtors' Business Activities

Since the filing of the Bankruptcy Petition, the Debtors have filed the following motions for assumption of leases, approval of agreements and arrangements, which were heard by the Bankruptcy Court on April 25, 2011. Those motions and pleadings are:

A.    Motion for an Order Pursuant to Section 365(a) of the Bankruptcy Code for an order Authorizing and Approving the Rejection of an Executory Contract with Cifaloglio, Inc. (at docket no. 66); which Order was entered on April 26, 2011 (docket no. 120).

B.    Motion for an Order Pursuant to Section 365(a) of the Bankruptcy Code for an order Authorizing and Approving the Assumption of an Executory Contract with Millville Rescue Squad (at docket no. 65).

Pre-petition, NJMP had contracted with MRS to provide necessary emergency medical and non-medical services associated with operating the racing facilities. On March 7, 2011 NJMP moved for leave to pay MRS the sum of $200,000.00 as a critical vendor (docket no. 8). On March 10, 2011, the motion was granted via a bench order, and on March 11, 2011 the order was entered permitting this treatment (docket no. 29).

Subsequently, on March 24, 2011, the Debtors moved to assume the agreement with MRS to continue providing the necessary emergency services at the racetrack (docket no. 65). The Debtors filed the motion on the basis that the services MRS provides are specialized to the needs of the racetrack. For example, MRS EMTs are qualified to extract a driver from a wrecked car, and MRS is qualified to haul a wreck off of a hot racetrack. Additionally, the Debtors attempted to locate a provider of the same services that would have the capacity and qualifications to bid to provide the same services within a fifty-mile radius of Millville, New Jersey, but concluded that there were no other entities within that range that had the capacity to provide the services at all, and paying a provider farther away would incur additional costs that would have been economically unfeasible to pay. The Debtors also determined that they did not have the capacity to qualify their own employees during the pendency of the bankruptcy cases. The Debtors are currently in negotiation with MRS concerning the Motion to Assume MRS.

C.    Motion for an Order Pursuant to Section 365(a) of the Bankruptcy Code Authorizing and Approving the Assumption of Executory Contracts with Non-Consumer Deposit Creditors (at docket no. 69) and Motion for an Order Authorizing the Debtors to Honor Pre-Petition Customer Deposits (at docket no. 70).

Pre-petition, the Debtors had accepted deposits from both consumers and corporate entities in order to reserve use of the racetracks on the Property, hotel rooms, and other services offered by the Debtors in the normal course of their business. On

March 24, 2011, the Debtors moved to assume the agreements made relating to deposits made by non-consumer entities (docket no. 69) and to honor pre-petition deposits made by consumers (docket no. 70). Orders granting these two Motions were entered on April 26, 2011 (docket no. 123 and 122, respectively).

D.      Motion for an Order Pursuant to Section 365(a) of the Bankruptcy Code for an order Authorizing and Approving the Assumption of Executory Contracts with the City of Millville (at docket no. 78).

The Debtors have moved to assume two executory contracts with the City of Millville. The Municipal Development Authority Agreement (the "MDA Agreement") was entered into between the City and NJMP on June 21, 2004, as amended in its final form on October 17, 2006, and adopted on November 6, 2006. The MDA Agreement provides, in relevant part, that NJMP would purchase and develop certain real property over time, with the Option to purchase to expire on April 1, 2015. The Debtors sought to assume the MDA in order to ensure that the Option was not rejected.

On March 9, 2007, Debtor Urban and the City entered into a Payment In Lieu Of Taxes Agreement (the "PILOT Agreement"). Pursuant to the PILOT Agreement, the City agreed to exempt certain real property owned by Urban (the "Urban Property") from local taxation for fifteen years from the date the development project on the property owned by Urban was substantially completed. In lieu of a tax on that property, the City agreed to accept an estimated $175,000 annual service charge on the improvements on the property, which represented an estimated savings of over $575,000.00. The Debtors moved to assume the PILOT Agreement in order to continue to pay the assessment in lieu of taxes, with the understanding that the Debtors' business would continue after the reorganization and that the tax reduction would benefit Merrill Lynch, the general unsecured creditors, and other claimants and creditors in the Debtors' Chapter 11 Cases.

An Order granting this Motion was entered on April 26, 2011 (docket no. 121)

E.      Motion for an Order Pursuant to Section 363 of the Bankruptcy Code Authorizing and Approving A Lease Of Real Property (at docket no. 84).   An Order granting this Motion was entered on April 26, 2011 (docket no. 119).

4.      Bar Date

The Bankruptcy Court established the general deadline for filing proofs of Claim against the Debtors to be July 7, 2011. By Order of the Bankruptcy Court, this deadline was shortened to May 16, 2011 (at docket no. 99) and notice of same was given to all creditors and parties-in-interest (docket no. 103).

5.      Cash Collateral Order

On March 11, 2011, the Court entered an interim order (docket no. 25) (the "Interim Order") authorizing the Debtors, on an interim basis, to use the cash collateral of Merrill Lynch

18

on the terms set forth in the Interim Order. Subsequently, on April 13, 2011, the Court entered a final order (docket no. 98) (the "Final Order" and, together with the Interim Order, the "Cash Collateral Order") authorizing the Debtors, on a final basis, to use the cash collateral of Merrill Lynch on the terms set forth in the Final Order. The Cash Collateral Order was negotiated at arms' length by the Debtors, Merrill Lynch, the Committee and the U.S. Trustee and provides, among other things, (i) for Merrill Lynch to receive various forms of adequate protection against any diminution in the value of its pre-Commencement Date collateral (including cash collateral), including adequate protection in the form of a replacement lien on all of the Debtors' post Commencement Date assets, (ii) for the Debtors' expenditures of cash collateral to be made pursuant to the budget (as such budget may be updated from time to time) annexed to the Final Order, and (iii) for the establishment of certain "benchmarks" for the administration of the Debtors' cases.

As a result of entry of the Cash Collateral Order, the Debtors have authority to continue to operate in Chapter 11, and now propose their Plan to formulate an exit strategy from Chapter 11.

      6.     Motion for Relief from Stay

On March 14, 2011, Ovations filed a Motion for Relief from Stay to take possession of certain equipment and other property to which Ovations holds title but which was in the custody of NJMP (at docket no. 43). The Debtors and Ovations entered into a stipulation, which stipulation was approved by the Bankruptcy Court on March 24, 2011, that authorized the Debtors and Ovations to continue a payment structure for the purchase of equipment and other assets from Ovations for the benefit of the Debtors (at docket no. 68). The Stipulation provides, *inter alia*, that the Debtors shall make payments to Ovations over a ten year period of time, will own a certain vehicle upon making a lump sum payment on the Effective Date and at the conclusion of the payment schedule, the Debtors shall own the equipment that is subject to the Ovations agreement.

C.    Financial Information

The Debtors filed their Schedules and Statements of Financial Affairs with the Bankruptcy Court on March 18, 2011 (docket no. 56; also, docket no. 22 in Operations, docket no. 22 in Development, and docket no. 18 in Urban). The Debtors filed their Initial Operating Reports on March 22, 2011 (docket no. 63; also, docket no. 26 in Operations, docket no. 26 in Development, and docket no. 22 in Urban). Since the Commencement Date, the Debtors have timely filed all Monthly Operating Reports with the Office of the Clerk of the Bankruptcy Court, and paid all appropriate quarterly fees to the Office of the United States Trustee for the District of New Jersey. These documents may be examined during normal business hours in the Office of the Clerk of the Bankruptcy Court, or online if you are a registered recipient of Court Documents.

## V.    THE PLAN

The following is a summary of each of the Plan, and is qualified in its entirety by the full text of the Plan, copies of which accompany this Joint Disclosure Statement. The Plan, if confirmed by the Bankruptcy Court, will be binding upon the Debtors, the Committee, and all creditors. All creditors are urged to read the Plan carefully.

### A.    Treatment and Classification of Claims

The Plan provides for six (6) Classes of Claims and also provides for the payment of non-classified Claims (the holders of which do not vote) - those for administrative expense claims and taxes. The Classes and distributions, if any, to be made to each Class (and non-classified Claims) under the Plan are described below.

1.    Administrative Expense Claims.

Except to the extent that any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim (save only Allowed Administrative Expense Claims for professional compensation and reimbursement of expenses that are specifically addressed in section 2.3 of the Plan) shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid in full and performed by the Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. The Debtors are not aware of any Administrative Expense Claims other than ordinary course of business claims that the Debtors have and will continue to honor during the pendency of these Chapter 11 Cases.

2.    Professional Compensation and Reimbursement Claims.

All Entities seeking an award by the Bankruptcy Court of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date under sections 330 or 331 of the Bankruptcy Code or entitled to the priorities established pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date which is 30 days after the Effective Date, or such other date as may be fixed by the Bankruptcy Court and (b) if granted such an award by the Bankruptcy Court, be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court, (i) on the later of the Effective Date and the date upon which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim, the Debtors, and the Committee, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court.

The Debtors estimate that there will be $250,000.00 of compensation Claims for the combined Debtors.

     3.      Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, at the option of the Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, equal annual Cash payments commencing on the first anniversary of the Effective Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest on any outstanding balance from the Effective Date at the statutory rate, over a period not exceeding five years after the Commencement Dates, or upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim with deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; provided, however, that the Debtors shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance, in full, at any time on or after the Effective Date, without premium or penalty.

The Debtors estimate that there will be the following amounts of Priority Tax Claims for each Debtor:

| Debtor | Claim Amount |
| --- | --- |
| NJMP | $185,703.50 |
| Operating | $0 |
| Development | $7,253.04 |
| Urban | $4,111.10 |

     4.      Class 1 – Secured Claim of Merrill Lynch.

In relation to Class 1, Merrill Lynch is impaired by the Plan, and is entitled to vote to accept or reject the Plan. Merrill Lynch shall (i) reduce the amount of its Allowed Secured Claims from a total of approximately $30,543,205.13.00 to a total of $20,500,000.00 (the "Reduced Secured Claim"); (ii) be granted an Allowed General Unsecured Claim equal to the difference between $30,543,205.13.00 and the Reduced Secured Claim (such Allowed Claim, the "Lender Deficiency Claim") and (iii) in exchange for its Reduced Secured Claim, receive on the Effective Date the Lender Debt Distribution and the Lender Equity Distribution. The Lender Deficiency Claim shall be a Class 3 General Unsecured Claim.

If NEI is not the Successful Bidder, then, in full and complete settlement, satisfaction and discharge of Merrill Lynch's Allowed Secured Claims, Merrill Lynch shall (i) receive cash on the Effective Date in the total amount of $20,500,000.00 and (ii) be granted the Lender Deficiency Claim, which shall be a Class 3 Claim.

| Class | Status |
|---|---|
| Class 1 – Secured Claim of Merrill Lynch | Impaired |

   5.      Class 1(a) – Other Secured Claims.

   Class 1(a) consists of all Other Secured Claims.  On or as soon as practicable after the Effective Date, holders of Allowed Claims in Class 1(a), in full and final satisfaction of their Claims secured by valid Liens on the Debtors' property, shall receive one of the following treatments at the option of the applicable Debtor:

   (a)    payment of the Allowed Class 1(a) Claim in full in Cash on the later of the Distribution Date or as soon as practicable after a particular Secured Claim becomes Allowed;

   (b)    such other treatment as may be agreed to by the applicable Debtor and the holder; or

   (c)    the holder shall retain its Lien on such property, the Debtors shall cure defaults, if any, and the holder's lien shall be reinstated pursuant to section 1129 of the Bankruptcy Code.

   Class 1(a) is unimpaired, and holders of Class 1(a) Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 1(a) Other Secured Claims are not entitled to vote to accept or reject the Plan.

| Class | Status |
|---|---|
| Class 1(a) – Other Secured Claims | Unimpaired |

   6.      Class 2 – Other Priority Claims.

   Class 2 consists of Other Priority Claims.  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Other Priority Claim against any of the Debtors is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim has been paid by any Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Other Priority Claim, Cash and/or services of equivalent Cash value, in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

   There was approximately $94,596.88 in Other Priority Claims for pre-petition wages and benefits, as well as for deposits made by individuals for services to be provided by the Debtors. The satisfaction of such obligations have already been approved by the Court and honored (or will be honored), either in Cash or via services to individuals who made deposits prior to the Commencement Date.

22

| Class | Status |
|-------|--------|
| Class 2 – Other Priority Claims | Unimpaired |

    7.    <u>Class 3 – General Unsecured Claims.</u>

Class 3 consists of General Unsecured Claims against the Debtors' substantively consolidated Estates. Class 3 is impaired by the Plan. Each holder of an Allowed Class 3 General Unsecured Claim is entitled to vote to accept or reject the Plan.

Each holder of an Allowed Class 3 Claim who does not make the Creditor Opt-Out Election shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Class 3 Claim, its Pro Rata Share of the funds available from the Plan Pool on the earlier to occur of thirty (30) days after the Effective Date or the Subsequent Distribution Date after such Claim becomes an Allowed Claim.

**The Creditor Opt-Out Election on each Ballot entitles any holder of a General Unsecured Claim to opt out of the release provisions of Section 10.3 of the Plan in favor of the Released Parties. Unless a holder of a General Unsecured Claim checks the box on the Ballot opting out of the release provisions, such holder will be bound by Section 10.3. In the event a holder of a General Unsecured Claim makes the Creditor Opt-Out Election, such holder will forfeit its right to receive distributions under the Plan.**

The Debtors have analyzed the Schedules filed with the Bankruptcy Court in terms of the universe of General Unsecured Claims. There are two (2) groupings of General Unsecured Claims: those General Unsecured Claims which the Debtors listed as undisputed in the Schedules, and those General Unsecured Claims which the Debtors listed as contingent, disputed, and/or unliquidated in the Schedules. Approximately $4,308,000.00 in General Unsecured Claims (including contingent, disputed, and/or unliquidated claims) were listed in the Debtors' Chapter 11 Cases. Assuming that any Claim listed as Disputed in the Schedules and for which no Proof of Claim was filed is disallowed, and without the benefit of the claims reconciliation process having played itself out, there are approximately $2,976,195.00 in undisputed General Unsecured Claims, and approximately $1,331,805.58 in remaining General Unsecured Claims which are contingent, disputed, and/or unliquidated. However, the Debtors estimate that for distribution purposes the General Unsecured Claims will be approximately $1,500,000.00. The reduction in claims for distribution is based in large part on the resolution of the claims held by MRS and Ovations, the non-payment of the Holdings Claim, and the satisfaction of the Debtors' obligations to their non-individual deposit creditors in accordance with an Order entered by the Bankruptcy Court (Docket No. __). The Allowed Claims in this Class will share *pro rata* in the Plan Pool proceeds. Holdings, an insider of the Debtors, shall receive no property or distribution under the Plan on account of the Holdings Claim.

The holder of a Class 3 Claim shall receive, in full and complete settlement, satisfaction and discharge of such Allowed Claim, a payment which shall be made on or about the Distribution Date.

By virtue of the Lender Deficiency Claim, Merrill Lynch is a holder of a Class 3 Claim. As a holder of a Class 3 Claim, Merrill Lynch has agreed to waive its right to receive distributions from the first $500,000.00 of the Plan Pool proceeds, but shall share ratably with other holders of Class 3 Claims in Plan Pool proceeds that exceed $500,000.00. In the event that other consideration is available besides funds in the Plan Pool to pay Class 3 Claims, the Lender Deficiency Claim shall be entitled receive a distribution in the amount of its Pro Rata Share of those assets as well.

| Class | Status |
|---|---|
| Class 3 – General Unsecured Claims | Impaired |

8.   Class 4 – Interests.

Class 4 consists of holders of Interests in the Debtors. Class 4 is impaired by the Plan and conclusively deemed to have voted to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code. On the Effective Date, the Interests shall be cancelled and the holders of such Interests shall receive no property or distribution under this Plan on account of such Interests.

Pre-petition, Development, Operating, and Urban were each owned 100% by NJMP. The ownership structure of Development, Operating, and Urban shall remain the same post-petition.

| Class | Status |
|---|---|
| Class 4 – Interests | Impaired |

9.   Class 5 – City of Millville.

Class 5 consists of the City of Millville. Class 5 is unimpaired by the Plan and conclusively deemed to have voted to accept the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

Upon confirmation of the Debtors' Plan, the Guarantors shall continue to make all payments to the City relating to the Promissory Note, consistent with the terms and conditions of the Promissory Note, and shall assume primary liability for the Promissory Note. No assets of the Debtors shall be used to pay the Class 5 Claim, nor shall any portion of the Plan Pool created for Class 3 be used to pay the Class 5 Claim.

| Class | Status |
|---|---|
| Class 5 – City of Millville | Unimpaired |

B.   Sale and Auction Provisions

The Debtors will seek to sell the Reorganized Equity Interests pursuant to a Motion for Approval of Sale and Auction Procedures, Notice Procedures, and Cost Reimbursement/Break-Up Fee Provisions in Connection With Proposed Auction of Interests (the "Bidding Procedures Motion"). The Bidding Procedures Motion shall set forth the procedures which will be utilized

to sell the Reorganized Equity Interests at an auction sale. In the interest of conducting the sale of the Reorganized Equity Interests, the Debtors have filed or will file an application seeking employment of The Brownstein Corporation, which will fulfill the duties of a professional auctioneer pursuant to Local Rule 2014-1(c).

To summarize the Bidding Procedures Motion, pursuant to the Funding Term Sheet, NEI is the proposed purchaser of the Reorganized Equity Interests and the so-called "stalking horse bidder." The Brownstein Corporation will advertise the sale and seek potentially interested parties who would be qualified to bid on the Reorganized Equity Interests. Bidding shall be in increments of $250,000.00. Any person may make a qualified bid, which is defined as a bid equal to or greater than the amount of (a) $20,500,000.00 representing Merrill Lynch's secured position; (b) $2,000,000.00 representing the Cash infusion which NEI proposes to make if it is a Successful Bidder, and (c) a Minimum Overbid of $500,000.00. Incremental bidding will be in the amount of $250,000.00. Therefore, the lowest qualified bid for the Reorganized Equity Interests, apart from NEI's and Merrill Lynch's proposed purchase price, is $23,000,000.00, and beyond that, any successive bid must be increased by $250,000.00.

If NEI is the Successful Bidder, the Plan shall be funded with a $2,000,000.00 Cash infusion by NEI (the "NEI Funding"). NEI shall receive on the Effective Date, in exchange for the NEI Funding, 80.1% of the Reorganized Equity Interests, 3.69236% of which it shall transfer to ML Green and 2.30764% of which it shall transfer to Holdings. Merrill Lynch shall receive 19.9% of the Reorganized Equity Interests. Further, the proceeds of the NEI Funding shall be used to satisfy the following obligations on the Effective Date:

(a) $404,778.00 shall be used to pay the fees and expenses (including filing fees and costs) of attorneys, professionals, and consultants (i) retained by the Debtors and the Committee; provided the Debtors' professionals shall not be paid more than $105,000.00 of such funding, less $23,162.00 paid to such professionals on or before the Effective Date in accordance with the Cash Collateral Order and the Budget, and the Committee professionals shall not be paid more than $15,000 from April 8, 2011 going forward in accordance with the Cash Collateral Order and the Budget; and (ii) retained by Merrill Lynch, provided that Merrill Lynch's professionals shall not be paid more than $325,000.00 of such funding, less $71,692.00 paid to such professionals on or before the Effective Date in accordance with the Budget and the Cash Collateral Order. In the event that the sum of $404,778.00 shall not be sufficient to satisfy such obligations on Effective Date and the full $2,000,000.00 funding has otherwise been used in accordance with section 9.2(a) of the Plan, the NEI Funding shall pay such outstanding obligations that exceed $404,778.00 (the "Excess"). Notwithstanding the foregoing, Reorganized NJMP shall pay the first $200,000.00 of such Excess from cash on hand as of the Effective Date that was not paid with the Funding and NEI shall pay the balance of the Excess as follows:

(i)     approximately $50,000.000 shall be used to pay Priority Tax Claims;

(ii)     $500,000.00 shall be used to fund the Plan Pool for the benefit of General Unsecured Creditors;

(iii)     $209,222.00 shall be used to pay Ovations;

(iv)    $336,000.00 shall be used to fund reserves for, among other things, debt payment, insurance, taxes and such other reserves as Merrill Lynch and Reorganized NJMP mutually shall deem necessary; and

(v)    $500,000.00 shall be used to fund the operating and other liquidity obligations of the Reorganized Debtors.

(b) The remaining NEI Funding, if any, shall pay such other costs and expenses as Merrill Lynch and NEI mutually shall deem necessary to continue the ongoing business operations of Reorganized Debtors.

In the event any party other than NEI is determined to be the Successful Bidder, such party shall receive on the Effective Date 100% of the Reorganized Equity Interests. Of such successful bid, $20,500,000.00 shall be paid to Merrill Lynch on the Effective Date in accordance with 4.1(c) of the Plan and $2,000,000.00 shall be used to fund the Plan in the manner set forth in Section 9.2 of the Plan. Any amount paid by the Successful Bidder in excess of the amount stated herein to pay Merrill Lynch, to fund the Plan, to pay the Minimum Overbid, and to pay professional fees of attorneys, professionals, and consultants employed in the Chapter 11 Cases, and any remaining balance shall be added to the Plan Pool for distribution to General Unsecured Creditors. This remaining balance distribution, if any, shall be made pro rata to Class 3 Claimants, including Merrill Lynch, upon finalization of the payment of Administrative Claims to attorneys, professionals, and consultants.

C.    Revised Loan Facilities

As set forth above, in the event that NEI is the Successful Bidder, Merrill Lynch will receive the Lender Debt Distribution. In such event, and in accordance with the Facilities Term Sheet, after the Bankruptcy Court's approval of the Plan the Debtors and Merrill Lynch have agreed to enter into a new loan facility and related documents. The new facility will consist of a senior loan in the amount of $10,000,000 evidenced by a promissory note, Note A, and a subordinate loan in the amount of $10,000,000, evidenced by a promissory note, Note B. Until, among other conditions, the first $10 million plus interest on account of Note A is paid in full, the Reorganized Debtors may take as much as $2 million as a revolving line of credit. For a more fulsome description of the terms of the revised loan facility, including Notes A and B, please see the Facilities Term Sheet, which is appended as an exhibit to the Cash Collateral Order [Docket No. 98].

D.    Surviving Litigation

From and after the Effective Date, any and all claims, Causes of Action and Retained Causes of Action accruing to the Debtors shall be preserved and retained by the Reorganized Debtors and/or Merrill Lynch, who shall have the exclusive right to enforce any such Causes of Action. The Reorganized Debtors and/or Merrill Lynch may pursue, abandon, settle or release any or all such Causes of Action and Retained Causes of Action, as they deem appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court. A

list of the Causes of Action that may be pursued are attached to this Disclosure Statement as "Exhibit A".

E.   Summary of Other Provisions

The Plan also contains various other provisions, including those pertaining to the following:

1.   Rejection of Executory Contracts and Unexpired Leases.

The Plan provides in Section 8.1 that, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, no later than fifteen (15) days before the scheduled hearing on Plan confirmation, the Debtors shall file (a) a motion to assume those executory contracts and unexpired eases that they deem necessary to continue with their operations as reorganized Debtors, which contracts and unexpired leases shall be assumed on the Effective Date, and (b) a separate motion seeking to reject those executory contracts and unexpired leases that the Debtors determine to reject..

Claims arising out of the rejection of an executory contract or unexpired Lease must be filed with the Bankruptcy Court and served upon the Debtors by no later than 30 days after the later of (i) thirty (30) days after the entry of an order rejecting such executory contract or unexpired Lease via U.S. mail, postage prepaid, electronic mail, electronic filing, and/or facsimile, or (ii) such other date as may be fixed by order of the Bankruptcy Court. All such Claims not filed within such time will be forever barred from assertion against the Debtors, their Estate and their property.

2.   Cancellation of Securities, Instruments, and Any Other Agreements Evidencing Claims and Interests.

Except as otherwise provided in this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, the promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged; provided that nothing in the foregoing shall affect in any way the right of each holder of a Claim or Interest to enforce its rights under this Plan. The holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to this Plan.

Agreements that shall survive the Effective Date are (1) the Financial Security Agreement dated June 20, 2007 by and among the City, NJMP, and Merrill Lynch, and all amendments thereto; and (2) Letter of Credit No. 8-0284 by and among Wilmington Trust FSB,

Holdings, and Trust Under Agreement of Judith Freeman Brahin dated January 3, 1983, for the Benefit of Lee F. Brahin.  The Debtors reserve the right to identify any such other agreements that may survive the Effective Date.  Any Successful Bidder shall be responsible for the continuation and assumption of the Agreements contained in this paragraph.

 3. Provisions for Treatment of Disputed Claims.

 Except as to applications for allowance of compensation and reimbursement of expenses under sections 330, 331 and 503 of the Bankruptcy Code, the Debtors shall, on and after the Effective Date, have the exclusive right to make and file objections to Administrative Expense Claims and General Unsecured Claims.  On and after the Effective Date, the Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and General Unsecured Claims and compromise, settle or otherwise resolve Disputed Administrative Expense Claims and Disputed Claims without approval of the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court, the Debtors shall file all objections to Administrative Expense Claims that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses) and Claims and serve such objections upon the holder of the Administrative Expense Claim or Claim as to which the objection is made as soon as is practicable, but in no event later than thirty (30) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

 4. Method of Distribution Under the Plan.

 Pursuant to the Plan, distributions shall be made by the Plan Administrator from the Plan Pool in accordance with the priorities established therein.  At the option of the Plan Administrator, any Cash payment to be made pursuant to the Plan may be made by check or wire transfer.

 Distributions to the holders of Allowed Claims will be made as follows: (i) at the address set forth in the Schedules unless superseded by the address set forth on the proofs of Claim filed by holders of Claims, or (ii) at the address set forth in any written notice of address change delivered to the Plan Administrator after the date of filing of any proof of Claim.  If any holder's distribution is returned as undeliverable, the Plan Administrator will take reasonable steps to attempt to deliver the distribution to the holder of the Allowed Claim.  Any holder of an Allowed Claim that does not advise the Plan Administrator that it has not received its, his or her distribution within ninety (90) days after the date of attempted distribution will have its, his or her Claim for such undeliverable distribution discharged and will be forever barred from asserting any such Claim against the Debtors or their property.  Distributions must be negotiated within ninety (90) days of the date of distribution.  Any distributions which are undeliverable and unclaimed or have not been cashed within the time periods set forth above shall become available for distribution to the holders of Allowed Claims in accordance with the Plan and the holder of an unclaimed or undeliverable distribution shall not be entitled to any further distribution under the Plan.

5.     Plan Administrator.

Lee F. Brahin shall serve as Plan Administrator without Bond. The Plan Administrator shall receive no compensation for any services rendered or reimbursement of any expenses incurred pursuant to the Plan. If Mr. Brahin is unable to serve as Plan Administrator, the Reorganized Debtors shall designate a substitute Plan Administrator. All distributions to be made under the Plan shall be made by the Plan Administrator. The duties and powers of the Plan Administrator shall include, but not be limited to, the following:

(i)     To exercise all power and authority that may be necessary to implement the Plan, commence and prosecute all proceedings that may be commenced and take all actions that may be taken by any officer, director or shareholder of the Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including consummating the Plan;

(ii)     To maintain all bank accounts, make distributions and take other actions consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Reorganized Debtors;

(iii)     To take all steps reasonably necessary and practicable to continue the corporate existence of the Reorganized Debtors;

(iv)     To make decisions regarding the retention or engagement of professionals or other persons by the Reorganized Debtors to undertake the duties necessary to consummate the Plan, and to pay, without court approval, all reasonable fees and expenses of the Reorganized Debtors relating to the Chapter 11 Cases that accrue from and after the Effective Date;

(v)     To take all other actions not inconsistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable in connection with the administration and consummation of the Plan; and

(vi)     To exercise such other powers as may be vested in the Plan Administrator by order of the Bankruptcy Court.

6.     Retention of Jurisdiction by the Bankruptcy Court.

Pursuant to the Plan, the Bankruptcy Court shall retain jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)     To hear and determine any and all adversary proceedings, applications and contested matters, even if filed after the Confirmation Date;

(b)     To hear and determine any objections to Administrative Expense Claims or Claims;

(c)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(d)     To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(e)     To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(f)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(g)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan as is necessary to ensure that the purpose of the Plan is carried out;

(h)     To recover all assets of the Debtors and property of their Estates, wherever located;

(i)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(j)     To hear and determine any requests by the Debtors to sell any asset pursuant to section 363 of the Bankruptcy Code;

(k)     To hear any other matter not inconsistent with the Bankruptcy Code;

(l)     To enter a final decree closing the Chapter 11 Case;

(m)     To enforce and interpret the terms and conditions of this Plan or the Confirmation Order;

(n)     To correct any defect, cure any omission or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to implement the purposes and intent of this Plan;

(o)     To determine any other matters not inconsistent with the Bankruptcy Code; and

(p)     To seek entry of such orders and/or take such action as is necessary to enjoin any interference with the implementation or the consummation of this Plan.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction, or is otherwise without jurisdiction over any matter set forth in this Article, or if the Debtors or

Reorganized Debtors elect to bring an action or proceeding in any other forum, then the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court, public authority, or commission having competent jurisdiction over such matters.

7.    Modification of the Plan.

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors, with the consent Merrill Lynch and the Committee, at any time prior to the Confirmation Date, provided that the Plan, as altered or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, or modified by the Debtors at any time after the Confirmation Date and before substantial consummation, with the consent of Merrill Lynch and the Committee, provided that the Plan, as altered, or modified, satisfies the requirements of sections 1122, 1123, and 1127 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. Prior to the Effective Date, the Debtors may make appropriate technical non-material modifications to the Plan or the Disclosure Statement without further order or approval of the Bankruptcy Court, provided that such technical modifications do not adversely affect the treatment of holders of Claims and is approved by Merrill Lynch.

8.    Releases by Creditors.

Pursuant to Section 10.3 of the Plan, on the Effective Date and subject to the holder of an Allowed Claim receiving the treatment to which such holder is entitled under the Plan, and to the fullest extent permissible under applicable law, all holders of Claims that have not made the Creditor Opt-Out Election, in consideration for the obligations of the Released Parties under this Plan, will be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged each of the Released Parties from any and all claims or manner of action, suits, Causes of Action, actions, liens, agreements, promises, liabilities, demands, fees, costs and expenses, of any type whatsoever, direct or derivative, contract or tort, legal or equitable, indemnity or otherwise, known or unknown, common law or statutory, contingent or fixed, liquidated or unliquidated, matured or unmatured, that arise out of or relate in any way to any or all of the Debtors and/or any financing provided to the Debtors by Merrill Lynch or any Affiliate or any claim, act, fact, transaction, occurrence, statement or omission in connection therewith occurring up to and including the Effective Date. For the avoidance of doubt, the releases granted pursuant to Section 10.3 of the Plan include releases for the benefit of the Lender Released Parties.

9.    <u>Releases of Lender Released Parties by the Debtors and the Estates.</u>

In accordance with Section 10.2 of the Plan, as of the Effective Date, the Committee, the Debtors, their Estates, the Reorganized Debtors and the successors and assigns of any of them, and any other person that claims or might claim through, on behalf of, or for the benefit of any of the foregoing, shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged each of the Lender Released Parties from any and all claims or manner of action, suits, Causes of Action, actions, liens, agreements, promises, liabilities, demands, fees, costs and expenses, of any type whatsoever, direct or derivative, contract or tort, legal or equitable, indemnity or otherwise, known or unknown, common law or statutory, contingent or fixed, liquidated or unliquidated, matured or unmatured, that arise out of or relate in any way to any or all of the Debtors, any financing provided to the Debtors by Merrill Lynch or any Affiliate and any claim, act, fact, transaction, occurrence, statement or omission in connection therewith occurring at any time up to and including the Effective Date. Notwithstanding anything contained in Section 10.2, the foregoing is not intended to release the Lender Released Parties' obligations arising under this Plan.

10.    <u>Injunction.</u>

*Section 10.4 of the Plan provides that except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all Entities who have held, hold or may hold Claims against the Debtors and/or their estates, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors on account of any such Claim, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors or against the property of the Debtors, (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors, and (e) commencing or continuing in any manner any action or other proceeding of any kind with respect to any claims and Causes of Action which are extinguished, dismissed or released pursuant to the Plan. Such injunction shall extend to successors of the Debtors and their property and interests in property. None of the foregoing shall enjoin the rights of holders of Claims that arise under the Plan.*

11.    <u>Exculpation Provision.</u>

In accordance with Section 10.5 of the Plan, none of the Released Parties, nor any of their respective members, officers, directors, employees, advisors, professionals or agents shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, negotiations regarding or concerning the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, or any pre-petition acts or omissions to the maximum extent permissible under applicable law, except for willful misconduct or gross negligence, and, in all respects, the Released Parties, and each of their respective members, officers, directors, employees, advisors, professionals and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

12.    <u>Substantive Consolidation.</u>

On the Effective Date Date, the Debtors' Chapter 11 Cases, the Debtors, and the Debtors' Estates shall be deemed to be substantively consolidated for voting and distribution purposes only under this Plan. The assets and liabilities of the Debtors shall be pooled and all Claims shall be satisfied from the assets of a single consolidated estate. Any Claims against one or more of the Debtors shall be treated as a single Claim against the consolidated estate of the Debtors and shall be entitled to Distributions under this Plan only with respect to such single Claim.

13.    <u>Continued Corporate Existence and Vesting of Assets.</u>

(a)    Except as otherwise provided in the Plan, the Debtors will, as the Reorganized Debtors, continue to exist after the Effective Date as follows: NJMP shall retain its corporate existence; Operating shall be consolidated for all purposes into NJMP, and appropriate steps will be taken to dissolve Operating pursuant to New Jersey law; and Development and Urban shall each retain their corporate existence; with all the powers of a corporation, limited liability company, partnership or limited partnership, as appropriate, under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. The following will occur and be effective as of the date specified in the documents effectuating the Plan or as of the Effective Date, if no other effective date is specified in the documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by members or directors of the Debtors: (i) the adoption of new or amended and restated bylaw, operating agreements; (ii) entry into revised loan facilities with Merrill Lynch if NEI is the Successful Bidder; (ii) the distribution of Cash pursuant to the Plan; (iii) the establishment of the Disputed General Unsecured Claims Reserve; (iv) the adoption, execution, delivery and implementation of all contracts, agreements, leases, instruments, releases and other agreements or documents related to this Plan; (v) the issuance of the Reorganized Equity Interests; and (vi) the other matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors or any corporate action to be taken by or required of the Debtors or Reorganized Debtors.

(b)    Except as otherwise provided in the Plan, on the Effective Date, all property of the Debtors' estates, including the Retained Causes of Action, shall, in accordance with section 1141(c) of the Bankruptcy Code, vest in the Reorganized Debtors, free and clear of all Liens (except for Liens granted in connection with the Lender Debt Distribution), Claims, and Interests. In accordance with the Plan, on and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or Confirmation Order. Without limiting the foregoing, each of the Reorganized Debtors may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

33

14.    Management of Reorganized Debtors

Lee F. Brahin, Co-Managing Member of Holdings, shall continue to serve as the Manager of all Reorganized Debtors and is the sole insider retained by the Debtors. Mr. Brahin, although eligible for compensation (as he was pre-petition), shall receive no compensation for services rendered. Mr. Brahin shall continue to perform in the same fiduciary capacity for the Reorganized Debtors to manage and direct their operations.

15.    Tax Consequences of the Plan.

This Disclosure Statement does not address the particular federal income tax consequences that may be relevant to taxpayers under the federal income tax laws, nor does it discuss any aspect of federal, state, local or foreign tax laws that may be applicable to particular taxpayers. the tax consequences to holders of Claims and Interests, including the availability of worthless debt or worthless stock deductions, if any, may vary based on the individual circumstances of each holder. Each creditor and equity holder treated by the Plan is strongly urged to consult with its own tax advisor regarding the federal, state, local or foreign tax consequences of the Plan.

## VI.    CONFIRMATION OF THE PLAN

A.    Acceptance

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that: (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors comply with applicable provisions of the Bankruptcy Code; (iv) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (v) the Plan has been proposed in good faith and not by any means forbidden by law; (vi) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vii) the Plan is feasible and confirmation will likely not be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan; (viii) the Plan is in the "best interests" of all holders of Claims in impaired Classes by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; (ix) all fees and expenses payable under 28 U.S.C. Section 1930 (fees owing to the bankruptcy clerk and the United States Trustee) have been paid or the Plan provides for their payment on the Effective Date; and (x) if applicable, the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined under section 1114 of the Bankruptcy Code, at the level established prior to confirmation for the duration of the period that the Debtors have obligated themselves to provide such benefits.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that Class, but for that purpose counts only those who

actually vote to accept or reject the plan. Thus, a Class will have voted to accept a plan if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

B.    <u>Best Interest Test</u>

Notwithstanding acceptance of a Plan by the requisite majorities of the holders of Claims in Classes entitled to vote, in order to confirm a Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes impaired by the Plan. In order to confirm a Plan, the Bankruptcy Court must find that the Plan provides to each Entity who rejects the Plan a recovery which has a value at least equal to the value of the distribution which each such Entity would receive if all of a Debtor's assets which are property of its estate were liquidated under chapter 7 of the Bankruptcy Code.

To calculate what creditors would recover in a chapter 7 liquidation, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from a Debtor's remaining assets if the Chapter 11 Case was converted to chapter 7 and the assets were liquidated by a trustee in bankruptcy. Upon liquidation, the potential distribution available to creditors may be reduced (a) to the extent of the value of the Collateral securing the Claims of secured creditors, and (b) by the costs of liquidation under chapter 7, which costs would include the compensation of a trustee, disposition expenses, including possible transfer taxes which may not be payable under chapter 11, all unpaid expenses incurred by a Debtor during the Chapter 11 Case (such as compensation of professionals), litigation costs (if any), and Claims arising during the pendency of the Chapter 11 Case and the chapter 7 liquidation proceedings. There may be included chapter 11 Administrative Expense Claims for the failure of a Debtor to fulfill post-petition contracts, if any. These Claims would have to be paid in full out of the liquidation proceeds before the balance, if any, would be made available to pay unsecured creditors. Moreover, any proceeds available for distribution would be reduced by the cost attributable to the time value of money resulting from what is likely to be a more protracted proceeding.

The Debtors have evaluated the range of returns to holders of Claims under the Plan, and has compared that anticipated return with what the Debtors believe will be realized if a forced liquidation occurs under chapter 7 of the Bankruptcy Code. Based on this evaluation and the assumptions set forth in the liquidation analysis affixed as "Exhibit B" to this Disclosure Statement, the Debtors believe that the holders of Allowed General Unsecured Claims will obtain a recovery from the Estates under the Plan of a value in excess of what otherwise would be available if the remaining assets of the Debtors were liquidated and distribution made pursuant to chapter 7 of the Bankruptcy Code. Put differently, it seems much more likely that the assets available for distribution, will only be diminished in the context of a liquidation under chapter 7 than under the Plan and that holders of Allowed General Unsecured Claims would receive NO distribution in a liquidation.

The liquidation analysis for the Debtors contains estimates of the amount of Claims that may ultimately be Allowed Claims. These estimates are based solely upon the Debtors' preliminary review of Claims filed and the Debtors' books and records. No order has been entered to date estimating or otherwise fixing the amount of Claims at the projected amounts set

forth in the liquidation analysis. The estimates set forth therein should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

C.     Cramdown

The Bankruptcy Code contains provisions for confirmation of a plan even if a plan is not accepted by all impaired classes, as long as at least one impaired class of claims has voted to accept the plan. These "cramdown" provisions are set forth in Section 1129(b) of the Bankruptcy Code.

A Plan may be confirmed pursuant to the cramdown provisions if, in addition to satisfying other requirements of section 1129 of the Bankruptcy Code, the Plan: (i) "does not discriminate unfairly"; and (ii) "is fair and equitable with respect to each Class of claims or equity interests that is impaired under, and has not accepted, the Plan." As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have meanings unique to bankruptcy law.

The requirement that a plan "not discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of a similar value under a plan. By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each Class the same, the Debtors submit that the Plan does not "discriminate unfairly" with respect to any Class of Claims.

The "fair and equitable" standard, also known as the "absolute priority rule," has different meanings with respect to secured and unsecured claims. With respect to secured claims, for a plan to be fair and equitable, the plan may provide, among other things, that the holder of such claims retain the liens securing those claims to the extent of the allowed amount of such claims, and that such holder receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. Alternatively, a plan may provide for the realization by the holders of secured claims of the indubitable equivalent of such claims. Here, the Plan provides that the holders of all types of Secured Claims receive that which they are entitled to under section 1129 of the Bankruptcy Code by virtue of the treatment under the Plan which contemplates the payment by the Debtor of Cash in an amount sufficient to satisfy any the reduced Allowed Secured Claims or the surrender of the Collateral securing any such Allowed Secured Claims.

With respect to a Class of unsecured creditors, a plan can be fair and equitable if it provides that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date, equal to the Allowed amount of the Claim, or if it provides that the holder of a Claim or interest that is junior to the Claims of such Class will not receive or retain under a Plan on account of such junior Claim or interest any property.

36

Pursuant to Section 1129(b) of the Bankruptcy Code, the Debtors intends to request confirmation of the Plan in the event that all of the applicable requirements of Section 1129(a), other than Section 1129(a)(8), are met.

D.      Feasibility

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization unless such liquidation or reorganization is proposed in the Plan.  The Plan provides for the reorganization of the Debtors' assets without the expectation that it will be followed by liquidation.

Attached to this Disclosure Statement as "Exhibit C" is the projected cash flow and summary Budget of the Debtors from the anticipated Effective Date going forward.  This Budget demonstrates that if the Plan as submitted is confirmed, and the transactions contemplated thereunder are consummated, it is highly unlikely that the Debtors will liquidate or will need further financial reorganization.  The Debtors therefore believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

## VII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, (ii) liquidation of the Debtors under chapter 11 of the Bankruptcy Code, and (iii) the preparation and presentation of an alternative plan of reorganization.

A.      Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the few remaining assets of the Debtor.  A discussion of the anticipated effect that a chapter 7 liquidation would have on the recoveries of holders of Claims is set forth above.  The Debtors believe that liquidation under chapter 7 would result in the elimination of a Plan Pool to be used to pay Allowed Claims, as well as the inability to pay, among other things, additional administrative expenses attendant to the appointment of a trustee, the trustee's employment of professionals, and any litigation costs.  Without the reduction of Merrill Lynch's Secured Claim, and without the infusion of Cash by NEI or any Successful Bidder, there would be no payment of General Unsecured Claims.

B.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest if the Debtors' exclusivity period has expired or has been terminated, could attempt to formulate a different plan or Plan of reorganization.  Because the Plan as proposed calls for the reorganization of the Debtors' assets and the distribution of Cash in accordance with the priorities of the Bankruptcy Code, it is difficult to conceive of an alternative plan of reorganization.  The Plan, in the opinion

of the Debtors, represents the best alternative to protect the interests of creditors and parties in interest.

## VIII.   EFFECT OF CONFIRMATION OF THE PLAN

In accordance with section 1141 of the Bankruptcy Code, the provisions of the Plan, if confirmed, will bind the Debtors and all creditors. The Plan binds the holders of Claims, whether or not a Claim is impaired under the Plan, and whether or not the holder of such Claim has accepted the Plan.

## IX.   RISK FACTORS

The distributions and recoveries set forth in this Disclosure Statement are based on the Debtors' estimates of Allowed Claims. The Debtors project that the Claims asserted against them will be resolved and reduced to an amount that approximates their estimates and may seek an order or orders from the Bankruptcy Court estimating the dollar amount of certain Allowed and Disputed Claims. There can be no assurance that such assumptions will prove accurate. In addition, if and to the extent that the Debtors have underestimated the amount of Allowed Claims or reserves for Disputed Claims, the Debtors could be required to redirect Cash to such disputed Cash reserves, resulting in a potential dilution of Available Cash. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and their implementation. The Debtors reserve the right to object to the amount and classification of any Claim. Thus, the estimates set forth in this Disclosure Statement and the Analysis affixed hereto cannot be relied upon by any creditor whose Claim is subject to a successful objection. Any such creditor may not receive the estimated distributions set forth herein.

## X.   CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. THUS, THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND URGE ALL SUCH HOLDERS THAT ARE ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

Respectfully submitted,

New Jersey Motorsports Park, LLC

By:    /s/ Lee F. Brahin_____
       Lee F. Brahin
       Co-Manager of Managing Member
       Dated: May 24, 2011

Cohen Seglias Pallas Greenhall & Furman, PC

By:    s/Steven D. Usdin_____
       Steven D. Usdin, Esquire
       Nella M. Bloom, Esquire (NB3891)

30 South 17th Street, 19th Floor
Philadelphia, PA  19103
215-564-1700
Counsel for the Debtors

Dated:  May 24, 2011

## Exhibit A:
## Preservation of Litigation

The Debtors preserve their right to file, pursue, litigate, and/or settle claims arising pre-petition and/or as a result of the filing of the Debtors' Chapter 11 Cases against the following:

601 Information Systems, LLC
Aetna
Atlantic City Electric
Barlen Group
Comcast Cable
Front Row Marketing
Kavanaugh, Kavanaugh & DiLazzero, LLC
Liberty Power
Lipsky & Brandt
Maurice River Trading Co.
Ovations Food Services, LP
Resort Data Processing
Riggins, Inc.
Robert A. McAllister, CPA
SSC East
State of New Jersey - UEZ Tax
SYSCO Philadelphia
TD Card Services
Verizon, Inc.
Verizon Credit, Inc.

Pursuant to the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in the bankruptcy court, certain transfers of the debtor's property, including payments of cash, made while the debtor was insolvent during the ninety (90) days immediately prior to the commencement of the bankruptcy case (or, in the case of a transfer to, or on behalf of, an "insider," one year prior to the commencement of the bankruptcy case) in respect of antecedent debts to the extent the transferee received more than it would have received on account of such pre-existing debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code. Such transfers include cash payments, pledges of security interests or other transfers of an interest in property. In order to be preferential, such payments must have been made while the debtor was insolvent; debtors are presumed to have been insolvent during the 90–day preference period.

However, there are certain defenses to preference claims. For example, transfers made in the ordinary course of the debtor's and the transferee's business according to ordinary business terms are not recoverable. Furthermore, if the transferee extended credit contemporaneously with or subsequent to the payment, and prior to the commencement of the bankruptcy case, for which the defendant was not repaid, such extension constitutes an offset against an otherwise recoverable transfer of property. If a payment is recovered by a debtor, the defendant has a general unsecured claim against the debtor to the extent of the recovery.

Under the Plan, all Causes of Action will be preserved including preference claims and all other claims under Chapter 5 of the Bankruptcy Code. The extent of recoveries from such claims is uncertain and speculative in nature.

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, CREDITORS AND INTEREST HOLDERS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE COMMENCEMENT DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION OF ANY TYPE OR NATURE, AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.

## Exhibit B:
## Liquidation Analysis

If a chapter 11 plan is not confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the assets of the Debtors. A discussion of the anticipated effect that a chapter 7 liquidation would have on the recoveries of holders of Claims is set forth above. Liquidation under chapter 7 would result in the elimination of the Plan Pool to be used to pay Allowed Claims of General Unsecured Creditors, as well as eliminate the Debtors' ability to pay, among other things, additional administrative expenses attendant to the appointment of a trustee, the trustee's employment of professionals, and any litigation costs.

The following constitutes a liquidation analysis reflecting the anticipated distributions available to pay Allowed General Unsecured Claims in the event that the Chapter 11 Cases are converted to cases under Chapter 7:

| ASSETS | VALUE | LIQUIDATION VALUE |
|---|---|---|
| Cash | $41,680.00 | $10,000.00 |
| Accounts Receivable | $9,372.31 | $0 |
| Real Property | $21,075,000.00 | $18,000,000.00 |
| Inventory | $44,168.88 | $10,000.00 |
| Equipment, Office Furnishings, Vehicles | $456,902.00 | $200,000.00 |
| Licenses | $180,000.00 | $0 |
| Other Assets | $26,397.54 | $5,000.00 |
| TOTAL ASSETS | **$21,824,167.02** | **$18,225,000.00** |

### LIABILITIES

| | |
|---|---|
| Secured Claim of Merrill Lynch | ($30,543,205.13) |
| Administrative Claims for Professionals and Chapter 7 Trustee Fees (estimated) | ($15,000.00) |
| United States Trustee Fees (estimated) | ($2,600.00) |
| **TOTAL LIABILITIES** | **($30,560,805.13)** |

### TOTALS

| | |
|---|---|
| Liquidation Value of Assets | $18,225,000.00 |
| Liabilities | ($30,560,805.13) |
| **NET AVAILABLE FOR UNSECURED CREDITORS** | **$0** |

The Plan, as proposed, provides a Plan Pool of $500,000.00 for distribution for Allowed General Unsecured Claims. Only if the Plan is confirmed will these funds be available for distribution pursuant to the Funding as provided by NEI.

In the event of a liquidation, as demonstrated above, there will be no funds available for any distribution to General Unsecured Creditors.

**Exhibit C:**
**Summary Budget**

#1269586-v1 50919-0001

NJMP Operating Budget  (WITH EVENTS)
2011 -2012 Budget

| | July 11 | Day of | Aug 11 | Sept 11 | Oct 11 | Nov 11 | Dec 11 | Jan 12 | Feb 12 | March 12 | Apr 12 | May 12 | June 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Confirmation | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Total |
| **Club House** | | | | | | | | | | | | | | |
| Club Track Days | 18,500 | | 22,000 | 18,500 | 18,500 | 6,000 | - | - | - | 12,000 | 18,000 | 18,000 | 18,500 | 150,000 |
| Club House Initiation Fees | 35,000 | | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 40,000 | 40,000 | 25,000 | 30,000 | 35,000 | 385,000 |
| Club House Dues | 42,000 | | 36,000 | 17,000 | 17,000 | 9,000 | 9,000 | 35,000 | 55,000 | 45,000 | 60,000 | 55,000 | 45,000 | 425,000 |
| Total Club House | 95,500 | | 88,000 | 65,500 | 65,500 | 45,000 | 39,000 | 65,000 | 95,000 | 97,000 | 103,000 | 103,000 | 98,500 | 960,000 |
| | | | | | | | | | | | | | | |
| Track Deposits Already Received | (50,000) | | (45,000) | (46,500) | (20,500) | (20,000) | 75,000 | 125,000 | 150,000 | 125,000 | (40,000) | (45,000) | (65,600) | 142,400 |
| Track Rentals | 420,000 | | 447,000 | 447,000 | 440,000 | 150,000 | - | - | - | 110,000 | 340,000 | 457,000 | 447,000 | 3,258,000 |
| Kart Track Income | 125,000 | | 125,000 | 125,000 | 45,000 | 25,000 | - | - | - | 25,000 | 85,000 | 115,000 | 125,000 | 795,000 |
| Spectator Events | 150,000 | | 50,000 | 300,000 | - | - | - | - | - | - | 25,000 | 25,000 | - | 550,000 |
| Season Ticket Sales | - | | - | - | - | 12,500 | 37,500 | - | - | 1,200 | - | - | - | 51,200 |
| Food  & Beverage Ops | 240,000 | | 90,000 | 225,000 | 80,000 | 25,000 | 50,000 | - | 8,840 | 7,350 | 75,000 | 90,000 | 100,000 | 991,190 |
| Other: | | | | | | | | | | | | | | |
| Fuel Sales Gross | 44,000 | | 58,134 | 45,000 | 45,000 | 22,500 | - | - | - | 16,000 | 51,211 | 53,711 | 70,000 | 405,466 |
| Gift Shop/Pro Shop Rentals | 3,500 | | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | - | - | 2,000 | 3,500 | 3,500 | 3,500 | 33,500 |
| RV Parking & Camping Income | 21,000 | | 20,000 | 21,000 | 5,000 | 3,000 | - | - | - | - | - | 5,000 | 15,000 | 90,000 |
| Golf Cart Rental | 2,000 | | 1,500 | 3,000 | - | - | - | - | - | - | 1,500 | 3,000 | 1,500 | 12,500 |
| Parking Income | 10,500 | | 1,500 | 15,000 | 1,500 | 1,500 | - | - | - | - | - | 1,500 | 8,500 | 40,000 |
| Programs | - | | - | 4,000 | - | - | - | - | - | - | - | - | - | 4,000 |
| Sponsorship Income | 50,000 | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 112,000 | 65,000 | - | 30,000 | 60,000 | 60,000 | 627,000 |
| Event Sponsorship | 50,000 | | - | - | - | - | - | - | - | - | 25,000 | - | - | 125,000 |
| VIP Garages | 2,000 | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | - | - | 2,000 | 2,000 | 2,000 | 2,000 | 20,000 |
| Event Garages | 4,500 | | 4,500 | 14,000 | 4,500 | 4,500 | 4,500 | - | - | 2,500 | 3,500 | 4,500 | 4,500 | 51,500 |
| VIP Suite Rental | 63,970 | | 63,970 | 62,100 | 36,110 | 13,200 | 6,820 | - | - | 4,500 | 23,100 | 32,690 | 48,900 | 355,350 |
| Shade Tree Garages | 6,000 | | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 3,000 | 2,000 | 4,000 | 5,000 | 6,000 | 6,000 | 62,000 |
| | | | | | | | | | | | | | | |
| **TOTAL REVENUE** | 1,237,970 | | 966,104 | 1,391,600 | 763,600 | 343,700 | 274,320 | 305,000 | 320,840 | 396,550 | 707,721 | 941,901 | 924,800 | 8,574,106 |
| | | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Wages | 318,058 | | 280,064 | 310,558 | 220,938 | 143,463 | 115,429 | 90,500 | 94,442 | 135,956 | 230,981 | 260,365 | 273,908 | 2,474,660 |
| Payroll Taxes | 34,986 | | 30,807 | 34,161 | 24,303 | 15,781 | 12,697 | 9,955 | 10,389 | 14,955 | 25,408 | 28,640 | 30,130 | 272,213 |
| Operating Expenses | 728,764 | | 439,155 | 685,589 | 358,222 | 179,068 | 176,779 | 180,160 | 102,042 | 233,512 | 456,876 | 448,483 | 409,232 | 4,397,883 |
| Interest Expense - ML/BOA - Senior Note | - | | 45,833 | 45,833 | 45,833 | 45,833 | 45,833 | 45,833 | 45,833 | 45,833 | 45,833 | 45,833 | 45,833 | 504,166 |
| **Total Operating Expenses** | 1,081,808 | | 795,859 | 1,076,142 | 649,296 | 384,145 | 350,739 | 326,448 | 252,706 | 430,256 | 759,097 | 783,322 | 759,103 | 7,648,921 |
| | | | | | | | | | | | | | | |
| **Available Cash from Operations** | 156,162 | | 170,245 | 315,458 | 114,304 | (40,445) | (76,419) | (21,448) | 68,134 | (33,706) | (51,376) | 158,579 | 165,697 | 925,185 |
| | 12.6% | | 17.6% | 22.7% | 15.0% | -11.8% | -27.9% | -7.0% | 21.2% | -8.5% | -7.3% | 16.8% | 17.9% | 10.8% |
| | | | | | | | | | | | | | | |
| **Other Cash Activities** | | | | | | | | | | | | | | |
| New Investment | | 2,000,000 | | | | | | | | | | | | 2,000,000 |
| | | | | | | | | | | | | | | |
| **Payment Of Prior Debts:** | | | | | | | | | | | | | | |
| Bankruptcy and Professional Fees | 75,000 | 404,000 | | | | | | | | | | | | 479,000 |
| Payoff of Unsecured Creditors | | 500,000 | | | | | | | | | | | | 500,000 |
| Sales Tax Installment | | 50,000 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 78,600 |
| Trustees Fee | 10,725 | | | | | | | | | | | | | 10,725 |
| Ovations | 12,052 | 209,489 | 12,052 | 12,052 | 12,052 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 12,052 | 12,052 | 12,052 | 313,853 |
| MRS Payback | 200,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 255,000 |
| Working Capital | | 500,000 | | | | | | | | | | | | 500,000 |
| Escrow Activity | | 336,000 | 101,500 | 101,500 | 41,500 | (70,004) | (95,392) | (125,042) | (65,042) | (96,291) | (108,545) | 116,833 | 116,833 | 253,850 |
| Preferred Return | | | | | | | 125,000 | | | | | | | 125,000 |
| Transfer of Working Capital to Cash | | (500,000) | | | | | | | | | | | | (500,000) |
| Capital Projects | | 75,000 | | | | | | | | | | 150,000 | | 225,000 |
| **Total** | 297,777 | 1,499,489 | 196,152 | 121,152 | 61,152 | (58,404) | 41,208 | (113,442) | (53,442) | (84,691) | 61,107 | 136,485 | 136,485 | 2,241,028 |
| | | | | | | | | | | | | | | |
| Beginning Cash Balance | 311,321 | 169,706 | 670,217 | 644,310 | 838,616 | 891,768 | 909,727 | 792,100 | 884,094 | 1,005,670 | 1,056,655 | 944,171 | 966,266 | 311,321 |
| | | | | | | | | | | | | | | |
| Ending Cash Balance | 169,706 | 670,217 | 644,310 | 838,616 | 891,768 | 909,727 | 792,100 | 884,094 | 1,005,670 | 1,056,655 | 944,171 | 966,266 | 995,478 | 995,478 |

NJMP Operating Budget

| EXPENSES: | July Budget | August Budget | September Budget | October Budget | November Budget | December Budget | January Budget | February Budget | March Budget | April Budget | May Budget | June Budget | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Personnel Cost:** | | | | | | | | | | | | | |
| Track Operations | 61,905 | 72,355 | 61,905 | 65,655 | 28,119 | 13,332 | 12,235 | 12,235 | 25,253 | 61,905 | 65,655 | 71,405 | 551,959 |
| Food & Beverage | 80,916 | 35,916 | 76,416 | 32,916 | 16,416 | 23,916 | 8,916 | 8,916 | 16,416 | 31,416 | 35,916 | 38,916 | 406,992 |
| Housekeeping | 13,000 | 13,000 | 13,000 | 8,000 | 5,000 | 5,000 | 3,000 | 3,000 | 5,000 | 8,000 | 11,000 | 12,000 | 99,000 |
| Events | 9,144 | 9,144 | 9,144 | 2,286 | 2,286 | 2,286 | - | - | 2,078 | 8,312 | 9,144 | 9,144 | 62,968 |
| Security | 33,366 | 29,166 | 33,366 | 21,816 | 20,766 | 13,836 | 13,416 | 15,516 | 20,766 | 21,816 | 24,966 | 13,836 | 262,632 |
| Karting | 39,745 | 38,245 | 36,745 | 25,232 | 13,597 | 5,000 | 5,000 | 6,296 | 13,814 | 32,600 | 37,100 | 37,495 | 290,868 |
| Membership | 9,916 | 9,916 | 9,916 | 6,416 | 6,416 | 6,416 | 3,750 | 7,416 | 7,416 | 7,916 | 8,916 | 9,916 | 94,326 |
| Maintenance | 31,544 | 33,800 | 31,544 | 20,095 | 13,900 | 9,400 | 9,600 | 9,000 | 13,500 | 21,544 | 32,296 | 31,544 | 257,767 |
| Administration | 38,522 | 38,522 | 38,522 | 38,522 | 36,963 | 36,243 | 34,163 | 34,163 | 36,963 | 38,522 | 38,522 | 38,522 | 448,148 |
| **TOTAL WAGES** | 318,058 | 280,064 | 310,558 | 220,938 | 143,463 | 115,429 | 90,500 | 94,442 | 135,956 | 230,981 | 260,365 | 273,908 | 2,474,660 |
| | | | | | | | | | | | | | |
| Payroll Taxes | 34,986 | 30,807 | 34,161 | 24,303 | 15,781 | 12,697 | 9,955 | 10,389 | 14,955 | 25,408 | 28,640 | 30,130 | 272,213 |
| | | | | | | | | | | | | | |
| **GENERAL & ADMINISTRATIVE COST:** | | | | | | | | | | | | | |
| Advertising/Marketing | 55,000 | 55,000 | 50,000 | 10,000 | 10,000 | 10,000 | 10,000 | - | 25,000 | 35,000 | 55,000 | 55,000 | 370,000 |
| Banking and Credit Card Fees | 17,730 | 13,629 | 19,467 | 11,248 | 4,501 | 2,887 | 1,618 | - | 4,140 | 11,604 | 13,744 | 15,142 | 115,710 |
| Club House/Membership Oper. Exp | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 500 | 5,000 | 5,000 | 5,000 | 5,000 | 55,500 |
| Fuel Costs | 35,200 | 46,507 | 33,750 | 33,750 | 16,875 | - | - | - | 9,949 | 40,897 | 42,969 | 56,000 | 315,897 |
| Food & Beverage Cost (COS - Operating) | 120,000 | 96,000 | 112,500 | 40,000 | 12,500 | 25,000 | - | - | 12,500 | 10,000 | 30,000 | 36,000 | 494,500 |
| EMT | 71,055 | 80,740 | 71,055 | 78,950 | 19,738 | - | - | - | 12,413 | 71,055 | 78,950 | 78,950 | 562,906 |
| Equipment Rentals | 16,500 | 16,500 | 16,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 83,500 | 8,500 | 8,500 | 201,000 |
| Event Costs | 66,000 | - | 116,000 | - | | | | | - | | 10,000 | | 192,000 |
| Ground Maintenance/ waste | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Health Insurance | 6,000 | 6,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 6,000 | 6,000 | 6,000 | 79,000 |
| Insurance: | 6,421 | 6,421 | 49,559 | 23,993 | 24,171 | 49,559 | 19,229 | 19,209 | 50,458 | 22,712 | 22,712 | 33,532 | 327,956 |
| Kart Track | 21,375 | 19,875 | 15,925 | 5,948 | 1,950 | | | | 4,718 | 17,625 | 22,125 | 19,125 | 128,666 |
| Miscellaneous Expense | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Office Expenses | 10,150 | 10,150 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 10,150 | 10,150 | 10,150 | 92,750 |
| Professional Fees | 15,000 | 15,000 | | | | | - | | 25,000 | 15,000 | 15,000 | 15,000 | 100,000 |
| Property Taxes | 60,000 | | | 60,000 | | | 60,000 | | | 60,000 | | | 240,000 |
| Sanctioning Fees | 150,000 | | 120,000 | - | - | | | | | | 60,000 | | 330,000 |
| Software and Support | 7,500 | 7,500 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 7,500 | 7,500 | 7,500 | 51,500 |
| Sponsorships Comm & Cost | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 129,998 |
| Event Sponsorship Commission | 5,000 | - | | 5,000 | | | | | | | | 2,500 | 12,500 |
| Supplies | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 72,000 |
| Telephone Expense | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| Travel & Entertainment | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | - | 2,000 | 2,000 | 2,000 | 2,000 | 22,000 |
| Utilities | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 252,000 |
| Vehicle Expenses | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 54,000 |
| | | | | | | | | | | | | | |
| **Total Expense** | 728,764 | 439,155 | 685,589 | 358,222 | 179,068 | 176,779 | 180,160 | 102,042 | 233,512 | 456,876 | 448,483 | 409,232 | 4,397,883 |

NJMP Operating Budget  (WITH EVENTS)
2011 - 2012 Budget

| | July 11 Confirmation Budget | Aug 11 Budget | Sept 11 Budget | Oct 11 Budget | Nov 11 Budget | Dec 11 Budget | Jan 12 Budget | Feb 12 Budget | March 12 Budget | Apr 12 Budget | May 12 Budget | June 12 Budget | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Escrow Activity** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Allocation to Reserve:** | | | | | | | | | | | | | |
| Insurance | **76,000** | 36,500 | 36,500 | 36,500 | | | | | | | 31,000 | 31,000 | 247,500 |
| Property Taxes | **60,000** | 40,000 | 40,000 | 40,000 | | | | | | 20,000 | 40,000 | 40,000 | 280,000 |
| Interest - Senior Note | **200,000** | 25,000 | 25,000 | 25,000 | | | | | | | 45,833 | 45,833 | 366,666 |
| Interest - Preferred Return | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | - |
| **Disbursements from Reserve:** | | | | | | | | | | | | | |
| Insurance | | | | | (24,171) | (49,559) | (19,209) | (19,209) | (50,458) | (22,712) | | | (185,318) |
| Property Taxes | | | | (60,000) | | | (60,000) | | | (60,000) | | | (180,000) |
| Property Taxes | | | | | | | | | | | | | - |
| Interest - Senior Note | | | | | (45,833) | (45,833) | (45,833) | (45,833) | (45,833) | (45,833) | | | (274,998) |
| Interest - Preferred Return | | | | | | | | | | | | | - |
| | - | 336,000 | 101,500 | 101,500 | 41,500 | (70,004) | (95,392) | ###### | (65,042) | (96,291) | ###### | 116,833 | 116,833 | 253,850 |

| Taxes: | |
|---|---|
| Property Taxes - NJMP | 180,000 |
| Property Taxes - Development | 60,000 |
| | 240,000 |
| | |
| Insurance | |
| WC | 160,000 |
| GL | 101,551 |
| Auto D&O | 28,494 |
| Property | 16,316 |
| | 22,022 |
| | 328,383 |

**Exhibit D:**
**Proposed Ownership of NEI**

COHEN, SEGLIAS, PALLAS,
GREENHALL & FURMAN, PC
Steven D. Usdin, Esquire
Nella M. Bloom, Esquire (NB3891)
30 South 17th Street, 19th Floor
Philadelphia, PA 19103
Tel: (215) 564-1700
Fax: (215) 564-3066
Email:  susdin@cohenseglias.com
        nbloom@cohenseglias.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>NEW JERSEY MOTORSPORTS PARK, LLC, *et al.*,<br><br>Debtors | Chapter 11<br><br>Case No. 11-16752 JHW<br><br>Jointly Administered |

### NOTICE OF THE PROPOSED OWNERSHIP OF NEI MOTORSPORTS, LLC

New Jersey Motorsports Park, LLC ("NJMP"), New Jersey Motorsports Park Operating Company, LLC ("Operating"), New Jersey Motorsports Park Urban Renewal, LLC ("Urban"), and New Jersey Motorsports Park Development Associates, LLC ("Development") (collectively the "Debtors"), pursuant to the direction of the United States Bankruptcy Court for the District of New Jersey, hereby file Notice of the proposed Ownership of NEI Motorsports, LLC ("NEI").

There are two (2) groups of investors in NEI: Lightning Investment Partners, and P47 Investment Partners.  Each group of investors holds equal voting rights.

*Lightning Investment Partners*

| Investor | Investment in NEI | Ownership in NJMP |
|---|---|---|
| Darius Grala | $100,000.00 | N/A |
| Garrett Kletjian | $100,000.00 | N/A |
| Mark Greenberg | $50,000.00 | N/A |

| Ira Goldberg | $100,000.00 | An owner of Longview Investment, LLC, the owner of a 22.22% equity interest in Thunderbolt Investment Partners, LLC, the 14% equity owner of NJMP Holding Company, LLC, the 38.4165% owner of NJMP |
| Dana Martin | $50,000.00 | Owner of a 22.22% equity interest in Thunderbolt Investment Partners, LLC, the 14% equity owner of NJMP Holding Company, LLC, the 38.4165% owner of NJMP |
| Peter Bassett | $50,000.00 | Owner of a 22.22% equity interest in Thunderbolt Investment Partners, LLC, the 14% equity owner of NJMP Holding Company, LLC, the 38.4165% owner of NJMP |
| RJ Valentine | $650,000.00 | Owner of an 33.34% equity interest in Thunderbolt Investment Partners, LLC, the 14% equity owner of NJMP Holding Company, LLC, the 38.4165% owner of NJMP |

*P47 Investment Partners*

| Investor | Investment in NEI | Ownership in NJMP |
| --- | --- | --- |
| Lee Brahin | $650,000.00 | Owner of an 52.874% equity interest in NJMP Associates, LLC, the 86% equity owner of NJMP Holding Company, LLC, the 38.4165% owner of NJMP |

2

| Norman Cahan | $200,000.00 | An owner of Cahan & Associates and of Cahan Investment Company, LP, which each own 2.325% of NJMP Associates, LLC, the 86% equity owner of NJMP Holding Company, LLC, the 38.4165% owner of NJMP |
| Harvey Siegel | $200,000.00 | An owner of Siegel Investors, LLC, the 36.674% owner of NJMP Associates, LLC, the 86% equity owner of NJMP Holding Company, LLC, the 38.4165% owner of NJMP |

**COHEN, SEGLIAS, PALLAS,
GREENHALL & FURMAN, P.C.**

/s/ Nella M. Bloom
_____
**Steven D. Usdin, Esquire
Nella M. Bloom, Esquire**
30 South 17th Street, 19th Floor
Philadelphia, PA 19103
(215) 564-1700
*Attorney for the Debtors*

Dated: May 16, 2011